# EXHIBIT A

FILE COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LAKELAND PARTNERS, L.L.C., d/b/a LAKELAND NURSING HOME, Plaintiff, v. THE UNITED STATES, Defendant. | ) | No. 06-295C (Chief Judge Damich) |

**DEFENDANT'S FIRST AMENDED RESPONSE TO PLAINTIFF'S INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits its amended responses to plaintiff's interrogatories.

DEFENDANT'S RESPONSES

INTERROGATORY NO. 22:

Please list the individuals whom you contend would have had authority to bind ICE and/or DIHS in contract with Lakeland for the provision of healthcare services to detainees, such as Duncan Nyanjong.

Response:

The Government reaffirms its objection to this question as overbroad, burdensome and not specific in time period. Subject to that objection, defendant responds as follows: In 2004, when Mr. Nyanjong was placed at Lakeland Nursing home, the Department of Homeland Security, Immigration and Customs Enforcement (ICE) and the Department of Health and Human Services, Health Resources and Services Administration, Bureau of Primary Health Care entered into an Interagency Agreement (GOV 0001-0009). The Interagency Agreement provided

that the Division of Immigration Health Services (DIHS) served as the medical authority for ICE and provided all of the services set out in the Interagency Agreement, as well as management, direction, coordination and oversight of these services. In support of this, DIHS was responsible for providing or arranging the most clinically appropriate and cost effective health care services for ICE detainees. (GOV 0328-0437). As part of this support, the Department of Health and Human Services; Program Support Center (PSC), entered into various contracts with health care providers to support DIHS in its mission to provide medical services to ICE. According to documents previously provided to plaintiff, in 2003 the PSC entered into a contract with CRAssociates to provide, in part, a nationwide integrated health care system, including a managed care network of providers and medical facilities offering off-site health care services. (GOV 0328-0437). Because these contracts were entered into through the HHS or PSC on ICE's behalf, the Government contends that the only individuals who would have authority to bind ICE and/or DIHS in contract with Lakeland for the provision of healthcare services to detainees, such as Duncan Nyanjong, would be Contracting Officers with either HHS or PSC. At the time Mr. Nyanjong was placed at Lakeland Nursing home (i.e., in 2004) the Contracting Officer on the PSC contract was Joseph J.E. Pirrone.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

STEVEN J. GILLINGHAM
Assistant Director

CARRIE DUNSMORE
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: (202) 305-7576

January 22, 2008

Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that on this 22nd day of January 2008, I caused to be mailed via email and United States mail copies of "DEFENDANT'S FIRST AMENDED RESPONSE TO PLAINTIFF'S INTERROGATORIES" addressed as follows:

Michael Reese Davis
Hymel Davis & Petersen, L.L.C.
10602 Coursey Boulevard
Baton Rouge, Louisiana 70816
(225) 755-1060

/S/Carrie A. Dunsmore

# EXHIBIT B

ORIGINAL

FILED
APR 14 2006
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LAKELAND PARTNERS, L.L.C.
d/b/a LAKELAND NURSING HOME

V.

THE UNITED STATES

06-295C

**COMPLAINT**

1.

This court has jurisdiction pursuant to 41 U.S.C. § 609(a)(1).

2.

Petitioner, Lakeland Partners, L.L.C. is a Louisiana limited liability company, which owns and operates Lakeland Nursing Home in Pineville, Louisiana.

3

In April 2004, Lakeland Nursing Home of Pineville, Louisiana, (Lakeland) was contacted regarding the care of I.N.S. detainee Duncan Nyanjong.

4.

Nyanjong was suffering from HIV, dementia, seizure disorder, and respiratory failure. *See* Request for Medical Eligibility Determination, attached hereto as Exhibit A.

5.

On behalf of the U.S. Immigration and Customs Enforcement (ICE) and

the Division of Immigration Health Services (DIHS), Jay Seligman negotiated the terms of Nyanjong's placement at Lakeland.

6.

Lakeland and Mr. Seligman agreed that the monthly rate would be $2,964 plus pharmacy costs; any additional costs outside the normal services provided would need prior approval by DIHS.

7.

