U.S. Immigration
and Customs
Enforcement

# About Us

# ICE Operations

U.S. Immigration and Customs Enforcement (ICE), the largest investigative arm of the Department of Homeland Security (DHS), is responsible for eliminating vulnerabilities in the nation's border, and with economic, transportation and infrastructure security.

The ICE organization is composed of four law enforcement divisions and several support divisions. These divisions of ICE combine to form a new investigative approach with new resources to provide unparalleled investigation, interdiction and security services to the public and our law enforcement partners in the federal and local sectors.

## Office of Congressional Relations (OCR)

The Office of Congressional Relations (OCR) represents ICE's core values and DHS objectives through federal Congressional liaison activities.

How We Work

The OCR maintains an effective liaison by promoting Congressional awareness of ICE operations, national and local programs, policies and initiatives.

## Office of Detention and Removal Operations (DRO)

The Office of Detention and Removal Operations (DRO) is responsible for promoting public safety and national security by making certain through the enforcement of U.S. immigration laws that all removable aliens depart the United States.

How We Work

DRO makes use of its resources and expertise to transport aliens, to manage them while in custody and waiting for their cases to be processed, and to remove unauthorized aliens from the United States when so ordered.

## Office of Federal Protective Service (FPS)

Federal Protective Service (FPS) is responsible for policing, securing and ensuring a safe environment in which federal agencies can conduct their business. FPS does this by investigating threats posed against the more than 8,800 federal facilities nationwide.

How We Work

FPS' work focuses directly on the interior security of the nation and the reduction of crimes and potential threats to federal facilities throughout the nation. Uniformed FPS officers and special agents respond to calls for assistance, conduct investigations and provide crime prevention tips, as well as assist in occupant emergency planning.

All federal facilities under FPS control receive a thorough building security assessment on a recurring schedule. During this assessment representatives of all agencies in the facility are interviewed to gather information on the specific mission they perform within the facility, and intelligence and crime statistics for the area are reviewed, as are existing security countermeasures. Based on the findings and working with the agencies housed in the facility, security countermeasures are added or adjusted. This allows for tailored security for each individual facility versus a one-size-fits-all approach.

## Office of Intelligence

The Office of Intelligence is responsible for collecting, analyzing and sharing strategic and tactical intelligence data for use by the operational elements of ICE and DHS.

How We Work

ICE intelligence professionals process information from a variety of sources to provide assessments of patterns, trends and new developments in a wide range of law enforcement areas. Intelligence focuses on data and information related to the movement of people, money and materials into, within and out of the United States, to provide accurate and timely reporting to ICE leadership and field agents in support of enforcement operations.

The branches and divisions of ICE fulfill their mission to protect America and uphold public safety by working together and separately, within ICE and with other law enforcement and intelligence entities, to keep the United States secure.

## Office of International Affairs (OIA)

OIA is the largest international investigative component in DHS, interacting with the international community on behalf of ICE through investigations of immigration and customs violations, management of the Visa Security Program and the International Visitor's Program, representation with international organizations, conducting international training and guiding repatriation efforts.

## Office of Investigations (OI)

The Office of Investigations (OI) is responsible for investigating a range of issues that may threaten national security.

How We Work

OI uses its legal authority to investigate issues such as immigration crime, human rights violations, and human smuggling; narcotics, weapons and other types of smuggling; and financial crimes, cybercrime and export enforcement issues. ICE special agents also conduct investigations aimed at protecting critical infrastructure industries that are vulnerable to sabotage, attack or exploitation.

## Office of Principal Legal Advisor (OPLA)

The Office of Principal Legal Advisor (OPLA) provides legal advice, training and services to support the ICE mission and defends the interests of the United States in the administrative and federal courts.

How We Work

OPLA protects the security of the United States by providing professional, highly motivated and client -focused staff in sufficient numbers to promptly and effectively prosecute immigration and customs law violators, particularly those who threaten the safety of our citizenry.

## Office of Professional Responsibility (OPR)

The Office of Professional Responsibility (OPR) is responsible for investigating allegations of misconduct involving employees of ICE and Customs and Border Protection (CBP).

How We Work

OPR preserves the organizational integrity of ICE by impartially, independently and thoroughly investigating allegations of criminal or serious administrative misconduct by ICE and CBP

INTERAGENCY AGREEMENT
Between
DEPARTMENT OF HOMELAND SECURITY
BUREAU OF IMMIGRATION AND CUSTOMS ENFORCEMENT

And

DEPARTMENT OF HEALTH AND HUMAN SERVICES
HEALTH RESOURCES AND SERVICES ADMINISTRATION
BUREAU OF PRIMARY HEALTH CARE

FISCAL YEAR 2004

## I. Purpose

The purpose of this agreement is to set forth the Fiscal Year 2004 responsibilities of the Department of Health and Human Services (DHHS), Health Resources and Services Administration (HRSA), Bureau of Primary Health Care (BPHC) regarding the provision of on-site health care and other health-related services to undocumented aliens detained at various locations by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE). As the agent for BPHC in executing this agreement, the Division of Immigration Health Services (DIHS), which is part of BPHC, will serve as the medical authority for ICE and provide all of the services set out in the agreement, as well as management, direction, coordination and oversight of these services.

## II. Authority

This agreement is entered into under the authority of sections 322, 323 and 325 of the Public Health Service Act (42 U.S.C. §§ 249, 250, and 252, respectively), 18 U.S.C. § 4005, and section 601 of the Economy Act of 1932, as amended (31 U.S.C. § 1535).

## III. ICE Responsibilities

ICE agrees to reimburse BPHC for DIHS' delivery of all on-site health care and other health-related services provided to or arranged for undocumented aliens in the custody of ICE, which are described in Section V. of this agreement, as well as any necessary FTEs described in Section VII. of this agreement. ICE agrees to furnish and maintain the medical facility space and security necessary for DIHS to provide health care services to detained aliens.

IV. DIHS Responsibilities

DIHS agrees to provide on-site health care services for detained aliens or will arrange for off-site services, as appropriate, which are in compliance with National Commission on Correctional Health Care, Joint Commission on Accreditation of Healthcare Organizations, and American Correctional Association standards. DIHS will coordinate payment for all off-site services arranged by and authorized by DIHS. The range of on-site services provided at each location is dependent upon the population of that detention facility; the level of human and financial resources; and, the overall space allocation provided by ICE to support the facility.

V. Description of Services to be Provided by DIHS

1. On-site personnel services include administration, physicians, nurses, nurse practitioners/physician assistants, pharmacists, dentists, and other allied health care personnel;

2. Other personnel services, such as domestic and international medical escorts and flight personnel;

3. Consultation and technical assistance in the areas of medicine, psychiatry, health records administration, managed care, sanitation, nursing, pharmacy, dental health, nutrition, medical-legal, computer support systems, quality assessments, and the availability of health care in countries outside the United States;

4. On-site health care services include sick call, health screening and physical examinations, follow-up care, formulary medications or pharmacy services, and detainee health education; (At selected facilities, limited laboratory and radiology services, dental care, and infirmary care are also provided)

5. Miscellaneous services include in-service health education for ICE personnel (limited by DIHS staff availability), emergency and limited preventive employees health care, and appeal hearings (excludable illnesses);

6. Mental health services and technical assistance for detained aliens including inpatient care, crisis intervention, and mental health evaluations;

7. Medical consultation and logistical support services associated with CONUS and OCONUS transport and hospital placement of medical evacuees from Guantanamo Bay or other safe havens;

8. Program management to include health related policy development and program implementations; oversight of detainees' health care activities

recommended by, arranged and/or provided for by ICE-contracted detention facilities and at other Federal, state, and local jail facilities; planning and oversight of health-related activities in mass immigration influxes and emergencies; and, submission of reports on program activities on a regular and/or ad hoc basis;

9. Administration and operation of a managed care network referred to as the Managed Care Branch (MCB) for the authorization and validation of medical care and medical payment oversight for persons in custody under the authority of the Immigration and Nationality Act, as amended, and which may be housed in ICE-contracted detention facilities and Federal, state or local government agency facilities. DIHS will act as the agent and final health authority for ICE on all off-site detainee medical and health-related matters. For medical care provided outside the facility, DIHS may determine that an alternative medical provider or institution is more cost-effective or more aptly meets the needs of ICE and the detainee. The MCB will assist ICE in the placement of detainees with special medical and health-related conditions but will not act as the agent for ICE in securing and purchasing detention and jail beds. The ICE will support the Managed Care Coordinators (MCC) in the exercise of their duties by obtaining reasonable access to the facilities. ICE will also provide the MCCs direct access to ICE detainee information and telecommunication systems;

10. Epidemiologic surveillance and other public health services as needed to address the communicable and non-communicable diseases of national and international importance.

## VI. <u>Medical Records</u>

Ownership of these records is with ICE. DIHS shall ensure that records are maintained in accordance with national standards.

## VII. <u>Federal Personnel Support (FTEs)</u>

BPHC agrees to provide DIHS the necessary federal full time equivalents (FTEs) to support ICE's mission and to meet and satisfy the delivery and provision of services, responsibilities and management oversight outlined in this agreement.

## VIII. <u>Periods of Agreement</u>

This agreement shall become effective upon signature of all parties and will remain in effect until September 30, 2004.

IX. **Estimated Cost**

ICE agrees to reimburse BPHC for such sums as necessary to carry out the terms of this agreement. The fiscal year 2004 estimated cost for delivery of on-site health care and other health-related services identified in Section III is $38.1 million. Such costs are attributed to the care and services delivered by both Federal and non-Federal components as determined necessary and appropriate. The estimate also includes an indirect administrative costs of $100,000 to reimburse BPHC for providing oversight, leadership, and financial management support in carrying out the terms of this agreement.

The BPHC agrees to notify ICE of the need for additional funding at least 60 days prior to the end of fiscal year 2004, so that the agreement can be modified accordingly. ICE agrees to assume financial responsibility for catastrophic costs incurred by aliens in custody of the Detention and Deportation Program.

X. **Method of Payment**

ICE agrees to transfer funds to BPHC via the Intra-Governmental Payment and Collection (IPAC) System citing the following accounting codes:

| From ICE: | | To BPHC: | |
|---|---|---|---|
| DUNS: | | DUNS: | 044007990 |
| ALC: | 70-01-1515 | ALC: | 75-03-0030 |
| Appropriation: | 7040504.002 | Appropriation: | 7540350 |
| Cost Center: | DRO-3M-RQ0230 | Allotment: | 21/24 |
| | | Allowance: | 031 / 318 |
| Direct Estimated Cost: | $38,000,000 | Direct Cost: | 4-3912701 |
| Indirect: | $ 100,000 | Indirect: | 4-3981068 |
| Total Estimate: | $38,100,000 | | |

XI. **Agency Budget Contacts**

| ICE | BPHC |
|---|---|
| Ms. Jay Brooks | Ms. Tracy Repass |
| Bureau of Immigration and Customs Enforcement | Program Support Staff |
| Office of Detention and Removal | Bureau of Primary Health Care |
| 801 I Street, NW | 4350 East West Highway |
| Washington, DC 20536 | 9th Floor |
| (202) 353-3146 | Bethesda, MD 20814 |
| | (301) 594-3812 |

## XII. Amendments and Termination

This agreement may be amended at any time by mutual written consent of both parties. In the event that funds are not available for reimbursement, the Director, Office of Detention and Removal, ICE, shall notify the Associate Administrator, BPHC and the Director, Division of Immigration Health Services, in writing and in advance of the delivery of services for which funds are not available, that the agreement is terminated for this reason.