In connection with the admission of Nyanjong, Mr. Seligman completed the Request for Medical Eligibility Determination, wherein he indicated that DIHS would be the responsible party for payment. *See* Request for Medical Eligibility Determination, attached hereto as Exhibit A.

8.

Mr. Seligman also indicated that Nyanjong's placement at Lakeland was "permanent." *Id.*

9.

Mr. Seligman also personally assured Hank Cooley, the Lakeland administrator, that DIHS/ICE would pay all costs associated with Nyanjong's care.

10.

On May 12, 2004, Lakeland received Nyanjong as a patient.

11.

Lakeland treated Nyanjong without incident until January 15, 2005, when a nurse found him on the floor and unresponsive.

12.

Nyanjong was transferred to Huey P. Long Hospital, which diagnosed him with respiratory failure and placed him in the ICU on a ventilator.

13.

On February 4, 2005, Nyanjong was returned to Lakeland, too weak to ambulate or take are of himself.

14.

Nyanjong was wheelchair-bound and too weak to ambulate; he could not feed, clean, or otherwise care for himself; mentally he was unable to understand anything beyond simple commands.

15.

As a result of Nyanjong's admission to Huey P. Long Hospital, DIHS caused ICE to reconsider Nyanjong's status.

16.

It appears that ICE went before an immigration judge and requested and received an order to release Nyanjong because he was too sick.

17.

In February 2005, Christopher Jacobs with ICE informed Lakeland that

Nyanjong was going to be discharged effective March 1, 2005, because Nyanjong was no longer a threat to society.

18.

Lakeland requested a 30-day extension in order to locate another facility to care for Nyanjong, or another payor source.

19.

Eventually, Mr. Jacobs faxed to Lakeland an Order to Release Nyanjong on April 1, 2005. *See* Order to Detain or Release Alien, attached hereto as Exhibit B.

20.

Licensing standards for nursing homes, as well as Medicare and Medicaid regulations, prevented Lakeland from simply discharging Nyanjong, a patient unable to care for himself.

21.

Nyanjong's mental condition prevented Lakeland from conveying notice of discharge. Additionally, Lakeland was unable to locate any known family member.

22.

Further, Louisiana Medicaid precludes coverage to non-citizens, and social security disability is necessary to qualify for Medicaid.

23.

Lakeland contacted a variety of nursing homes, hospice agencies, and

indigent pharmacy agencies, all of whom refused to accept Nyanjong or otherwise contribute to his care.

24.

As of March 2005, ICE/DIHS ceased reimbursement to Lakeland.

25.

However, Mr. Seligman on behalf of ICE/DIHS had promised to Lakeland that payment for Nyanjong's care would be guaranteed by ICE/DIHS.

26.

Further, the contract entered into between ICE/DIHS unequivocally stated that Nyanjong's care was "permanent," without exception or qualification. *See* Request for Medical Eligibility Determination, attached hereto as Exhibit A.

27.

ICE/DIHS never represented to Lakeland that there was even a possibility that Nyanjong's placement would not be permanent.

28.

Pursuant to the Immigration and Nationality Act, the Public Health Service Act, and the Division of Immigration Health Services' (DIHS) policies and procedures, DIHS provides or arranges healthcare services for detainees on its behalf and on behalf of the U.S. Immigration and Customs Enforcement (ICE).

29.

In fact, DIHS "serves as the primary focal point within the ICE for the

planning, management, policy formulation, program coordination, direction, and liaison for all health matters pertaining to aliens detained by ICE." *See* DIHS Policies and Procedures, Chapter 1 - Organization and Executive Direction, p. 1.

30.

Based on the foregoing, DIHS and ICE breached their contract with Lakeland.

31.

On October 7, 2005, petitioner Lakeland filed a formal written complaint with the contracting officer, Mr. Seligman, against ICE and DIHS for breach of contract with Lakeland. Lakeland also filed that complaint with Christopher Jacobs and William Cleary of the U.S. Immigration and Customs Enforcement, Division of Detention and Removal. *See* Formal Claim, attached hereto as Exhibit C.

32.