Approvals

**For the Bureau of Immigration and Customs Enforcement**

Anthony Tangeman
Director, Office of Detention and Removal

1/6/04
Date

Mike Caltabiano
Deputy Assistant Director, Office of Detention and Removal

1/7/04
Date

**For the Health Resources and Services Administration**

Elizabeth M. Duke, PhD
Administrator

5/7/04
Date

**For the Bureau of Primary Health Care**

for Caroline Lewis
Sam Shekar, MD
Associate Administrator

4/23/04
Date

Gene Migliaccio, Dr.P.H.
Director, Division of Immigration Health Services

10 Dec 03
Date

**Bureau of Primary Health Care**
**Division of Immigration Health Services**
**FY 2004 Estimate**

| **Description** | **FY 2004 Estimate** |
|---|---|
| 11. Personnel Compensation | $ 10,620,000 |
| 12. Benefits | 5,680,000 |
| Subtotal | 16,300,000 |
| 21. Travel | 1,200,000 |
| 22. Transportation | 300,000 |
| 23. Rent, Communications, Utilities | 700,000 |
| 24. Printing | 20,000 |
| 25. Other Contractual Services | 17,170,000 |
| 26. Supplies and Materials | 2,200,000 |
| 31. Equipment | 200,000 |
| 43. Interest | 10,000 |
| Total | $38,100,000 |

05/10/2006 WED 9:58 FAX 2023057094 ☒002/010

DEPARTMENT OF HEALTH AND HUMAN SERVICES
HEALTH RESOURCES AND SERVICES ADMINISTRATION

# AGENCY AGREEMENT

1. HRSA AA NUMBER
04HRSABPHC04

2. PARTICIPATING AGENCY AA NUMBER
*(Additional participants list in Statement of Work)*

3. TYPE OF AGREEMENT
☐ New ☐ Modification ☒ Inter/Intra-agency
☐ MOU-MOA ☐ Other *(please specify)* ____
Modification Number: ____

4. TITLE OF PROJECT
InterAgency Agreement between DHS/ICE and DHHS/HRSA/BPHC

5. AMOUNT *(Not to exceed without written modification)*
$ 38,100,000.00

6. STATEMENT OF WORK
Contained in section V of Agreement

7. NAME AND ADDRESS OF PARTICIPATING AGENCY
Department of Homeland Security
Bureau of Immigration and Customs Enforcement
801 I Street, NW
Washington, DC 20536

*Project Officer for Participating Agency*

| Name | Phone Number |
|---|---|
| Jay Brooks | 202-353-3146 |
| **Email Address** | **FAX Number** |
| jaymbrooks@dhs.gov | 202-514-0555 |

8. NAME AND ADDRESS OF HRSA PROGRAM OFFICE
Division of Immigration Health Service
1220 L Street NW Suite 500
Washington, DC 20005

*Project Officer for HRSA Program Office*

| Name | Phone Number |
|---|---|
| William Waldron | 202-305-7081 |
| **Email Address** | **FAX Number** |
| William.Waldron@dhs.gov | 202-616-8176 |

9. PROJECT PERIOD
From: 10/1/2003 Through: 9/30/2004

FUNDING PERIOD
From: 10/1/2003 Through: 9/30/2004

10. LEGAL AUTHORITY
☒ The Economy Act, section 1535 of title 31 U.S. Code.
☐ Specific program authority: ____
☐ Other (please specify): ____

11. BUDGET PLAN AND JUSTIFICATION - Provide project budget by object class; include direct and indirect costs. Justify budget.
See Attached DHHS FY 2004 Financial Plan

12. FUNDING *(Please check "From" or "To" as appropriate.)*

a. ☒ From: ☐ To: DUNS:

| Agency Location Code | Appropriation | Allotment/allowance | CAN Number | Object Class | Amount |
|---|---|---|---|---|---|
| 70-01-1515 | 7040504.002 | | | | 38,100,000.00 |
| | | | | | |
| | | | | | |

b. ☐ From: ☒ To: HRSA DUNS: 044007990

| Agency Location Code | Appropriation | Allotment/allowance | CAN Number | Object Class | Amount |
|---|---|---|---|---|---|
| 75-03-0030 | 7540350 | 24/031 | 4-3912701 | | 38,000,000.00 |
| | | 24/318 | 4-3981068 | | 100,000.00 |
| | | | | | |

HRSA-120 (10/03) Page 1 of 2 PSC Media Arts (301) 443-1090 EF



GOV 0008

HRSA AA NUMBER:

13. BILLING REQUIREMENTS

a. Administrative Billing Requirements: HRSA's ALC IS 75-03-0030. Other Agency's ALC *(required)*: 70-01-1515

[X] Billing is to be made through the use of the Intra-governmental Payment and Collection (IPAC) system. **Please include HRSA'S Official AA number from Item 1 on all IPAC billings and correspondence.** When funds are provided to the performing agency in advance of services being provided or goods being delivered, the performing agency agrees to provide, within 15 days of the end of each quarter, statements of obligations and expenditures made during the quarter. The statements shall be provided to the HRSA project officer listed in item 8, page 1 of this agreement, and to the following address: **DHHS, PSC/FMS/DFO, Attn: IPAC Desk, Parklawn Building, 5600 Fishers Lane, Rm. 16-30, Rockville, MD 20857**. (If required by other agency, HRSA's Tax Identification number is 52-0821668.)

b. Additional Billing Requirements *(This block must be completed if procuring services under the Economy Act)*:

[ ] All funds provided under this agreement must be obligated by the performing agency by the end of the FY in which the funds expire. Any unobligated but expired funds may not be used to fund services in subsequent periods. The HRSA Financial Management Office (FMO) must be notified of any unobligated funds pertaining to this agreement at least 15 days before the end of the FY so that the agreement may be modified to reduce the funding amount when appropriate. This notification shall be provided to the following address: **DHHS, PSC/FMS/DFO, Attn: IPAC Desk, Parklawn Building, 5600 Fishers Lane, Rm. 16-30, Rockville, MD 20857.**

14. OTHER REQUIREMENTS

a. Travel under this agreement is subject to allowances authorized in accordance with Federal Travel Regulations, Joint Federal Travel Regulations, and/or Foreign Service Regulations.

b. HRSA will retain the title to any equipment procured under this agreement, unless otherwise justified in the statement of work.

c. Annual financial and progress reports will be submitted thirty (30) days after the end of the performance period to the HRSA Project Officer listed in Item 8 of this agreement, unless otherwise specified in the statement of work.

15. ADMINISTRATIVE/FINANCIAL CONTACTS

| a. For HRSA | | b. For Participating Agency | |
|---|---|---|---|
| Name<br>Tracy Repass | | Name<br>Jay Brooks | |
| Telephone Number<br>301-594-3812 | Email<br>Trepass@hrsa.gov | Telephone Number<br>202-353-3146 | Email<br>jaymbrooks@dhs.gov |

16. SPECIAL PROVISIONS *(please check all that apply)*:

[ ] The participating agency as a signatory to the Common Rule states that in accepting these Interagency Agreement funds, it will abide by the human subjects research requirements stated in the Common Rule, and certify that all necessary assurances and institutional review board (IRB) approvals are obtained.

[ ] The participating agency is NOT a signatory to the Common Rule. Upon issuance of these Interagency Agreement funds, it is the responsibility of the ATSDR Division or Office to certify that all necessary assurances and institutional review board (IRB) approvals are obtained. The ATSDR Associate Administrator for Science (AAS) must determine the applicability of the Human Subjects Regulations.

[ ] **CERCLA:** The receiving agency will retain detailed and accurate records of travel expenditures, personnel hours, and all other costs under this agreement. Such documents may be required to provide the basis for cost recovery actions or other litigation. Additionally, this documentation must be available for audit or verification upon request of the DHHS and/or Participating Federal Agency Inspectors General.

[X] **Federal-Facilities:** The receiving agency will maintain an accounting system that will keep an accurate, complete, and current accounting of all financial transactions on a site-specific basis, i.e., individual time, travel, and associated costs, including indirect costs, as appropriate for the site. Such documents and records will be retained for a minimum of 10 years unless there is a litigation, claim, negotiation, audit or action involving the specific site; then records will be maintained until resolution of all issues on the specific site.

[ ] **Not Applicable**

[ ] **Other** *(please specify)*: ______

***Please print within applicable non-signature items below.***

17. MODIFICATION/CANCELLATION

This agreement may be terminated by either agency upon a 60-day advance written notice. This agreement may be modified or terminated by formal written notice from either party if there is joint agreement as evidenced by the signature of responsible officials representing both parties.

| 18. HRSA RECOMMENDING OFFICIAL | 19.a. HRSA CLEARANCE --Budget | b. HRSA CLEARANCE --Other |
|---|---|---|
| Signature<br>Caroline Lewis | Signature<br>[signature] | Signature<br>[signature] |
| Title<br>Associate Administrator, BPHC | Title<br>Program Analyst, OD/PSS | Title<br>Director DHHS/BPHC/HRSA |
| Date<br>4/23/04 | Date<br>1/22/04 | Date<br>1/20/04 |

| 20. HRSA AUTHORIZATION AND ACCEPTANCE | | 21. PARTICIPATING AGENCY AUTHORIZATION AND ACCEPTANCE | |
|---|---|---|---|
| Name | | Name<br>M. L. Castellano | |
| Title<br>Administrator, HRSA | Email Address | Title<br>Dep. Assist. Dir. | Email Address |
| Signature<br>[signature] | Date<br>5/7/04 | Signature<br>[signature] | Date<br>1/20/04 |

# Immigration Health Services

# Provider Handbook

June 2003

# PROVIDER HANDBOOK

## INTRODUCTION

The Division of Immigration Health Services (DIHS), Managed Care Program (MCP) employs acceptable widely used industry standards to manage the medical care and costs of undocumented migrants in the custody of the Department of Homeland Security/Border and Transportation of Security Directorate (DHS/BTSD) , formerly Immigration and Naturalization Service (INS). The MCP employs Managed Care Coordinators (MCCs) who perform oversight functions and authorize reimbursable offsite and onsite emergent and non-routine health care. This plan is offered by the DHS/BTSD through the Division of Immigration Health Services (DIHS).

## ELIGIBILITY

**To be eligible for care, the following must apply:**

- The individual must be in DHS/BTSD custody as indicated by a valid alien number in the Detained Alien Control System (DACS) or a valid tracking number assigned by the Border Patrol.
- This assigned tracking number is a unique detainee identifier that can be correlated to a particular detainee and the Sector or Sector/Station that had custody of the detainee.
- All detainees presented to network providers must be referred by DIHS for treatment or consultation.
- The detainee will be in custody and will arrive with a DHS/BTSD officer or Federal Marshal that has been arranged by the local DHS/BTSD facility or correctional institution.
- The detainee will have a DIHS Treatment Authorization Request (TAR) form (refer to Appendix A) identifying and requesting the specific treatment and/or consultation.

### Verification of Eligibility

DIHS MCC's will verify DHS/BTSD custody status through the DACS before making any benefit payments on a claim. If the individual is not eligible, according to DACS, DIHS will deny the claim. The facility/provider will receive an Explanation of Benefits stating that an individual is not listed as a DHS/BTSD alien detainee for that date(s) of service listed.

## COVERAGE INFORMATION

### Who is Covered?

The Immigration and Nationality Act (INA), Section 234, INA and the Public Health Service Act (PHSA), Section 322, PHSA provide for cooperative arrangements between the ICE and the

Public Health Service (PHS) for the medical inspection of aliens within and outside of the United States and for the provision of services by PHS personnel to aliens being detained by the ICE.

**When Coverage Begins**

Coverage is effective on the first day that an individual is placed in the custody and under the jurisdiction of the DHS/BTSD.

**End of Coverage/When Coverage Ends**

Coverage ends on the day that DHS/BTSD releases the detainee from its custody as indicated in DACS.