In accordance with 41 U.S.C. § 605, petitioner requested that a decision be rendered within 60 days.

33.

No action has been taken and no decision has been rendered on Lakeland's claim. Therefore, pursuant to 41 U.S.C. 605(c)(5), Lakeland has deemed the claim denied.

34.

Mr. Nyanjong died on March 6, 2006.

35.

Lakeland's cost of care for Nyanjong was $2,964/month.

36.

Lakeland also incurred costs for room and board, pharmacy costs, lab costs, and approximately $1,000 in costs from other hospitals, and approximately $300 in costs is owed to Nyanjong's physician.

37.

In total, Lakeland incurred approximately $49,500.00 in costs and expenses for the care of Mr. Nyanjong.

WHEREFORE, petitioner Lakeland Nursing Home prays that this court grant relief as follows:

(1) By declaring that the U.S. Immigration and Customs Enforcement and/or the Division of Immigration Health Services breached its contract with Lakeland Nursing Home;

(2) By ordering the U.S. Immigration and Customs Enforcement and/or the Division of Immigration Health Services (DIHS) to pay all sums owed to Lakeland Nursing Home in the amount of $49,500.00.

Respectfully submitted,

Michael Reese Davis 4/12/06

Michael Reese Davis (La. Bar # 17529)
HYMEL DAVIS & PETERSEN, L.L.C.
15171 South Harrell's Ferry Rd., Suite C
Baton Rouge, Louisiana 70816
Phone: (225) 755-1060
Fax: (225) 755-1065

Counsel for Lakeland Nursing Home

# EXHIBIT C

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LAKELAND PARTNERS, L.L.C., d/b/a LAKELAND NURSING HOME, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-295C (Chief Judge Damich) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DECLARATION OF JOHN TSOUKARIS

I, John Tsoukaris, declare as follows:

1. I am a Unit Chief for the Executive Information Unit (EIU) with Immigration and Customs Enforcement (ICE), Detention and Removal Operations (DRO). I am located at the ICE Headquarters in Washington, D.C. I have been with ICE and the former Immigration and Naturalization Service since 1992.

2. As Unit Chief for the EIU, I am responsible for the oversight of the statistical analyses, briefing papers, and responses to taskings from the Department of Homeland Security (DHS), and Congress regarding DRO issues. In addition, I am responsible for coordinating the modernization of DRO's information technology infrastructure and systems.

3. ICE uses the Deportable Alien Control System (DACS) to track the cases of aliens in removal proceedings. DACS contains deportable alien data, including biographical information; immigration history since being encountered; case information for both detained and non-detained aliens in removal proceedings; and case disposition (i.e. removed, benefit granted). There are over 4,846,000 records in DACS, of which approximately 1,662,000 are currently open.

4. In the case of detained aliens, DACS indicates where the alien is/was detained while in ICE custody, including the book-in (arrival) and book-out (release) dates and type of release. The release types include bonded out, deported, released on own recognizance, released on order of supervision, paroled, voluntary departure, proceedings terminated, transferred to another facility.

5. DACS does not have the capability to track a detainee's medical condition. There is a medical alert code that may be used to indicate whether a detainee has a medical condition. This is an alert to ensure the alien is provided with proper custody

management and health care while the alien remains in DRO custody. This code does not correspond to a specific medical condition. In addition, there is an alert code to indicate a person has psychological issues. The ICE personnel entering the medical alters are detention staff and are not medically trained.

6. DRO officers have the ability to add comments about the alien's case in a "case comment" field. This is not a required field to be completed by ICE personnel. Additionally, this information is not in a searchable format and could not be produced without printing every comment field from every case file and manually reviewing the comments. These comments are not inputted by medical personnel, but by immigration officers and are not considered medical files or medical comments to the detainee records.

7. Because DACS does not capture medical information regarding detained aliens, to attempt to collect this type of information would require a manual review of hundreds of thousands of paper alien files – called "A-files". This would be an extremely burdensome and time-consuming task to the agency and would cause a significant adverse affect to daily enforcement operations nationwide.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Washington, D.C. on Jan. 22, 2008.

JOHN TSOUKARIS
Unit Chief, Executive Information Unit