**Description of Covered Services**

Covered Services refers to the health care services and supplies that the Health Care Provider/Hospital has the capacity, capability and normally provides, including room and board, routine diagnostic tests, procedures and treatments, and routine nursing services as outlined in the Medical/Dental Health Services Package. Covered Services are provided to detainees pursuant to a completed DIHS TAR form from the DIHS Managed Care Coordinator for authorization, and must include a treatment plan developed by the Primary Provider and the Preferred Provider for the services they render. The DIHS Medical Director is the final authority on Medically Necessary Covered Service Determinations. Most health care that is medically necessary is covered but there are limits on certain types of care and some types are not covered at all (refer to Appendix B).

**PROVIDER SELECTION**

The hospitals that are selected for the DIHS Managed Care Provider Network:

- Are accredited by the Joint Commission on the Accreditation of Health Care Organizations, or other qualified accrediting agency, and are quality facilities meeting DIHS and associated partnership's strict requirements
- Are located according to geographical distribution that provides easy access to the DHS/BTSD detention facilities
- Maintain appropriate malpractice insurance
- Cooperate with DIHS medical management program and its determinations
- Accept payment based on negotiated fee arrangements

The Physicians selected for the DIHS Managed Care Provider Network:

APPENDIX F

## GLOSSARY OF TERMS

**Authorization or Authorization of Care**

Prior and/or subsequent approval provided by DIHS using an DIHS TREATMENT AUTHORIZATION REQUEST (TAR) form for a Network Provider or other provider to render Medically Necessary Covered Services.

**Authorization for Care Program**

The mutually agreed to, and implemented procedures established and administered by CRA, Hospital, Physician Group, Preferred Providers and the DIHS, to ensure that the Covered Services provided to Detainees are Medically Necessary, cost-effective, delivered at the appropriate level and comply with established standards of acceptable professional care. The Authorization for Care will include procedures for preadmission certification, and the preauthorization of tests and procedures.

**Case Management**

A collaborative process which assesses, plans, implements, coordinates, monitors, and evaluates the options and services to meet an individual's health care needs using resources available to provide quality and cost-effective outcomes. Case management is not restricted to catastrophic illnesses and injuries.

**Claims Processor**

The contractor that processes the claims for care received by detainees for payment.

**Clean Claim**

A claim that complies with the billing guidelines and requirements of the claims processor has no defect or impropriety, includes substantiating documentation and all required data elements, and does not require special processing that would prevent timely payment.

**Covered Services**

The health care services and supplies that the Physician and/or Hospital has the capacity, capability, and normally provides, including room and board, routine diagnostic tests, procedures and treatments, and routine nursing services as outlined in the Provider Manual. Covered Services are provided to Detainees pursuant to a completed DIHS TREATMENT AUTHORIZATION REQUEST (TAR)form from the DIHS Managed Care Coordinator. Referrals must be submitted to the DIHS Managed Care Coordinator for Authorization, and must include a treatment plan developed by the Primary Provider and the Preferred Provider for the services they render. The DIHS Chief of Medical Staff is the final authority on Medically Necessary Covered Service determinations.

**Detainee**

An individual who is in the custody and under the jurisdiction of the Department of Homeland Security/Border and Transportation of Security Directorate (DHS/BTSD, formerly the Immigration and Naturalization Service, INS).

**Diagnosis-Related Groups**

Diagnosis-Related Groups (DRGs) are a way of paying civilian hospitals for inpatient care under a fixed rate.

**DIHS**

Division of Immigration Health Services.

**Durable Medical Equipment (DME)**

Equipment for which:

1. Is medically necessary for the treatment of a covered illness or injury;
2. Improves the function of a malformed, diseased, or injured body part, or retards further deterioration of a patient's physical condition;
3. Is used primarily and customarily to serve a medical purpose rather than primarily for transportation, comfort, or convenience;
4. Can withstand repeated use;
5. Provides the medically appropriate level of performance and quality for the medical condition present (that is, non-luxury and non-deluxe);
6. Is other than eyeglasses, contact lenses. Or other optical devices, hearing aids or other communication devices and;
7. Is other than exercise equipment, spas, whirlpools, or other such items.

**EOB**

Explanation of benefits.

**Emergency Services**

Covered Services provided to a Detainee as a result of a sudden or unexpected medical or mental condition manifesting itself by acute symptoms of sufficient severity, including but not limited to, severe pain or psychiatric disturbances such that an average layperson, could reasonably expect the absence of immediate medical attention to result in (i) placing the Detainee's health in serious jeopardy; (ii) serious impairment to bodily functions; or (iii) disfigurement or, serious dysfunction of a bodily organ or part.

**Explanation of Benefits**

A statement sent to the provider that shows who provided the care, the kind or covered service or supply received, the allowable charge and amount billed, and the amount paid. It also gives the reason for denying a claim.

# National Mental Health Coordinator (NMHC)

## Position Description

The United States Public Health Service is tasked by the Immigration and Customs Enforcement (ICE) to provide direct medical, mental health and short stay unit care to detainees. It is the responsibility of the NMHC to adhere to National Policies and Procedures as stated in the ICE Health Services Division Polices and Procedures Manual regarding the following areas:

1. **Case Management**

- Receive written treatment authorization requests for off-site and/or non-routine mental health care services from DIHS Managed Care Coordinators.
- Function as a reviewer to determine mental health necessity and appropriateness of requested services by consulting clinical guidelines established by the Chief Medical Director of the DIHS.
- Refers treatment authorization requests that do not meet criteria for approval to the Mental Health Consultant and Medical Director for final review and determination.
- Informs the originator of treatment authorization request (TAR) of all final determinations.
- Monitors utilization reviews at Columbia Care Center at least every 72 hours , maintaining a record of all pertinent information (point of contact at the hospital, patient identification and alien number, current and projected health status and discharge date projection).
- As needed, provide authorization for further treatment beyond that established by the Medicaid DRGs. The Mental Health Consultant must approve authorization.
- Provides support and assistance to ICE in placing detainees with special mental health needs in appropriate facilities.
- Conducts site visits to long term psychiatric care facilities where DIHS beneficiaries are housed (i.e. Columbia Care Center) to look at appropriateness of care and to provide information to medical staff regarding policies and procedures of DIHS.

2. **Community Liaison Services**

- Serves as liaison with community resources and other agencies in coordinating referrals, pending a detainee's release into the community.
- Networks with a variety of offices in the resolution of management of cases.
- Contributes to the development of social policy.
- Improves the scope and capacity of delivery systems.

3. **Assessment and Treatment Planning Functions**

- Interviews patient, reviews appropriate medical and legal records, and reviews functioning to determine the patient's psychosocial status and related needs.

- With proper credentialing and the approval of the Mental Health Consultant the NMHC may provide psychotherapy.

4. **Authority and Responsibility**

- The incumbent works as an independent provider of mental health services. The incumbent is expected to oversee the mental health care of those detained in long term mental health treatment facilities. The incumbent shall also have responsibility for the development and implementation of national mental health operating procedures.

5. **Education and Training Required**

- The incumbent shall have a master's degree with major course work in behavioral science.

- The incumbent must possess the highest level or independent practitioner level from the state where the case manager hold licensure.

- As the work requires a high degree of professional and personal integrity and emotional stability, the incumbent must be familiar with various patient care fields of mental health, especially forensic, case management, and clinical.

- The incumbent shall maintain his/her continuing professional education by completion of training to keep professional licensure and to meet the needs of the DIHS and ICE.

- The incumbent must be capable of respecting and protecting the confidential nature of his/her work. Additionally, the incumbent must exert a high degree of initiative and creativity. The incumbent must be able to coordinate widely diverse activities that contribute to an integrated result. He/she must be reliable and demonstrate good judgment, as his/her performance will normally have profound effects on the detainees and their involvement with the US Government.

6. **Guidelines**

- The work guidelines for the position are available in the Policy and Procedures Operational Manuals addressing administrative and health care issues. The incumbent shall use professional judgment in interpreting and applying guidelines to clinical practice. The Mental Health Consultant and the Medical Director may provide consultation as needed.

7. **Scope and Effect**

- The combined forensic and clinical aspects of work effects the mental health and general well being of the detainees, as well as the prevention of the introduction potentially dangerous individuals into the community.

8. **Personal Contacts**

- Personal contacts are with detainees, private security agents, ICE staff, contract health care providers, and other individuals from a variety of state and federal government agencies involved with ICE detainees.

9. **Mobility Demands**

- The incumbent is subject to short term relocation (i.e. TDY) at the discretion of DIHS.

**10. Supervisory Controls**

- For reporting and evaluation purposes the Supervisory Managed Care Coordinator and the Mental Health Consultant. Reviewing official shall be the DIHS Medical Director.

**11. Work Environment**

- Work normally takes place in an ICE detention center and the hours of work shall be from 0730 to 1600. The hours of work may be modified with the consent of the Mental Health Consultant.
- Work normally takes place in an ICE Detention Facility

**12. Other Duties**

- The incumbent may be assigned other duties as may be required by the Medical Director and Mental Health Consultant. These may include participation in monthly mental health meetings and presentations to ICE/DIHS staff of annual trainings and other trainings as needed.

**13. Evaluation and Monitoring**

- Competencies will be assessed at the completion of orientation. Peer review will be conducted on a quarterly basis.

**14. Back-up coverage**

- The Managed Care Branch is responsible for back-up coverage for the National Mental Health Coordinator.

002

**U.S. Department of Justice**
Immigration and Naturalization Service

**Record of Deportable/Inadmissible Alien**

| | | | | |
|---|---|---|---|---|
| CONTROL Name (Last, First, Middle) NYANJONG Duncan Ochieng | | | | Aliases: None claimed |
| Birthdate: June 3, 1957 | Age: 43 | Marital Status: ☒ Single ☐ Separated ☐ Widowed ☐ Married ☐ Divorced | File Number: A76 480 523 | Name of Last/Current U.S. Employer: Unemployed |
| Sex: M / Hair: BLK / Eyes: BRO | Complexion: Very Dark | Height: 67" / Weight: 130 | Scars or Marks: N/V | Address of U.S. Employer: |
| U.S. Address/Mail (Number) (Street): Happy Journey Motel, 300 Genesee Street | (City): Utica | (State): NY | (ZIP CODE): | Type of Employment: |
| Alien's Telephone #: Unknown | Date of Action: 11/30/2000 | | Location Code: ALB | Salary: ___ hr. From: To: |
| City, Province (State) and Country of Birth: Nyansa Province, Kenya | | Country of Citizenship: Kenya | | Passport Number and Country of Issue: Unknown |
| Date, Place, Time, and Manner of Last Entry/Attempted Entry: an unknown date, an unknown place, unknown manner | | Status at Entry: unknown | | Length of Time Illegally in U.S.: Unknown / Status When Found: Domicile |
| Foreign Address/Residence (Number, Street, City, Province (State), Country): None known | | | | Arrived From/Boarded At: Nairobi, Kenya |
| Method of Location/Apprehension: 518.3 | (At/Near): Utica, NY | Date & Hour: 11/30/2000 11:00 AM | | Apprehended by: S/A C. Belyayev / Off. Beck, Utica P.D. |
| Visa #: ☒ NIV ☐ IMM ☐ None | Date of Visa Iss./Loc.: Unknown | Name on Social Security Card: Duncan Ochieng NYANJONG | | Social Security No.: 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 |
| Name, Address, and Nationality of Spouse (Maiden Name, if appropriate): Claims 100, 200, over 1000 wives all over (appears delusional) | | | | Number & Nationality of Minor Children: Billions of kids (appears delusional) |
| Father's Name, and Nationality and Address, if Known: William NYANJONG, Kenya, deceased | | Mother's Present and Maiden Names, Nationality, and Address, if Known: Dorina NYANJONG, Kenya, Kenya | | |
| Monies Due/Property in U.S. Not in immediate possession: ☐ None Claimed ☐ See Form I-43 | Record Checks Completed: None ☐ ☒ CIS ☒ DACS ☒ NIC ☒ IDENT ☒ CLASS ☒ STSC ☒ Other (Specify) | | | F.B.I. No.: 294769PB7 |
| Deportation Charge(s): 237 (a) ( ) ( ) ( ); 237 (a) ( ) ( ) ( ); 237 (a) ( ) ( ) ( ) | | | Exclusion Ground(s): 212 (a) ( 6 ) ( A ) ( i ); 212 (a) ( ) ( ) ( ) | |
| Place a check on the appropriate box(es) if any of the following actions were completed: ☐ Doc Lifted (No.) ☒ Fingerprinted ☒ Photographed ☒ I-217 Executed | | | | DACS Citation(s): I6A |
| Special Programs: ☐ OCDETF ☐ Grandfathered Alien ☐ Sanctions SAVE | Fraudulent Documents: ☐ Sanctions ☐ Other | Criminal Record: ☒ Yes No ☐; ☐ CA ☐ CO ☐ SR ☐ AF | | Immigration Record: Yes ☐ No ☒; ☐ Prior Deport ☐ Prior VR |
| Smuggled Alien: ☐ Claimed ☐ Verified; ☐ Land ☐ Water ☐ Aircraft | Assistance in Apprehension: ☐ Sensors ☐ Observation Aircraft ☒ Patrol ☐ Horse Patrol ☐ All Terrain Vehicle ☐ Other Observation Device (specify) | | | |
| Contraband: ☐ Narcotics ☐ Weapons ☐ Currency ☐ Other | Funds in Possession / Alien Initial / Date | | | A list of free legal services has been provided: ☒ Yes ☐ No (formal proceedings were not instituted) |

Alien has been advised of communication privileges pursuant to 8 CFR 242.2(g). ____ Initial ____ Date

Narrative: (Include details not shown above and whether or not eligible for special status program (e.g., TPS, etc.)

The SUBJECT was arrested by this agent and Officer Beck of the Utica P.D. on this date at the above address. The SUBJECT was reported to this office by Norm PEEK of the Oneida Co. Social Services Dept. on 11/29/2000. The SUBJECT has been sponsored by that agency and has been residing at the above motel in lieu of a permanent domicile. At the time of the arrest, the SUBJECT appeared delusional and incoherent. After stating that he is a citizen of Kenya and that he entered in 1992 via NYC/JFK as a tourist (B-2), he began talking to himself in a language that this agent could not comprehend. Among the statements made were references to "Doctor Professor Al Gore", Hilary Rodham Clinton, Bill Clinton, etc. The SUBJECT was then transported to the Albany INS office for processing. Enroute to the office, the SUBJECT continued a conversation with an imaginary partner. On several occasions he would raise his voice at this agent, shouting obscenities. The SUBJECT also spat at this agent and kicked him with his foot attempting to cause the loss of control of the GOV. The SUBJECT was delivered to the INS office without further incident. At the office, the SUBJECT repeated his claim of entry, but all the searches conducted on the INS systems proved negative. This agent was able to locate a record of the SUBJECT's alleged sister, Risper OGALO (A90261003). The SUBJECT was issued an NTA and held on a $10,000 bond.

S/A
(Signature and Title)

☐ Continued on attached continuation page

DISTRIBUTION
1 - File
1 - Stats

12/01/00
[handwritten signature] Bailey
IMS

Received (subject and documents) (report of interview) from
Officer: C. Belyayev
11/30 19 2000 at
Disposition: NTA/WA/$10,000 BOND
(Receiving Officer) LeRoy F. Tario, SSA

Form I-213 (Rev. 4/1/97) X

U.S. Department of Justice
Immigration and Naturalization Service

# Notice to Appear

**In removal proceedings under section 240 of the Immigration and Nationality Act**

File No: A76 480 523

In the Matter of:

Respondent: Duncan Ochieng NYANJONG currently residing at:

Happy Journey Motel, 300 Genesee Street Utica NY Unknown
(Number, street, city, state and ZIP code) (Area code and phone number)

☐ 1. You are an arriving alien.
☒ 2. You are an alien present in the United States who has not been admitted or paroled.
☐ 3. You have been admitted to the United States, but are deportable for the reasons stated below.

RECEIVED
US DEPARTMENT OF JUSTICE
00 DEC -4 PM 3:48
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
BATAVIA, NEW YORK

The Service alleges that you:

1. You are not a citizen or national of the United States.
2. You are a native of Kenya and a citizen of Kenya.
3. You entered the United States at or near an unknown place on or about an unknown date.
4. You were not then admitted or paroled after inspection by an Immigration Officer.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 212(a)(6)(A)(i) of the Immigration and Nationality Act, as amended, in that you are an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

Section 235(b)(1) order was vacated pursuant to: ☐ 8 CFR 208.30(f)(2) ☐ 8 CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:
Executive Office for Immigration Review Office of the Immigration Judge
130 Delaware Avenue, Suite 410 Buffalo, New York 14202
(Complete Address of Immigration Court, Including Room Number, if any)

on to be set (Date) at to be set (Time) to show why you should not be removed from the United States based on the charge(s) set forth above.

Officer in Charge
(Signature and Title of Issuing Officer)

Date: November 30, 2000

Albany, New York
(City and State)

"EXHIBIT 1
ID ______ EVIDENCE 12/12/00"

See reverse for important information

GOV 0225



Form I-862 (Rev. 3/22/99) N

**Date:** 12/20/2000 8:38 AM
**Sender:** Mark P Murphy
**To:** Rex Velasquez; Steve K Roney; Joy A Merriman; Denise C Hochul; Carla Hengerer; James W Grable; Steve Connelly; Mary F Loiselle; Howard S Lobaugh; Charles Mule'
**Priority:** Urgent
**Subject:** Duncan Ochieng Nyanjog A76 480 523

The above individual was in court yesterday 12-19-00. While in court he was complaining that his attorney's (Johnnie Cochrine, the Attorney General of the United States, and a man named Frank Fryer) were being turned away from the facility and not allowed to visit him.

The court thinks he is nuts.

The court (REID) says he needs medical evidence that he is competent and understands the nature of the proceedings against him. The court said they will not proceed with this case unless we have such documentation. The **next** hearing date is **January 9, 00.**

The alien is charged as being present without being admitted or paroled. He was refered to our Albany office by the Onidia county Social Services. At his arrest, he was incoherent and rambling. His criminal history shows one arrest and conviction on 9-28-00 for criminal mischief PL 145.00-1. He was given time served (20 days).

His bond is 10,000 dollars
Mark Murphy

Ccmail

Tony

Reply Separator

Subject: Candidates for CCC
Author: Jacinto Garrido at ERO-MIA-KRO-001
Date: 12/28/00 1:12 PM

Hello Tony,

Happy Holidays to you and your family! Tony, I have two pote
ntial
candidates for CCC. One has been accepted already by CCC. Th
at
candidate's name is:

1) Nyanjong, Duncan A# 76-480-523, Kenya. Diagnosis is: HIV
induced
mania dementia. He is presently at Buffalo Federal Detention
Facility. He has a minor criminal history (midsemeanor) but
is
incompetent to stand trial. The INS contact is:
Lisa Corsi Ph# 716-343-0814

The second one PENIDNG is a Hunger Striker in a jail near St.
Louis,
MO. He is a Cuban Mariel. He has been on Hunger Strike for 3
9 days as
of today. He is on this Hunger Strike because he wants to ge
t into a
BOP facility. Terry Bretz and some other INS individuals are
trying to
get him into a BOP facility but have not been successful yet.
The
detainee's name is Juan Batista. He would need to be force f
ed. We
want to make sure that CCC is willing to take him and can for
ce feed
him if he is transferred there. Do you happen to have a copy
of the
INS detention standard on Force Feeding? If so, could you pl
ease fax
it to me at 305-552-7088 so I can fax it to CCC?

Ccmail

I will page you regarding Juan Batista as soon as I hear more from
CCC. If they accept him and are willing to force feed him, w ould you
be willing to accept him?

Look forward to hearing from you. Thank you.

Carol Lindsey for Jay (1-800-482-4876)

Form I-216
U. S. DEPARTMENT OF JUSTICE
IMMIGRATION AND NATURALIZATION SERVICE
(Rev. 8-8-56)

Sheet No. 1 of 1

# RECORD OF PERSONS AND PROPERTY TRANSFERRED

Date of transfer 01/09/2001 From Batavia, New York To Columbia, South Carolina

| File No. | Name of person | Nationality | Status [1] | Afflicted or dangerous [2] | From service detention [3] | Expense of deportation [4] | Money and hand luggage | Checked baggage | Baggage check Nos. |
|---|---|---|---|---|---|---|---|---|---|
| A 76 480 523 | NYANJONG, Duncan | Kenya | Trans. | Psych | YES | INS | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

[1] Show whether deport, removal, etc.
[2] Show whether criminal, diseased, epileptic, insane, etc., or likely to attempt escape.
[3] Show whether alien detained at Service expense immediately prior to transfer.
[4] Show whether deportation is to be effected at Service expense or at carrier expense.

Use a separate line for each person transferred.

This form is to be executed in sufficient number of copies to allow each receiving officer to retain one copy for his personal expense voucher and two additional copies for station of final delivery.

GPO 962820

Received the above listed persons, property and baggage checks

Signature Charles H. McLendon

Title Chief of Security

Place and date Columbia Care Center January 10, 2001

| | |
|---|---|
| Subj: | **Duncan Ochieng Nyanjog , A76 480 523** |
| Date: | 12/28/00 10:57:06 AM Eastern Standard Time |
| From: | PElake156 |
| To: | Carlindsey |
| CC: | MIGS560SL, Juan.Campos@intmail.usdoj.gov, Sean.Ervin@inmail.usdoj.gov, Chmclendon |

Carol Lindsay:
This is to advise that the Columbia Care Center will accept the above subject in our M2 status with a price of $250.00 per day.

Parker Evatt,Executive Director





GOV 0172

**Date:** 1/22/2004 3:30 PM
**Sender:** William M Cleary
**To:** Michael T Phillips
**Priority:** Normal

Mike:
Could you please check on this guy
Bill

Forward Header

Author: Jay A Seligman
Date: 1/22/2004 1:25 PM

Sir,

I have had Duncan Nyanjong A# 76-480-523 in Columbia Care Center as of 1/01/03.
It has cost the service over $400,000 so far in care. With his medical condition, I may be able to have located in a nursing home. Can you please tell me who I can contact in order to explore community placement. Thank you.

Jay

CHRIS' CASE, FILE CHARGED TO SWG.

BHSF Form 90-L
Rev. 11/00

# REQUEST I R MEDICAL ELIGIBILITY TERMINATION

## .. RECIPIENT INFORMATION

| | | | |
|---|---|---|---|
| A. Recipient's Name: DUNCAN NYANJONG | | SS #: 08-6804469 Medicaid #: | |
| B. Address (City, State, Zip Code, Parish): | | C. Responsible Party/Curator: DIHS | |
| 7901 FARROW ROAD | | Address (City, State, Zip Code, Parish): Managed Care Branch | |
| Columbia, SC. 29203 | | 1220 L STREET N.W., Suite 500 | |
| Telephone #: | Race: BLACK Sex: M | Washington, DC 20005 | |
| Medicare #: | Date of Birth: 6/5/57 | Relationship: | Telephone #: 305-552-1845 x162 |

D. What are/were the living arrangements: • Own home • Relative's home • (Other) Immigration facility

E. What previous institutional care (including nursing facilities) has this person received?

| | | | |
|---|---|---|---|
| Facility: Columbia Care Center | Date: 1/10/01 | Facility: | Date: |
| Facility: | Date: | Facility: | Date: |

F. What Home/Community-based services have been used/considered: • ADHC • MR/DD • CC • PCA • ELDERLY • HH

G. Why were services not suitable? pt in Immigration Custody

H. Requesting Nursing Home placement: • Temporarily (• Permanently)

I. Applicant/~~Responsible Party Signature~~: LCDR JAY SELZGMAN 305-552-1845 x162 Date: 4/19/04

## II. LEVEL OF CARE DETERMINATION

Institutional care is provided under classifications dependent upon the type and/or complexity of care and services rendered, as well as, the amount of time required to render the necessary care and services. The attending physician must designate the required level of care by selecting the appropriate level below. This requirement also applies to applicants requesting home or community-based waiver services to allow for a determination of the level of institutional care that would otherwise be required. Please select one of the following levels of care:

A. • Intermediate Care II ( minimum care required) - Includes some aid in activities of daily living, diversionary activities, protection from hazards and/or a minimum

(B.) • Intermediate Care I (medium care required) - Includes need for nursing care to manage a plan of care and/or more assistance with extensive personal care, ambulation, and mobilization. Pt needs cueing for bathing & ADLs

C. • Skilled Care (maximum care required) - Indicate special level, if indicated: • TDC • ID • NRTP (• Complex; • Rehab) Includes professional nursing care and assessment on a daily basis due to a serious condition which is unstable or a rehabilitative therapeutic regime requiring professional staff.

D. • ICF/MR - Requires active treatment of mental retardation or a developmental disability under supervision of a qualified mental retardation or developmental disability professional.

E. Is this person likely to need services in a medical facility (hospital, nursing facility, etc.) for at least thirty (30) consecutive days ? • (Yes) • No

F. Home/community based services are adequate to meet the needs of this patient. • Yes • (No)

C. COMMENTS:



GOV 0183

Recipient's Name:

# III. MEDICAL INFORMATION

A. Diagnosis: HIV & DEMENTIA

B. Medications: (Specify dosage, frequency, and route) ALLERGIES NKA

| | | |
|---|---|---|
| 1. AMBIEN 10 MG | 5. VICODENES 7.5 MG 750 | 9. |
| 2. Avandia 4 MG | 6. REFERENCE MAR | 10. |
| 3. COMBIVIR 150/300 MG | 7. | 11. |
| 4. Glucophage 500 MG | 8. | 12. |

C. Recent Hospitalizations: (include psychiatric) NONE

D. Mental Status/Behavior: check Yes or No. If Yes, indicate frequency: 1 = seldom; 2 = frequent; 3 = always

- Yes (1, (2), 3) • No 1. Oriented
- Yes (1, (2), 3) • No 2. Forgetful
- Yes ((1), 2, 3) • No 3. Depressed
- Yes (1, 2, 3) • (No) 4. Comatose
- Yes (1, (2), 3) • No 5. Confused
- Yes (1, 2, 3) • (No) 6. Wanders
- Yes (1, 2, 3) • (No) 7. Hostile
- Yes (1, 2, 3) • (No) 8. Combative

E. Activities of Daily Living: (check appropriate box)

- ~~1. Verbal~~ (circled)
- 2. Non-verbal
- 3. Bowel Incontinence
- 4. Dentures
- 5. Impaired vision ____ • Glasses
- 6. Impaired hearing ____ • Hearing Aid
- 7. Bladder Incontinence
- 8. Urinary Catheter

| SELF | ASSIST | TOTAL | |
|---|---|---|---|
| (•) | • | • | 10. Eating |
| • | (•) | • | 11. Bathing |
| • | (•) | • | 12. Personal |
| • | (•) | • | 13. Oral Hygiene |
| (•) | • | • | 14. Ambulation |

F. SPECIAL CARE/PROCEDURES: (check appropriate box: when appropriate give type, frequency, size, stage and site)

| | |
|---|---|
| 1. Ostomy care NA | 7. MRSA NA |
| 2. Glucose Monitoring WEEKLY | 8. Diet/Tube Feeding NA |
| 3. Restraints NA | 9. Dialysis NA |
| 4. IV's NA | 10. Respiratory NA |
| 5. Suctioning NA | 11. Decubitus NA |
| 6. Specialized Rehab NA | 12. Other |

G. PHYSICAL EXAMINATION: Height 5'7 Weight 138 Pulse 100 Resp 16 Temp 97.6 B/P 120/80

Lab Results: HCT 27.7 HGB 9.2 U/A negative Radiology chest x-ray 10/30/03 no evidence

General Good Head and CNS Good

Mouth and EENT Good Chest Good

Heart and Circulation Good Abdomen Good

Genitalia Good Extremities Good

Skin AREA BEHIND LEFT EAR (RESOLVED) Other

H. Physician's Name (Type or Print) GUSTAVO CADAVID PHONE 305-552-1845 x 305

Address: 18201 SW 12th Street, Miami, FL 33194

Physician's Signature [signature] Date 19 APR 04

# UNITED STATES PUBLIC HEALTH SERVICE

IMMIGRATION HEALTH SERVICES
TREATMENT AUTHORIZATION REQUEST

**DETAINEE INFORMATION:**
Duncan Nyanjong
Auth Date: 05/11/2004
Date of Birth: 6/5/1957
Arrival Date: 1/10/2001

Alien ID: 76480523
Sex: Male
Country of Origin: Kenya

**JAIL INFORMATION:**
Lakeland Nursing Home
Pineville , LA

**INS Status**

- [ ] Hearing Pending
- [ ] FO Deportation
- [ ] TD Pending
- [ ] Appealing
- [ ] Exclusion
- [x] Other

Court Date:

**REASON FOR REFERRAL:**
Requestor: seligman
ICD9 Code: -dementia/hiv
DRG Code: -
CPT/CDT: -
CPT/CDT: -
CPT/CDT: -
Patient Notes: Pt had dementia and will require nursing home assistance for adl's. The cost at Columbia Care Center is $335 a day while at Lakeland the charge will be $175 due to the HIV medication. Pt will arrive at nursing home on 5/12/04
INS Notified: Yes

Referred to:
Lakeland Nursing Home
81 Hillsdale Drive
Pineviller, LA 71360
318-448-0141

Date of Appointment: 05/12/2004 Time of Appointment:

**AUTHORIZED ACTION:**
Status: Approved Authorization Number: 53311-0
Reason For Denial / Request for Information:

Pay rate until discharged. Spoke with CDR wacha and will try to get deatinee on medicaid

Authorizing Officer: LCDR Jay Seligman

Send claims to: Immigration Health Services
1220 L Street, NW
PMB 468
Washington, DC 20005-4018
Phone: 1-800-479-0523
Fax: 1-866-475-9349

*Created: jseligman - 5/11/2004 1:22:53 PM* *Last Modified: jseligman - 5/11/2004 1:22:53 PM*

**Seligman, Jay A**

**From:** Cynthia.McFadden@justcareinc.com
**Sent:** Wednesday, May 12, 2004 9:34 AM
**To:** surge29@aol.com
**Cc:** Jay.A.Seligman@dhs.gov
**Subject:** FW: Patient Discharge Notification[Scanned]

-----Original Message-----
**From:** Wingard, Lucy M.
**Sent:** Wednesday, May 12, 2004 9:36 AM
**To:** Cooper, David; Miles, William MD; 'mmdalal@earthlink.net'
**Cc:** Anderson, Lavaunda; Holland, Beverly; Grainger, Beverly; Greene, Steve; McFadden, Cynthia; Nguyen, Lovelle - Pharmacy; Iles, Avery D.; Wingard, Lucy M.; Wilson, Laurie; McClease, Bruce - Transportation; Campbell, Mardy
**Subject:** Patient Discharge Notification

## Patient Discharge Notification

**Patient Name:** Nyanjong, Duncan

**Room Assignment:** 302A

**CCC #:** 0581

**Institution #:** INS - A76480523

**Patient transported to:** Columbia Metro Airport

**Date/Time of departure:** 5/12/04 @ 4:00 am

**Responsible for Discharge Summary:** Dr. Dalal

---

If there are any questions or concerns, please feel free to contact me at 935-0505 ext. 328

This email and any files transmitted with it may contain confidential patient information that is protected from disclosure by applicable federal and/or state law. If you are not the named addressee and you disseminate, distribute, copy or alter this email you may be subject to disciplinary actions.

07/07/2004 12:34 LAKELAND NURSING HOME → 18664759349P3239 3649

# Statement of Account

A#76480523
V60.9
R120
Pay $4266.56

Lakeland Nursing Home
81 Hillsdale Drive
Pineville, LA 71360

*ALL ACCOUNTS ARE DUE AND PAYABLE BY THE 1ST OF EACH MONTH*

6/30/04
ALIEN # A76480523

DIHS
1220 L STREET N. W. SUITE 500
WASHINGTON, DC 20005

*For:* NYANJONG, DUNCAN
*Res No.:* 901

*Amount Due:* [illegible]

*Amount Enclosed:*

*Detach here and return the top portion with your payment.*

| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|---|---|
| | | | ***Due from last Statement - $84.62/$2574.16*** | P1 | | 4,266.56 |
| | | | ***Current Activity*** | | | |
| 6/1/04 | 6/30/04 | 30- | SEMI-PRIVATE ROOM | P1 | 2,574.16 Mo | 2,574.16- |
| 6/1/04 | 6/2/04 | 2 | SEMI PRIVATE ROOM | P1 | 84.62 Da | 169.24 |
| 6/3/04 | 6/30/04 | 28 | SEMI-PRIVATE ROOM | P1 | 84.62 Da | 2,404.92 |
| | | | ***Balance Due 06/30/04 - $84.62/$2574.16*** | P1 | | 4,266.56 |
| | | | ***Advance Charges for 07/04*** | | | |
| 7/1/04 | 7/31/04 | 31 | SEMI-PRIVATE ROOM | P1 | 2,574.16 Mo | 2,574.16 |
| | | | ***Amount Now Due From Resident*** | | | 6,840.72 |

OK TO
PAY
[signature]
CDeWaphe
7-12-04

RECEIVED
JUL 15 2004
IOS Medical Claims Processing
VA FSC Austin, TX

NYANJONG, DUNCAN Lakeland Nursing Home (318) 448-0153

| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|---|---|
| $2,574.16 | $4,266.56 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Page 1 of 1



GOV 0206

| Alien Number | Last name | Provider | Provider Name | Claim Number | Status |
|---|---|---|---|---|---|
| 76480523 | NYANJOG | 721213887-01 | LAKELAND NURSING HOME | 07192004cng0056 | CLOSED |
| 76480523 | NYANJOG | 721213887-01 | LAKELAND NURSING HOME | 07192004cng0056 | CLOSED |
| 76480523 | NYANJOG | 721213887-01 | LAKELAND NURSING HOME | 07192004cng0056 | CLOSED |
| 76480523 | NYANJOG | 721213887-01 | LAKELAND NURSING HOME | 10152004rae0002 | CLOSED |
| 76480523 | NYANJOG | 721213887-01 | LAKELAND NURSING HOME | 10152004rae0002 | CLOSED |
| 76480523 | NYANJOG | 721213887-01 | LAKELAND NURSING HOME | 10152004rae0002 | CLOSED |
| 76480523 | NYANJOG | 721213887-01 | LAKELAND NURSING HOME | 04152005mrf0041 | CLOSED |
| 76480523 | NYANJOG | 721213887-01 | LAKELAND NURSING HOME | 04152005mrf0041 | CLOSED |
| 76480523 | NYANJOG | 721213887-01 | LAKELAND NURSING HOME | 04152005mrf0041 | CLOSED |
| 76480523 | NYANJOG | 721213887-01 | LAKELAND NURSING HOME | 04152005mrf0041 | CLOSED |
| 76480523 | NYANJOG | 721213887-01 | LAKELAND NURSING HOME | 04152005mrf0041 | CLOSED |

| From DOS | To DOS | CPT | DX | charges | net_amount |
|---|---|---|---|---|---|
| 06/30/04 | 06/30/04 | R120 | V60.9 | $(4,266.56) | $(2,574.16) |
| 06/30/04 | 06/30/04 | R120 | V60.9 | $ 4,266.56 | $ 2,574.16 |
| 06/30/04 | 06/30/04 | R120 | V60.9 | $ 6,840.72 | $ 6,840.72 |
| 08/01/04 | 08/31/04 | R120 | 311 | $ 1,100.52 | $ 1,100.52 |
| 09/01/04 | 09/30/04 | R120 | 311 | $ 2,574.16 | $ 2,574.16 |
| 10/01/04 | 10/15/04 | R120 | 311 | $ 2,694.00 | $ 2,694.00 |
| 11/01/04 | 11/30/04 | R120 | V60.9 | $ 2,964.00 | $ 2,964.00 |
| 12/01/04 | 12/31/04 | R120 | V60.9 | $ 2,964.00 | $ 2,964.00 |
| 01/01/05 | 01/31/05 | R120 | V60.9 | $ 2,964.00 | $ 2,964.00 |
| 02/01/05 | 02/28/05 | R120 | V60.9 | $ 2,964.00 | $ 2,964.00 |
| 03/01/05 | 03/31/05 | R120 | V60.9 | $ 2,964.00 | $ 2,964.00 |

10/06/2004 12 31 LAKELAND NURSING HOME → 15124605158P3239 NO 839 P02

# Statement of Account

Lakeland Nursing Home
81 Hillsdale Drive
Pineville, LA 71360

*ALL ACCOUNTS ARE DUE AND PAYABLE BY THE 1ST OF EACH MONTH*

A7648 0523 10/31/2004

DIHS
1220 L STREET N W SUITE 500
WASHINGTON, DC 20005

*For.* NYANJONG, DUNCAN
*Res No* 901
*Amount Due* [illegible]
*Amount Enclosed*

*Detach here and return the top portion with your payment*

| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|---|---|
| | | | ***Due from last Statement - PRIVATE*** | P1 | | 7,842 32 |
| | | | ***Current Activity*** | | | |
| | 10/4/04 | | Payment | P1 | | 1,473 64- |
| | | | ***Balance Due 10/31/04 - PRIVATE*** | P1 | | 6,368 68 |
| | | | ***Advance Charges for 11/04*** | | | |
| 11/1/04 | 11/30/04 | 30 | SEMI-PRIVATE ROOM | P1 | 2,694 00 Mo | 2,694.00 |
| | | | ***Amount Now Due From Resident*** | | | 9,062 68 |

NYANJONG, DUNCAN Lakeland Nursing Home (318) 448-0153

| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|---|---|
| $2,694 00 | $2,694 00 | $2,574 16 | $1,100 52 | $0 00 | $0.00 | $0 00 |

Page 1 of 1

288411 03001



GOV 0209

10/06/2004 12 31 LAKELAND NURSING HOME → 15124605158P3239 NO 839 P01

Claim# 10152004rae0002 3649

Index & Archive

LAKELAND NURSING HOME

HANK COOLEY, ADMINISTRATOR

KIM CLARK, R.N., D.O.N.

FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| TO Angela | FROM Donna Jones |
| COMPANY | DATE 10/6/04 |
| FAX NUMBER 1-512-460-5158 | TOTAL NO OF PAGES INCLUDING COVER 2 |
| PHONE NUMBER | SENDER'S REFERENCE NUMBER |
| RE | YOUR REFERENCE NUMBER |

☐ URGENT ☐ FOR REVIEW ☐ PLEASE COMMENT ☐ PLEASE REPLY ☐ PLEASE RECYCLE

NOTES/COMMENTS

Month of November 2004 - $2694.00 → excluded from pymt (future date)
Month of October 2004 - $2694.00
Month of September 2004 - $2574.16 } paid 10/15/04
Month of August 2004 - $1,100.52

August was actually $2,574.16 but there was a credit of $473.64 for Jorge Echevarria which left a balance of $1,100.52.
A#24793639

For a total due by Nov 5, 2004,

$9,062.68 -

OK TO PAY

Thanks,
Donna Jones

LT Jean-Pierre DeBarros
Chief of Managed Care Analysis

•P.O BOX 4300•PINEVILLE, LA 71361-4300•PHONE(318)448-0141•FAX (318)448-9772•

288411 03001

04/04/2005 12:17 LAKELAND NURSING HOME → 12023057059P3128 NO.079 D03

J# 3649

DX: 311
042

# Lakeland Nursing Home

March 4, 2005

ICE
Health Service
1220 L St. NW
PMB 468
Washington, DC 20005

To Whom It May Concern:

Please accept this letter as an invoice for Duncan Nyanjong A#76480523 for his room and board at Lakeland Nursing Home for the following months:

| Code | DOS | Amt |
| --- | --- | --- |
| R120 | November 2004 | $2964 |
| R120 | December 2004 | $2964 |
| R120 | January 2005 | $2964 |
| R120 | February 2005 | $2964 |
| R120 | March 2005 | $2964 |
| | Total | $14,820 |

Thank you,

Janice Elmore

Janice Elmore
Administrative Assist/
Account Manager

APR — , 05

0945 FILE COPY

P.O. Box 4300 • Pineville, LA 71361-4300 • 81 Hillkdale Drive • Pineville, LA 71360

**Date:** 2/28/2005 11:58 AM
**Sender:** William M Cleary
**To:** James J Creahan; Charles Mule'; Michael T Phillips
**Priority:** Normal
**Subject:** FW: SPC operational capacity

fyi

-----Original Message-----
From: Lee, Wesley J
Sent: Monday, February 28, 2005 11:33 AM
To: Cleary, William M
Cc: Perry, Timothy L
Subject: RE: SPC operational capacity

1. and 1a. We need to keep our SPCs at operational capacity. If Batavia is full and there is a Charter flight then you can go to Emergency capacity for a short period of time. You can also surge out to IGSAs for a short time if needed.

2. Call Tim Perry.

3. go ahead with MOU.

4. I concur with your recommendation. Keep Tim Perry and Jay Brooks in the loop.

-----Original Message-----
From: Cleary, William M
Sent: Monday, February 28, 2005 10:57 AM
To: Lee, Wesley J
Subject: RE: SPC operational capacity

Wes:
Several issues below....

1. Regarding SPC capacity at Batavia; we have recently reduced the BTV population with the expectation of receiving a large number of releases from the New York State prison system...that was supposed to occur Feb 01, but because NYC was unable to send us the files due to their move to Castle Point, BUF's pickups, with the exception of CPDO's, have been pushed back to April 01 (we are still not receiving files, NYC said they will send the files soon but they are still unpacking, and some file cabinets are not accessible)....Assuming an April 01 start up for BUF, we need the files now to give the State 3 weeks notice to schedule the releases at Orleans Correctional...I'll be working on this issue this week. John Longshore is aware of our file issue.

1.a. I've been advised that there is a Nigerian Charter flight scheduled out of Buffalo in April...with the NYDOCS start-up and the influx of Nigerian

cases we
will quickly be at max capacity in a short period...we don't want to exceed max
capacity as we have an ACA audit the first part of May; going over capacity will
severely hurt us in this audit. The alternative is to place cases in non-DHS
jails at a high cost.

2. About the ACA audit, we have an ACA contract or agreement that needs to be
signed. Tim Perry's shop just funded the audit; who should sign the agreement
with ACA for ICE ?..timeliness is a factor, it is supposed to be signed by the
end of Feb. I am willing to sign it based on the funding.

3. I have not heard back from you on the MOU with CIS to share EEO resources in
a mutual ICE/CIS EEO advisory committee; there is a meeting scheduled 3/10 for
the program directors to move forward/or not on this effort.

4. We have a Kenyan national (was violent and dangerous), in a nursing home in
NOL...placed by PHS, after a stay in ccc, he has terminal illness (6 mos or
less to live); we have been paying the costs for the medical care, via PHS; but
since he is confined to a wheelchair, there is no likelihood of his danger to
the community. His sister and only family refuses to care for him, but he still
requires nursing home care. If we release him, there possibly be negative
press, as opposed to ICE paying high medical costs. His case has been admin
closed by an IJ pending medical treatment; because he is St Cyr eligible, he is
eligible for a bond.....

I recommend releasing him O.R. after providing sufficient notice to the nursing
home of our intention and to provide them sufficient time to find another
location for him or obtain other funding source to pay for his care.

Bill

William M. Cleary
Field Office Director
Detention and Removal
Buffalo, NY 14202

OFC: (716) 551-4741 ext:1-2530#
FAX: (716) 551-5628
Cell: (716) 583-0093

-----Original Message-----
From: Lee, Wesley J
Sent: Thursday, February 24, 2005 4:51 PM
To: Smith, Ronald J; Crawford, Phillip C; Kee, Gloria S; Garcia, Rudolph

; Rozos, Michael D; Jolicoeur, Robert E; Moore, Marc J; Cleary, William M
Cc: Perry, Timothy L; Robertson, George
Subject: SPC operational capacity

Your SPCs need to be brought up to the operational capacity but do not increase your current AOR bed total. We are looking at efficiencies by taking detainees out of higher cost beds and placing them in available beds at our SPCs. We are also looking at moving BIA and possible POCR cases out of high cost beds to lower cost beds across the Country. More to follow.

--------------------------

Sent from my BlackBerry Wireless Handheld

**Seligman, Jay A**

**From:** Brooks, Jay M [JBrooks@fins2.dhs.gov]
**Sent:** Monday, April 04, 2005 12:09 PM
**To:** Phillips, Michael T; Cleary, William M; Perry, Timothy L; Seligman, Jay A; Migliaccio, Gene A
**Cc:** Creahan, James J; Jacobs, Christopher M
**Subject:** Re: Duncan NYANJONG A76 480 523

Gene,
I am out of the office today and this detainee's name does not ring a bell. Could your MCC staff check into the billing matter mentioned below? Thanks.
--------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Phillips, Michael T <MPhillips2@fins2.dhs.gov>
To: Cleary, William M <WCleary@fins2.dhs.gov>; Perry, Timothy L <TPERRY2@fins2.dhs.gov>; Brooks, Jay M <JBrooks@fins2.dhs.gov>; Seligman, Jay A <JSeligman2@fins2.dhs.gov>
CC: Creahan, James J <JCreahan@fins2.dhs.gov>; Jacobs, Christopher M <CJacobs3@fins2.dhs.gov>
Sent: Mon Apr 04 11:16:00 2005
Subject: Duncan NYANJONG A76 480 523

The above listed subject of Kenya was released on his own recognizance on Friday April, 1 2005 from the Lakeland Nursing Home in Pineville, LA. Subject was placed there by PHS after a stay at Columbia Care facility. Because of his illness, he is no longer considered to be a threat to the community. Wesley Lee was advised of our recommendation to release on an O/R in a cc mail dated 2/28/05. We were advised to give Lakeland Nursing Home advance notice of our intentions so they would have time to try to find another location to care for him or to find another funding source. Wesley concurred with our recommendation and asked that Tim Perry and Jay brooks be kept in the loop. Also, I spoke with the Diector of the facility, Hank Cooley. He informed me that ICE owes close to $14,000 for the cost of caring for this subject. He asked if I could assist in getting them paid.

Confirmation Report – Memory Send

Page : 001
Date & Time: Apr-01-05 07:27
Line 1 : +716 551 5628
Line 2 :
Machine ID : USINS BUF DETENTION & REMOVAL

| | | |
|---|---|---|
| Job number | : | 539 |
| Date | : | Apr-01 07:26 |
| To | : | ☎913184489772 |
| Number of pages | : | 002 |
| Start time | : | Apr-01 07:26 |
| End time | : | Apr-01 07:27 |
| Pages sent | : | 002 |
| Status | : | OK |

Job number : 539 *** SEND SUCCESSFUL ***

# FAX

*TO:*
ATTENTION: Janice
LOCATION: Lakeland Nursing Home
FAX #: 318-448-9772
DATE: ~~3/31/05~~ 4/1/05

*FROM:*
U.S. DEPARTMENT OF HOMELAND SECURITY
DETENTION AND REMOVAL OPERATIONS
130 DELAWARE AVENUE.
BUFFALO, N.Y. 14202
*PHONE (716) 551-4741 EXT. 2500*
*FAX (716) 551-5628*

*CONTACT PERSON* Christopher Jacobs

*PHONE EXTENSION* 2545

*REMARKS:* ☒ *URGENT* ☐ *FOR YOUR REVIEW* ☐ *REPLY ASAP* ☐ *PLEASE COMMENT*

MESSAGE

We are releasing Mr. Nyanjong from custody the form I-203 is the order releasing him and the form I-220A is his copy

TOTAL PAGES FAXED INCLUDING THIS PAGE = 3



GOV 0214

# FAX

*TO:*
ATTENTION: Janice
LOCATION: Lakeland Nursing Home
FAX #: 318-448-9772
DATE: ~~2/[illegible]/05~~ 4/1/05

*FROM:*
**U.S. DEPARTMENT OF HOMELAND SECURITY**
**DETENTION AND REMOVAL OPERATIONS**
**130 DELAWARE AVENUE**
**BUFFALO, N.Y. 14202**
*PHONE (716) 551-4741 EXT. 2500*
*FAX (716) 551-5628*

*CONTACT PERSON* Christopher Jacobs

*PHONE EXTENSION* 2545

*REMARKS:* ☑ *URGENT* ☐ *FOR YOUR REVIEW* ☐ *REPLY ASAP* ☐ *PLEASE COMMENT*

## MESSAGE

We are releasing Mr. Nyanjong from custody the form I-203 is the order releasing him and the form I-220A is his copy.

TOTAL PAGES FAXED INCLUDING THIS PAGE = 3



GOV 0215

## ORDER TO DETAIN OR RELEASE ALIEN

| | | | | | |
|---|---|---|---|---|---|
| To: (NAME and TITLE of Person in Charge of Facility)<br>Chief Administrator | | | | | |
| (Name of Facility)<br>Lakeland Nursing Home, Pineville, LA | | | | | |
| Please ☐ Detain ☒ Release | | | | Date<br>4/1/05 | Time |
| Name of Alien<br>NYANJONG, Duncan | | | | File Number<br>A76 480 523 | |
| Age<br>47 | Date of Birth (Mo./Day/Yr.)<br>6/5/1957 | Sex<br>male | Nationality<br>Kenya | Foreign Address<br>Kenya | |
| Nature of Proceedings<br>Removal Proceedings | | | Signature of Officer Receiving or Releasing Alien | | |
| REMARKS:<br>Per conversation with Mr. Cooley, this<br>subject is being released from custody.<br><br>Call 716-551-4741, x2545 for questions | | | | | |
| Signature of Officer Authorizing Action<br>[signature] | | | Title<br>Deportation Officer | Office<br>Buffalo, NY | |
| Form 1-203 (Rev. 7-15-78) Y<br>UNITED STATES DEPARTMENT OF JUSTICE-Immigration and Naturalization Service | | | | | |

## ORDER TO DETAIN OR RELEASE ALIEN

| | | | | | |
|---|---|---|---|---|---|
| To: (NAME and TITLE of Person in Charge of Facility) | | | | | |
| (Name of Facility) | | | | | |
| Please ☐ Detain ☐ Release | | | | Date | Time |
| Name of Alien | | | | File Number | |
| Age | Date of Birth (Mo./Day/Yr.) | Sex | Nationality | Foreign Address | |
| Nature of Proceedings | | | Signature of Officer Receiving or Releasing Alien | | |
| REMARKS: | | | | | |
| Signature of Officer Authorizing Action | | | Title | Office | |
| Form 1-203 (Rev. 7-15-78) Y<br>UNITED STATES DEPARTMENT OF JUSTICE-Immigration and Naturalization Service | | | | | |



GOV 0216

for. Mr. Nyanjong

U.S. Department of Justice
Immigration and Naturalization Service

# Order of Release on Recognizance

File No: A76 480 523
Date: 02/23/2005

Name: NYANJONG, Duncan

You have been arrested and placed in removal proceedings. In accordance with section 236 of the Immigration and Nationality Act and the applicable provisions of Title 8 of the Code of Federal Regulations, you are being released on your own recognizance provided you comply with the following conditions:

☒ You must report for any hearing or interview as directed by the Immigration and Naturalization Service or the Executive Office for Immigration Review.

☐ You must surrender for removal from the United States if so ordered.

☒ You must report in (writing) (person) to CHRISTOPHER JACOBS, DEPORTATION OFFICER
(Name and Title of Case Officer)
at FEDERAL CENTER, 130 DELAWARE AVENUE, BUFFALO, NY on APRIL 1, 2005 at 10:00 AM
(Location of INS Office) (Day of each week or month) (Time)

If you are allowed to report in writing, the report must contain your name, alien registration number, current address, place of employment, and other pertinent information as required by the officer listed above.

☐ You must not change your place of residence without first securing written permission from the officer listed above.

☒ You must not violate any local, State, or Federal laws or ordinances.

☐ You must assist the Immigration and Naturalization Service in obtaining any necessary travel documents.

☒ Other: (CONTINUED ON ATTACHED SHEET)

☐ See attached sheet containing other specified conditions. (Continue on separate sheet if required)

**NOTICE: Failure to comply with the conditions of this order may result in revocation of your release and your arrest and detention by the Immigration and Naturalization Service.**

(Signature of INS Official)

for WILLIAM CLEARY, FIELD OFFICE DIRECTOR,DRO
(Printed Name and Title of Official)

## Alien's Acknowledgement of Conditions of Release on Recognizance

I hereby acknowledge that I have (read) (had interpreted and explained to me in the ______ language) and understand the conditions of my release as set forth in this order. I further understand that if I do not comply with these conditions, the Immigration and Naturalization Service may revoke my release without further notice.

DO.
(Signature of INS Official Serving Order) (Signature of Alien) (Date)

## Cancellation of Order

I hereby cancel this order of release because: ☐ The alien failed to comply with the conditions of release.
☐ The alien was taken into custody for removal.
(Signature of INS Official Canceling Order) (Date)

Form I-220A (Rev. 4-1-97)N



GOV 0217

**Seligman, Jay A**

**From:** Seligman, Jay A
**Sent:** Monday, April 04, 2005 8:11 AM
**To:** Shack, Timothy T; Johnson, Geralyn S; Wacha, Steve; Cadavid, Gustavo I; Feldesman, Geoff
**Cc:** DeBarros, JeanPierre

Geoff,

Duncan Nyanjong A# 76 480 523 was released from ICE custody on April 1, 2005. DIHS has been paying for his care at Lakeland Nursing Home phone number 318-448-0141. Please do not pay for any care after 1 APR 05.

I was working with the nursing home administrator to assist him with finding alternative funding to pay for his care. Hopefully, he will be able to secure funding.

Please call me if you have any questions.

Commander Jay Seligman, LCSW
National Mental Health Coordinator
Division of Immigration Health Services
Miami, Florida
Office:305-552-1845 x162
Fax: 305-552-7964

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LAKELAND PARTNERS, L.L.C., d/b/a/ LAKELAND NURSING HOME, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-295C (Chief Judge Damich) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DECLARATION OF JAY SELIGMAN**

1. I, Jay Seligman, make the following declaration pursuant to the authority of 28 U.S.C. § 1746. I am aware that this declaration may be filed in the United States Court of Federal Claims, and that a declaration is the legal equivalent of a statement under oath. I have personal knowledge of the matters set forth in this declaration.

2. I am currently employed as a Commander in the Department of Health and Human Services, Health Resources and Services Administration (HRSA), Ready Responder Program. During the time period(s) relevant to the above referenced matter, I was employed as National Mental Health Coordinator in the HRSA, Division of Immigration Health Services.

3. As National Mental Health Coordinator, my job duties and responsibilities included coordinating mental health and medical care for detainees in the custody of the U.S. Immigration and Customs Enforcement. These duties included performing case management of detainees that are being released into the community and conducting utilization review of hospitalizations of mentally and medically ill clients/detainees.

4. I understand that the term "contracting officer" means "any person who,

by appointment in accordance with applicable regulations, has the authority to enter into and administer contracts and make determinations and findings with respect thereto. The term also includes the authorized representative of the contracting officer, acting within the limits of his authority."

5. I represent that I am not an authorized contracting officer.

I declare under penalty of perjury that the foregoing is true and correct.

August 10, 2006

Jay Seligman, Commander
Department of Health and Human Services
Health Resources and Services Administration
Ready Responder Program

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------:

LAKELAND PARTNERS, L.L.C. d/b/a :
LAKELAND NURSING HOME, :
Plaintiff, :
vs. : Case No.
THE UNITED STATES, : 06-295C
Defendant. :

-------------------------------------:

COPY

Washington, D.C.

Friday, November 2, 2007

Videoconferenced Deposition of:

JAY SELIGMAN

called for oral examination by counsel for Plaintiff, pursuant to notice, at Capital Reporting Company, 1821 Jefferson Place, Northwest, Washington, D.C., before Shari R. Broussard, of Capital Reporting Company, a Notary Public in and for the District of Columbia, beginning at 10:24 a.m., when were present on behalf of the respective parties:

 ©2007

June -- so from April 2000 to about June 2002 I was Assistant Health Service Administrator for Krome Service Processing Center located in Miami.

In June to July of 2002 I was promoted to National Mental Health Coordinator, and I took that position until 2000 -- April of 2006.

From then I went on to the position of Ready Responder with the Health Resource Service Administration, and I was there from approximately May 2006 to the end of July 2007. And in August I took the job with HHS and I'm currently in the position of Senior Policy Analyst.

Q So how long did you work for DIHS?

A The Division of Immigration total is from April 2000 to -- what was it? April 2000 to May 2006.

Q And how long did you serve as the National Mental Health Coordinator?

A That started in June or July 2002.

Q Until you left?

A Correct.

Q In May of '06?

competency in any trial would probably not be, you know, likely. However, his condition can improve or what-have-you.

Q Would it be fair to state that as the MHCC, you handled the transfer from the Columbia Care Center down to Lakeland Nursing Home?

A I was the conduit again, the case manager, so, yes, for that part.

Q Would it be fair to state that ICE was concerned with the rising costs of continuing to care for Duncan at the time he was transferred to Lakeland?

A Just with the e-mail you -- you were saying to me, I don't think -- I don't think Immigration really cared that much about it.

Q Would you agree that the reason you transferred Duncan from Columbia Care to Lakeland Nursing Home was to save money on the continuing cost of caring for him?

A That is correct.

Q And the reason is because the rates for a nursing home in Louisiana were a lot lower than the


©2007

rates the Columbia Care Center was charging the Federal Government?

A I think it was $150 less a day or something like that. That's...

Q In fact, in your capacity as MHCC, weren't you shopping around for cheaper medical care centers that could handle inmates or detainees such as Duncan?

A As long as it was an appropriate care facility, yes.

Q I just want to make sure that I'm understanding. The reason that Duncan was sent to the Lakeland Nursing Home was to save money rather than to provide any sort of specialized care that Duncan couldn't have gotten at the Columbia Care Center?

A Cost containment was the reason.

MR. DAVIS: Ms. Dunsmore, if you could place a two-page memorandum in front of Mr. Seligman Bates stamped GOV 263 and 264.

MS. DUNSMORE: Certainly. And we'll mark that as Seligman 2?

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

NUMBER 06-295C

* * * * * * * * * * * * * * * * * * * * * * * *

LAKELAND PARTNERS LLC
D/B/A LAKELAND NURSING HOME
VERSUS
THE UNITED STATES

* * * * * * * * * * * * * * * * * * * * * * * *

The deposition of HENRY ALLEN COOLEY, JR., 166 Foster Road, Leesville, Louisiana, given in the above-entitled cause, pursuant to the following stipulation, before Judy Polderman Gomez, Certified Court Reporter, authorized to administer oaths of witnesses pursuant to Section 961.1 of Title 13 of the Louisiana Revised Statutes of 1950, as amended, reported at the law office HYMEL DAVIS & PETERSEN, 10602 Coursey Boulevard, Baton Rouge, Louisiana, on Friday, November 16, 2007.

COPY

objections for later. Do you have any questions for me?
A. No, ma'am.
Q. Let's begin. I'm going to start with some general background questions. Please state your full name.
A. Henry Allan Cooley, Jr.
Q. When were you born?
A. December 29, 1963.
Q. Where do you currently reside?
A. In Leesville, Louisiana
Q. Are you currently employed?
A. Yes, I am.
Q. Where are you employed?
A. I'm employed at St. Christina Nursing Home which is owned by Lakeland Partners LLC.
Q. How long have you been employed there?
A. At St. Christina, I have been employed there for about four years now.
Q. Where did you work prior to St. Christina?
A. Prior to St. Christina -- which is also Lakeland Nursing Home. We had a name change.
Q When was the name change?

today is that we entered into a contractual agreement with the United States Government, and they failed to carry out that contract.
Q. What was that contract concerning?
A. Payment for a resident that we accepted.
Q. Who was that resident?
A. Duncan Nyanjong.
Q. You -- this is at the Lakeland Nursing Home?
A. Correct.
Q. Where you are currently employed under the name of St. Christina?
A. Correct.
Q. What is your title at Lakeland?
A. I'm the administrator.
Q. What does that mean?
A. Oversee all operations of the nursing home on a day-to-day basis.
Q. Was that your title --
A. Yes.
Q. Was that your title from April 2004 to April 2005?
A. Yes, ma'am.
Q. When was Mr. Nyanjong at the Lakeland

Nursing Home?
A. To the best of my ability, I think we started talking in April of 2004; and I think he was admitted, I want to say, in May of 2004. I would have to look at his records to be sure.
Q. And do you remember when the United States stopped paying for his care?
A. I want to say that it was in April or May of '05.
Q. When -- Mr. Nyanjong is deceased now?
A. Correct.
Q. And he died when he was at your nursing home?
A. Yes, ma'am.
Q. When was that?
A. I do not remember the date.
Q. And from April 2004 to April 2005, your title was administrator?
A. Correct.
Q. And if you could, just talk to me about your responsibility as administrator in a little bit more detail.
A. Okay. As I said, I oversee the day-to-day operations of the nursing home. I oversee each individual department within the

A. It's usually -- I think right now the Medicaid rate is around $101 give or take.
Q. Do you have Medicare or Medicaid?
A. I have both.
Q. Is the price different?
A. Yes, ma'am. Medicare is based on the patient's disease process and amount of services that is required for that patient.
Q. Before we talk about Mr. Nyanjong specifically, I want to talk about residents are admitted.
A. Okay.
Q. What is the procedure for admission to Lakeland?
A. I'm going to refer to the procedure back during the time frame.
Q. Thank you very much.
A. Because the procedure has changed since then.
Q. Absolutely. Let's talk about at the time.
A. Okay. The form for admission to a nursing home at that time was called a 90-L. That's the State of Louisiana's form. And an applicant to a nursing home would have to fill

out that form, put all of their medical conditions, medication, different medical records which describe their behavior, what's going on with them and have it signed by a physician. Once we would get that form in, we would review the form to make sure that we felt like we could meet this resident's mental and medical needs and that they had a payer source to pay for the care. Based on that and bed availability, we would admit the patient into the nursing home.

Q. How do you hear of patients? How do they hear of you?

A. Excuse me?

Q. How do patients find out about your facility?

A. Generally, I market to other nursing homes. In what we call a typical mom and pop nursing home, a patient with mental illness kind of sticks out like a sore thumb. We find in our facility these patients kind of blend in together because everyone has -- or most everyone has a mental illness, and they kind of fit together. It's kind of -- to use an expression -- birds of a feather.

Q. You said there's a medical evaluation that goes on before you admit a patient?
A. Correct. Correct.
Q. Other that the 90-L, is that the only form that has to be filled out?
A. Those are the forms that have to be filled out. We also reviewed Mr. Nyanjong's medical records that were supplied to us to make sure we felt like we could meet his needs.
Q. Are your patients generally able to make their own medical decisions, or do they usually have someone make decisions for them?
A. It goes both ways.
Q. How do patients -- once you fill out the form and you decide you have a bed, how do they know the terms and conditions of their stay?
A. We have what we call an admission packet. The admissions packet has an agreement in it where the resident will -- or the responsible person will sign and say this is the terms and conditions that we agree with. It gives us the ability to transport the resident to take their photograph, to provide what medical care is needed.

Q. Did you enter into an agreement like that with Mr. Nyanjong?
A. I would like to look at his records, but I would assume so.
BY MS. DUNSMORE:
We're working on a copy of that.
BY MR. HARTDEGEN:
I'm looking.
EXAMINATION BY MS. DUNSMORE:
Q. So that agreement sets out what's paid for, what isn't paid for, what you're allowed to do, what you're not allowed to do?
A. Normally with the residents that agreement does, yes.
Q. That's provided to patients when they're admitted or their caretaker? What services --
A. Correct.
Q. -- what services are included? If you will give me a general description of what's included as part of your pay and what if anything is extra?
A. If I'm understanding your question correctly, our basic services are included; medication administration, various treatment

because his case is different than most of my other residents -- if Mr. Nyanjong needed to see a dermatologist as you suggested, what we would have to do, there was a form -- I believe it was from DIHS -- which stated treatment authorization request. We would have to send the form over -- in this case -- to Commander Seligman and have him fill out the form and approve it before we could send Mr. Nyanjong to a dermatologist.

Q. How would you send that to him?

A. We usually fax it.

Q. I think we have one of these. We'll come back to that. For a regular patient, after you had the form 90-L, they would sign a contract or admission statement which would include certain things covered through the nursing home -- the sort of routine mental illness health care -- but other things would have to be arranged separate through the Medicaid or payer or whoever it was?

A. Yes, ma'am.

Q. That's how they know the terms and conditions of their stay at Lakeland is through that packet?

A. I would say for the most part, because of the wide range or residents that we deal with, some residents refuse to sign their packet and may not have a complete understanding of that. The social worker at the time will usually try to explain all that to the resident verbally.

Q. Somebody -- either the social worker or someone else -- somebody knows what they're getting and what they're not getting because of this agreement?

A. Right.

Q. I'm going to tender a document I'm going to mark Cooley 1, Gov Bates 183 to 184. This is the copy for you to be marked. Here is a copy for you. Mr. Cooley, are you familiar with this document? You should take a minute to look at it.

A. Yes, ma'am.

Q. What is this document?

A. This is a form 90-L.

Q. This is a 90-L?

A. Yes, ma'am. If you will see on the top left-hand corner.

Q. I do see that. This is a request for

medical eligibility determination?
A. Yes, ma'am.
Q. This is the document we discussed before that you would -- would be sent to you, and you would review it and then determine whether or not you had space. Did you ever receive one of these forms and review and determine that you weren't capable of taking care of a patient based on the form?
A. Yes, ma'am.
Q. So sometimes you would -- you wouldn't have space, and we discussed that?
A. Correct.
Q. Sometimes you would also determine that you didn't have the capacity or the capability to take care of a person because of their medical issues?
A. Correct.
Q. Were there other times that you got a form and didn't take the patient?
A. We have also not taken patients because they had no payer source or we felt they wouldn't want fit into our facility because of medical or mental conditions. There's a variety of reasons why we might not

accept a resident.
Q. So you would get this form and review it. You would determine whether or not you wanted -- you had space for the patient?
A. Correct.
Q. Then after that, you would send -- like we discussed -- the admissions form which they would sign and --
A. Once they would come into the facility, we would usually have the admission forms or packet filled out.
Q. Lakeland has represented to the Government it considers this document to be a contract between it and the Government. Do you consider this to be a contract?
A. In this particular case, I do.
Q. Now, do you have an admissions form in this case?
A. I would have to look and see. I do not know.
Q. But this is not the only document that you require patients to sign upon admission?
A. We don't require the patient to actually sign this document.
Q. They sign the other document that we

discussed?

A. Right.

Q. This document doesn't have the terms and conditions that we discussed. That's in the other document?

A. Correct.

Q. It doesn't have the price?

A. Correct. In Mr. Nyanjong's case, the prices were discussed with Commander Seligman before they decided to send him to us. That was the first thing he wanted to know, what would be our price before he ever wanted to fill out any documents.

Q. I'm asking generally right now. We'll get back to Mr. Nyanjong's situation. Number II is the level of care determination on this form?

A. Correct.

Q. It just tells you what sort of care they need. And do you provide the care here? The intermediate care or skilled care, is that provided by the nursing home?

A. Yes.

Q. This is part of the nursing home regular fee?

A. This --
Q. This care is not extra?
A. I'm --
Q. Here. Intermediate care. It says includes need for nursing care to manage a plan of care or more extensive care with ambulation or mobilization. The personal care, ambulation and mobilization is provided as part of the nursing home fee?
A. Yes, ma'am.
Q. But that's on the - -on this form. You just know that. It's not written here anywhere?
A. Okay.
Q. I think we discussed that filling out this form doesn't guarantee you a spot at the nursing home, does it?
A. No, ma'am.
Q. Because this form says request for medical care. It's not a guarantee?
A. Correct.
Q. I'm going to put this aside for a minute. I'm just talking generally again. Once a patient is admitted -- we discussed they have filled out the form, you decide you have a

placing the Cubans?
A. Yes. Actually, we had several people inquiring about placing residents within our facility because Louisiana had the lowest per diem rate at that time in the nation. Commander Seligman had told me it cost the Government a lot more money to keep the people in these other facilities. It was a win-win situation for both he and I.
Q. Did he ever contact you and you weren't able to take their --
A. I think there was a couple of people we felt may be too violent for our facility. This is me trying to remember from a couple of years ago.
Q. Would these people have filled out a 90-L form?
A. They would fill out the 90-L and medical bills.
Q. After reviewing the 90-L, you decided you wouldn't take them?
A. And all the medical information. I just seem to remember someone who was violent.
Q. The 90-L doesn't guarantee a spot in the nursing home?

A. Correct.
Q. Would you suppose you would have those 90-Ls?
A. For the other people that we --
Q. Didn't take.
A. I would doubt it. We usually would keep them for a few months. Then get rid of them because we didn't accept those people.
Q. When did you first became aware that INS -- I guess it's actually ICE -- when did you first become aware the Federal Government wished to release Duncan Nyanjong from custody?
A. After Mr. Nyanjong's hospital stay at Huey P. Long, I received -- I think I received a phone call first from somebody in Buffalo, New York maybe. I want to say Christopher Jacobs. That name is familiar. I don't know if he's the one that signed the order of release or if he is the one I talked to first. But he had told me that the Government has decided that Mr. Nyanjong was no longer a threat to society, and they were going to release him.
Q. Do you remember when that was?
A. I want to say -- my best guess is