IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LAKELAND PARTNERS, L.L.C.<br>d/b/a LAKELAND NURSING HOME,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 06-295C<br>(Judge Margaret M. Sweeney) |

**MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AND MOTION *IN LIMINE***

## I. Table of Contents


1. Table of Authorities. . . . . ii

2. Statement of the Issues. . . . . 1

3. Introduction. . . . . 1

4. Statement of the Case. . . . . 1

5. Law and Argument. . . . . 8

   A. Summary Judgment Standard. . . . . 8

   B. Mr. Seligman Had Implied Authority. . . . . 9

   C. A Contract Existed Between Defendant and Lakeland. . . . . 13

   D. The Government Ratified the Contract. . . . . 14

   E. Nyanjong Was Not Discharged Nor Released From ICE Custody. . . . . 16

   F. Evidence of Nyanjong's Release Should Be Excluded. . . . . 19

6. Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## II. Table of Authorities

**Cases**

*Brook v. Carey*, 2007 WL 2069941 *5 (E.D. Cal. 2007).. . . . . . . . . . . . . . . . . . . . . . . . . 20

*Bruther v. Gen. Elec. Co.*, 818 F. Supp. 1238, 1240 (S.D.Ind. 1993). . . . . . . . . . . . . . . . . 19

*Brunner v. United States*, 70 Fed.Cl. 623, 640 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 14

*Dureiko v. United States*, 62 Fed.Cl. 340, 353 (2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Garza v. United States*, 34 Fed.Cl. 1, 14 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Kerr-McGee Corp. v. U.S.*, 77 Fed.Cl. 309 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Khairallah v. United States*, 43 Fed.Cl. 57 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Leonardo v. United States*, 60 Fed.Cl. 126 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Silverman v. United States*, 230 Ct.Cl. 701 (1982). . . . . . . . . . . . . . . . . . . . . . . . . 14 - 15

*Son Broadcasting, Inc. v. United States*, 52 Fed.Cl. 815 (2002). . . . . . . . . . . . . . . . . . . . . 9

*Zoubi v. United States*, 25 Cl.Ct. 581 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**Statutes**

Fed. R. Evid. 901 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

RCFC 56(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

8 C.F.R. 1003.19. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

## III. Statement of the Issues

1. Whether Jay Seligman had authority to enter into contract with Lakeland on behalf of defendant for the provision of healthcare service for ICE detainee Duncan Nyanjong.

2. Whether defendant ratified the contract with Lakeland for the provision of healthcare services to detainee Duncan Nyanjong.

3. Whether a contract existed between Lakeland and defendant.

4. Whether Duncan Nyanjong was properly released from ICE custody.

5. Whether defendant should be prohibited from introducing evidence pertaining to the release or discharge of Nyanjong or the dropping of his detainer at the trial of this matter.

## IV. Introduction

This case involves a breach of contract by defendant. Defendant' star witness has likened defendant's conduct to "patient dumping." *See* Deposition of Jay Seligman, attached *in globo* as Exhibit F, p. 67. Lakeland asserts that its Motion for Summary Judgment and Motion *In Limine* should be granted for the following reasons:

## V. Statement of the Case

Prior to the facts giving rise to this suit, the Department of Homeland Security, Immigration and Customs Enforcement ("ICE") entered into an Interagency Agreement with the Department of Health and Human Services, Bureau of Primary Health Care ("BPHC") to provide on-site health care and other health-related services to

undocumented aliens in ICE custody. *See* Interagency Agreement, attached as Exhibit A; Defendant's Answer to Interrogatories, attached *in globo* as Exhibit B, No. 5.[1]

DIHS is responsible for the administration of a comprehensive health care delivery system incorporating medical, mental health, dental, and environmental health services. *See* DIHS Policies and Procedures, Chapter 1 - Organization and Executive Direction, p. 1, attached as Exhibit C. The Department of Immigration Health Services ("DIHS") is a part of BPHC and serves as "the medical authority for ICE" to provide all of the services set forth in the Interagency Agreement. DIHS also provides the management, direction, coordination, and oversight of medical services provided to undocumented aliens in ICE custody. *See* Defendant's Answers to Interrogatories, Exhibit B, No. 5; *see also* DIHS Policies and Procedures, Exhibit C.

In November 2000, ICE detained Duncan Nyanjong. *See* Exhibit 2 to Deposition of Seligman, attached as Exhibit D. In December 2000, Nyanjong appeared before an immigration judge. *Id.* The immigration judge refused to go forward with Nyanjong's case until ICE could provide medical evidence that Nyanjong understood the nature of the proceedings against him. *Id.* ICE was unable to do so. In January 2001, Nyanjong was placed in the Columbia Care Center ("CCC") for psychiatric treatment. *Id.* Nyanjong's immigration case was administratively closed until such time that he became mentally competent. *Id.*

---

[1] All exhibits, other than Interrogatories and Requests for Admissions, were provided by defendant via its answers to Request for Production of Documents.

The cost of caring for Nyanjong at CCC was $350 a day. *Id.* In fact, as of January 2004, the cost of caring for Nyanjong had reached over $400,000. *See* Exhibit 3 to Deposition of Seligman, attached as Exhibit E.

Mr. Nyanjong's care had been assigned to Jay Seligman, a National Mental Health Coordinator with DIHS. *Id.* Mr. Seligman believed that Nyanjong would probably never be competent enough to understand the nature of his proceedings. *See* Exhibit 2 to Deposition of Seligman, attached as Exhibit D; Deposition of Seligman, attached *in globo* as Exhibit F, p. 33. Therefore, given the costs of care at CCC, ICE and DIHS became increasingly concerned about the cost of Nyanjong's care. *Id.* at p. 27. Therefore, Mr. Seligman began searching for a nursing home in which to place Nyanjong. *See* Exhibit 3 to Seligman Deposition, attached as Exhibit E; *see also* Deposition of Seligman, Exhibit F, p. 28. Cost containment was the sole reason for the search. *Id.* at p. 28.

In April 2004, Lakeland was contacted by Mr. Seligman. On behalf of ICE and DIHS, Mr. Seligman negotiated the terms of Nyanjong's placement at Lakeland with Hank Cooley, Lakeland's administrator. Because of Nyanjong's condition, which had clearly prevented him from being released from ICE custody, Mr. Seligman never indicated to Mr. Cooley that Nyanjong's placement would be temporary. *See* Deposition of Hank Cooley, attached *in globo* as Exhibit G, p. 75. In fact, Mr. Seligman believed that Nyanjong would be at Lakeland until he passed away or was mentally competent to stand trial, or until an alternative payor source was located. *See* Deposition of Seligman, Exhibit F, pp. 25 - 26. Mr. Cooley was never informed that there was a chance Nyanjong

would be released from ICE custody or that his funding could be cut off. *See* Deposition of Cooley, Exhibit G, p. 80. In fact, Lakeland would not have accepted Nyanjong if it had known those things were possible. *See* Deposition of Cooley, Exhibit G, p. 81. Based upon Mr. Seligman's representations, Mr. Cooley believed Nyanjong's placement in Lakeland to be permanent, i.e., until an alternative payor source was located or until Nyanjong died. *Id.* at p. 75.

According to defendant, the procedure DIHS used for placing individuals in private care facilities, such as Lakeland, was as follows:

> An undocumented alien in the custody of ICE, as indicated by a valid alien number in the Detained Alien Control System (DACS), is provided medical services as described in the Immigration Health Services Provider Handbook, previously provided at GOV 0027-0087. Medical facilities that are in the DIHS Managed Care Provider Network must obtain prior authorization for all admissions and procedures as described in a completed DIHS Treatment Authorization Request (TAR) from the DIHS Managed Care Coordinator. Medical coverage of undocumented aliens begins the first day that an individual is placed in custody and under the jurisdiction of the DIHS and ends the day that DHS releases the detainee from custody. The previously provided Immigration Health Services Provider Handbook details the procedures for obtaining authorization for medical services, medical referrals, payment of claims, appeal of claims, and specific medically necessary and appropriate health care services and treatment that DIHS will authorize. If the Managed Care Coordinator deems it necessary and a TAR is approved, this medical care may include placement of an individual in a private care facility such as Lakeland.

*See* Defendant's Answers to Interrogatories, Exhibit B, No. 5.

Defendant admitted that Mr. Seligman followed this procedure in having Nyanjong admitted to Lakeland. *See* Defendant's Answer to Interrogatories, Exhibit B, No. 6. In fact, on April 19, 2004, Mr. Seligman completed the Request For Medical

Eligibility Determination, which had been provided by Lakeland. *See* Request for Medical Eligibility Determination, attached as Exhibit H. Mr. Seligman confirmed his previous conversations with Hank Cooley by marking "permanent" on the request which indicated Nyanjong was being placed in Lakeland permanently. *Id.*; Deposition of Cooley, Exhibit G, p. 75. The Request for Medical Eligibility Determination also stated that DIHS would be the responsible party for payment. *Id.*

On May 11, 2004, Mr. Seligman completed the Treatment Authorization Request. *See* TAR, attached as Exhibit I. INS was notified. *Id.* The TAR was submitted to the appropriate Managed Care Coordinator for approval. *Id.*; *see* Deposition of Seligman, Exhibit F, p. 56; Defendant's Answers to Interrogatories, Exhibit B, No. 6; Defendant's Answers to Requests for Admissions, attached *in globo* as Exhibit J, Nos. 3 and 10.

In fact, defendant has admitted that Mr. Seligman followed proper and usual procedures in placing Nyanjong in Lakeland and that Nyanjong's placement in Lakeland was approved by the appropriate ICE and DIHS officials. *Id.*; Defendant's Answers to Requests for Admissions, Exhibit J, No. 15.

Lakeland and Mr. Seligman also agreed that the monthly rate paid to Lakeland would be $2,964 plus pharmacy costs. On May 12, 2004, Lakeland received Nyanjong as a patient. Lakeland had no problems receiving payment from ICE/DIHS. *See* Deposition of Cooley, Exhibit G, p. 85; Deposition of Seligman, Exhibit F, p. 62.

The manner in which ICE and DIHS paid Lakeland for its services was in accordance with ICE and DIHS procedures. *See* Defendant's Answers to Requests for

Admissions, Exhibit J, No. 9. Payment was also approved by the appropriate ICE and DIHS officials. *See Id.*, No. 11.

Lakeland treated Nyanjong without incident until January 15, 2005, when a nurse found him on the floor and unresponsive. Nyanjong was transferred to Huey P. Long Hospital, which diagnosed him with respiratory failure and placed him in the ICU on a ventilator.

On February 4, 2005, Nyanjong was returned to Lakeland, too weak to ambulate or take care of himself. Nyanjong could not feed, clean, or otherwise care for himself. Mentally he was unable to understand anything beyond simple commands.

As a result of Nyanjong's admission to Huey P. Long Hospital, ICE began to reconsider Nyanjong's status. *See* Defendant's Answers to Interrogatories, Exhibit B, No. 13; Order to Release Alien, attached as Exhibit M. Specifically, towards the end of February 2005, William Cleary, the ICE Field Office Director, noted that Nyanjong was in a wheelchair and therefore there was no likelihood of his danger to the community. *See* Exhibit 9 to Deposition of Seligman, attached as Exhibit K. Mr. Cleary noted that Nyanjong's case had been administratively closed pending medical treatment. *Id.* However, Mr. Cleary recommended releasing Nyanjong "O.R. after providing sufficient notice to the nursing home of our intention and to provide them sufficient time to find another location for him to obtain other funding source to pay for his care." *Id.*

On April 1, 2005, Nyanjong was allegedly released from ICE custody. *See* Exhibit 10 to Deposition of Seligman, attached as Exhibit L. As of March 2005,

defendant quit providing payment for Nyanjong's care. Eventually, Christopher Jacobs faxed to Lakeland an Order to Release Nyanjong on April 1, 2005. *See* Order to Release Alien, attached as Exhibit M.

However, licensing standards for nursing homes, as well as Medicare and Medicaid regulations, prevented Lakeland from simply discharging Nyanjong, a patient unable to care for himself. Nyanjong's mental condition prevented Lakeland from conveying notice of discharge. Further, Louisiana Medicaid precludes coverage to non-citizens, and social security disability is necessary to qualify for Medicaid. Lakeland contacted a variety of nursing homes, hospice agencies, and indigent pharmacy agencies, all of whom refused to accept Nyanjong or otherwise contribute to his care. Lakeland therefore requested that defendant honor its contract with Lakeland by continuing to pay for Nyanjong's care. Defendant refused.

Therefore, Lakeland filed the instant suit on April 14, 2006. At that time, Lakeland had incurred more than $49,500 in costs and expenses for the care of Nyanjong. Nyanjong eventually died in Lakeland nursing home. Lakeland paid for all expenses and costs associated with his care until that time.

In defending this suit, defendant has maintained that no contract existed between Lakeland and defendant for the provision of healthcare services to Nyanjong. Defendant has also maintained that Mr. Seligman had no authority to contract with Lakeland on defendant's behalf. However, based on the facts herein and the following, Lakeland asserts that Mr. Seligman had authority to contract with Lakeland for the placement of

Nyanjong. Lakeland also asserts that a contract existed between Lakeland and defendant for the provision of healthcare services to Nyanjong. Lakeland requests that partial summary judgment be granted in its favor holding as such.

## VI. Law and Argument

### A. Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Kerr-McGee Corp. v. U.S.*, 77 Fed.Cl. 309, 314 (2007). A fact is material if it "might affect the outcome of the suit under the governing law. *Id.* An issue is genuine if it "may reasonably be resolved in favor of either party." *Id.*

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Id.* The moving party may discharge its burden by "pointing out ... that there is an absence of evidence to support the nonmoving party's case." *Id.* The moving party is not required to support its application with affidavits, but instead may rely solely on the pleadings, depositions, answers to interrogatories, and admissions. *Id.* The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial. *Id.* The nonmoving party must go beyond the pleadings and support its opposition with affidavits or with depositions, answers to interrogatories, and admissions. *Id.*

The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. *Id.* Entry of summary judgment is

mandated, after adequate time for discovery, against a party who fails to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.*

### B. Mr. Seligman Had Implied Authority

In order to establish the existence of a contract, a plaintiff must show that the government employee who entered the agreement had actual authority to contract. *Leonardo v. United States*, 60 Fed.Cl. 126, 130 (2004). Actual authority may be express or implied. *Son Broadcasting, Inc. v. United States*, 52 Fed.Cl. 815, 820 (2002); *Brunner v. United States*, 70 Fed.Cl. 623, 640 (2006) ("The authority to contract with the government is not limited to express authority, but may also be implied.").

An inquiry into the precise nature of the government employee's duties is appropriate to determine whether implied authority exists. *Leonardo*, 60 Fed.Cl. at 130. The Supreme Court has expressed its test as whether the power to be implied is the "usual and appropriate mode" or "the appropriate means" of performing a duty, or of doing what an officer "has a right to do." *Brunner*, 70 Fed.Cl. at 641 (citing *Bradley v. United States*, 98 U.S. 104, 114 (1878)). Courts have also held that authority to bind the government is generally implied when such authority is considered to be an integral part of the duties assigned to a government employee. *Brunner*, at 641.

For example, the Federal Circuit has suggested that implicit authority could be based on "responsibility for [a] subcontractor's administration" and "the authority to draw checks on [a] joint bank account" established for the subcontract. *Brunner*, at 641 (citing

*H. Landau & Co. v. U.S.*, 886 F.2d 322, 324 (1982)). The Court of Federal Claims has found the implied authority to contract based on the duties of scheduling, hiring, and paying invoices, that were central to an officer's work. *Id.* "Thus, it has long been established that an agent may have an implied authority to contract on behalf of the government, based on a consideration of the duties of that agent, and whether the power to contract was appropriate or essential to their performance." *Id.* Simply stated, actual authority to contract may be implied by the related duties and powers of a government agent. *Id.* at 643; *see, e.g., Zoubi v. United States*, 25 Cl.Ct. 581, 588 (1992) (holding that official not designated as a contracting officer had authority to contract where doing so was necessary to fulfill the officer's duties).

Jay Seligman's position description stated that it was his responsibility to receive written treatment authorization requests for off-site and/or non-routine mental health care services from DIHS Managed Care Coordinators. *See* NMHC Position Description, attached as Exhibit N. Mr. Seligman also functioned as a reviewer to determine mental health necessity and appropriateness of requested services. *Id.* It was also Mr. Seligman's responsibility to provide support and assistance to ICE in placing detainees with special mental health needs in appropriate facilities. *Id.* Mr. Seligman's position description also stated:

> **4. Authority and Responsibility**
>
> • The incumbent works as an independent provider of mental health services. The incumbent is expected to oversee the mental health care of those detained in long term mental health treatment facilities. The

> incumbent shall also have responsibility for the development and implementation of national mental health operating procedures.

*Id.* One purpose of Mr. Seligman's job was "prevention of the introduction of potentially dangerous individuals into the community." *Id.*

Mr. Seligman also described his duties as NMHC as follows:

> A. . . . I was a managed healthcare coordinator and my responsibilities was [sic] to follow the care of detainees for – if we couldn't provide care for them in our own facilities, I would follow them and track them into other healthcare facilities, whether outpatient, mental health or medical care, or inpatient facilities in the community.
> Q. So you would locate healthcare facilities for detainees to provide healthcare to them?
> A. Correct.

*See* Deposition of Seligman, Exhibit F, p. 12.

Mr. Seligman's deposition testimony also shows that Mr. Seligman was the official responsible for negotiating such contracts on behalf of defendant. *Id.* at p. 12. Mr. Seligman testified that, when DIHS did not have a prior relationship with a facility, he would send a TAR form to the facility. *Id.* It was Mr. Seligman's responsibility for preparing the paperwork for getting detainees admitted into a healthcare facility, including the TAR. *Id.* at pp. 12 and 14. Mr. Seligman testified that he always had the "blessing of ICE" and was granted authority by them in completing such paperwork. *Id.* at 13.

Furthermore, Mr. Seligman was the "case manager" for Nyanjong. *Id.* at 27. Mr. Seligman testified that he was responsible for coordinating the transfer of Nyanjong into another healthcare facility and that he got approval from DIHS and ICE for doing so.

*Id.* at 56. After getting that approval, Mr. Seligman testified that he was "the authorizing officer." *Id.* at 57.

It was also Mr. Seligman's responsibility to review payment statements submitted by healthcare facilities and to authorize payment. *Id.* at 15. Defendant has also admitted that it was part of Mr. Seligman's job to place detainees in healthcare facilities such as Lakeland. *See* Defendant's Answers to Request for Admissions, Exhibit J, No. 16. Defendant also admitted that, given Mr. Seligman's duties as NMHC, it was appropriate for Mr. Seligman to place Nyanjong in Lakeland. *Id.* at No. 17.[2]

Clearly, given these facts and based upon defendant's own admissions, it was appropriate for Mr. Seligman to negotiate on behalf of defendant the terms of Nyanjong's placement at Lakeland. In fact, as noted, defendant admitted that Mr. Seligman followed the usual and appropriate procedures for admitting Nyanjong into Lakeland. Additionally, considering Mr. Seligman's duties as NMHC, the power to contract with Lakeland was appropriate or essential to his being able to perform his job.

Furthermore, DIHS regulations do not require that authorizations for placement in off-site facilities such as Lakeland be approved by a contracting officer. To the contrary, defendant has admitted that authorization for admissions is obtained via a TAR. In this case, as noted, Mr. Seligman testified that he filled out the TAR in which he specified

---

[2] Notably, Mr. Seligman also stated that his approval was required for Huey P. Long hospital to get paid for its services. *See* Deposition of Seligman, Exhibit F, p. 41. This is further evidence of Mr. Seligman's authority.

that payment was to be made to Lakeland until Nyanjong was discharged. *See* TAR, Exhibit I. As noted, defendant has admitted that the appropriate official approved the TAR.

It is therefore clear that Mr. Seligman had the authority and responsibility for placing Nyanjong in Lakeland. Obviously, integral to that authority and responsibility was the power to negotiate the terms of care and payment and the authority to guarantee that payment would be made by defendant.

Therefore, Lakeland requests that it be granted partial summary judgment holding that Mr. Seligman had the implied authority to negotiate and enter into a contract with Lakeland on behalf of defendant for the provision of healthcare services for Nyanjong.

**C. A Contract Existed Between Defendant and Lakeland**

To establish the existence of a contract, whether express or implied-in-fact, the plaintiff mus show: (1) that there was an unambiguous offer to contract upon specific terms; (2) that there was an unambiguous acceptance of that offer; (3) that both parties intended to enter into a contract; and (4) that the United States received consideration. *Garza v. United States*, 34 Fed.Cl. 1, 14 (1995).

In this case, it is clear that all of these elements are satisfied. There was clearly an offer made to Lakeland to accept Nyanjong as a patient. Defendant readily admits that the appropriate officials approved Nyanjong's admission to Lakeland. Clearly, based upon the facts herein, both parties intended for Lakeland to accept Nyanjong as a patient and intended to defendant to provide payment to Lakeland - i.e., both parties intended to

enter into a contract. Lastly, the United States clearly received consideration for the contract and defendant has admitted this fact. *See* Defendant Answers to Requests for Admissions, Exhibit J, No. 19.

Therefore, Lakeland requests that a summary judgment be granted in its favor holding that defendant entered into a contract with Lakeland for the provision of healthcare services for Duncan Nyanjong.

**D. The Government Ratified The Contract**

The government may also ratify a contract entered into without authority from a contracting officer. To make the requisite showing to support ratification, the plaintiff must show that a superior official had authority to ratify, knowledge of a subordinate's unauthorized act, and then must confirm, adopt, or acquiesce to the unauthorized action. *Dureiko v. United States*, 62 Fed.Cl. 340, 353 (2004); *see also Brunner*, 70 Fed.Cl. at 646. Actual or constructive knowledge is sufficient. *Id.* Stated another way, ratification requires knowing acquiescence to an unauthorized agreement by a superior who has contracting authority. *Khairallah v. United States*, 43 Fed.Cl. 57, 64 (1999).

In *Silverman v. United States*, the Court of Claims held that a contract implied in fact is a contract "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Silverman v. United States*, 230 Ct.Cl. 701, 871 (1982). In *Silverman*, the court held that:

> Although the senior FTC official was not a contracting officer for the FTC, with expressly delegated authority to make contracts for the Government, the FTC retained and utilized the transcripts which the plaintiff released to the FTC on the basis of the official's promise [that the FTC would pay for the transcripts]. By accepting the benefits flowing from the senior FTC official's promise of payment, the FTC ratified such promise and was bound by it.

*Id.*

In this case, the following is undisputed: (1) that Mr. Seligman's superiors whom defendant contends had contracting authority were aware of the contract with Lakeland;. *(see* Defendant's Answers to Request for Admissions, Exhibit J, No. 20); (2) that the official whom defendant contends had contracting authority was aware that Lakeland was being compensated for the healthcare services it was providing to Nyanjong (*Id.* at No. 21); (3) that the manner in which Lakeland was paid for its service was in accordance with proper procedures (*Id.* at No. 9); (4) that Nyanjong's placement in Lakeland was approved by the appropriate ICE and/or DIHS officials (*Id.* at No. 10); (5) that payment to Lakeland was approved by the appropriate ICE and/or DIHS officials (*Id.* at No. 11); and (6) that defendant received a benefit from Lakeland's services (*Id.* at No. 19).

Mr. Seligman also testified that Lakeland's bills went through the proper channels to be paid. *See* Deposition of Seligman, Exhibit F, p. 62. Furthermore, as noted, Mr. Seligman testified that he received all proper authorizations from ICE and DIHS. Receiving such authorizations included submitting the TAR to the appropriate officials for approval.

Based on the foregoing law and facts cited herein, defendant entered into a contract with Lakeland even if Mr. Seligman did not have authority to contract on behalf of defendant. Therefore, Lakeland requests that a partial summary judgment be rendered holding that defendant ratified the contract with Lakeland for the provision of healthcare services to Nyanjong.

**E. Nyanjong Was Not Discharged Nor Released From ICE Custody**

On November 16, 2006, Lakeland sent a Request for Production of Documents to defendant, which included requests for any documents concerning ICE's release of Nyanjong. Defendant responded that all such documents could be found at GOV 0214-218, 220. *See* Defendant's Responses to Request for Production, attached *in globo* as Exhibit O, No. 3. Defendant also stated that it was not aware of any documents related to any proceedings or hearings related or pertaining to the order of release on recognizance of Nyanjong. *See Id.* at No. 4.

On April 10, 2007, counsel for Lakeland again requested that defendant search for and provide any documents related to Nyanjong's release. *See* 4/10/07 Correspondence, attached as Exhibit P. On September 17, 2007, defendant responded by providing a letter from ICE. The letter stated that ICE has not further documents related to the release of Nyanjong in its possession. *See* 9/17/07 Correspondence, attached as Exhibit Q.

**1. The Order of Release Was Legally Ineffective**

In response to discovery requests, two documents were provided as proof that Nyanjong was released from United States' custody. *See* Order to Detain or Release

Alien, Exhibit M; Order to Release on Recognizance, attached as Exhibit R. Both documents, constituting the order of release from United States' custody, are legally ineffective because they are incomplete orders.

The first document, Order to Detain or Release Alien, purported to direct Lakeland to release Nyanjong because removal proceedings had been instituted against him. The form was signed by Christopher Jacobs, Deportation Officer, who authorized the action. However, the form also provided for the signature of the officer physically receiving or releasing Nyanjong. This portion of the form was left blank. The two signature blocks indicate that two officers needed to participate in releasing Nyanjong. However, only Mr. Jacobs, who authorized the release, signed the form.

Furthermore, the Order to Detain or Release Alien indicated that "removal proceedings" had occurred. Yet, defendant has not been able to produce any documents related to removal proceedings.

The second document is an Order to Release on Recognizance. The form stated that Nyanjong was being placed into removal proceedings and that he would be released from the custody of the government if he complied with the conditions of release. One condition of release was that Nyanjong must report for any hearings for Immigration Review. *See* Order to Release on Recognizance, Exhibit R. Another condition was that Nyanjong was to report either in writing or in person (the method of reporting was incomplete) to Christopher Jacobs, Deportation Officer, in New York, on April 1, 2005. *Id.* A third condition marked on the form was that Nyanjong was to comply with

conditions contained on an attached sheet, which was not attached to the form and thus unknown and incomplete. *Id.*

A portion of the form also required that Nyanjong acknowledge the conditions of release by being served with a copy and signing the form. *Id.* Christopher Jacobs signed and attested that he had served the order on Nyanjong but left the date blank. The form had a notice that "[f]ailure to comply with the conditions of this order may result in revocation of your release and your arrest and detention by the Immigration and Naturalization Service." *Id.*

Nyanjong was never served with a copy of these orders. Despite attesting that he served Nyanjong with the order, Mr. Jacobs actually faxed a copy of the orders to Lakeland's administrator. Mr. Jacobs did nothing to ensure that Nyanjong agreed to the conditions of release. It is undisputed that, at the time Nyanjong was in fact bed-ridden at Lakeland's facility, mentally incompetent, and unable to understand the conditions of release. He was unable to agree to appear in New York on April 1, 2005, (and he obviously did not appear). Furthermore, ICE was aware that Nyanjong could not understand the proceedings against him and his release due to the fact that he was incompetent to stand trial in 2001 and that his mental condition had continued to decline.

Since both documents are incomplete, the order of release from United States' custody is legally ineffective.

Furthermore, defendant has stated that, in releasing aliens, ICE follows the same legal standard that Immigration Judges use at the Board of Immigration Appeals. *See*

Answers to Interrogatories, Exhibit B, No. 7. Defendant asserted that the standard is whether the alien is a flight risk or a danger to the community and cites to 8 C.F.R. 1003.19. *Id.* Defendant further stated that, "while there are certain classifications of aliens that may not seek reclassification, see 8 CFR § 1003.19, if the alien can show by 'clear and convincing evidence' that he/she is not a flight risk or danger to the community, he/she will often be released pursuant to the procedures detailed in the statute and regulations." *Id.* However, it is clear that Nyanjong was not released pursuant to those statutes and regulations. In fact, 8 CFR § 1003.19(h)(3), relied upon by defendant, clearly states that "an alien must first determine, by clear and convincing evidence, that release would not pose a danger to other persons or to property. If an alien meets this burden, the alien must further demonstrate, by clear and convincing evidence, that the aline is likely to appear for any scheduled proceedings or interview."

Clearly, in this case Nyanjong was not properly discharged from ICE custody. Lakeland therefore requests that a partial summary judgment be granted in its favor declaring that Nyanjong was never properly released or discharged from ICE custody.

**F. Evidence of Nyanjong's Release Should Be Excluded**

Federal Rule of Evidence article 901 provides:

> **(a) General provision.** The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

The rationale is that a document has no relevance if there is no evidence that it is what it purports to be. *Bruther v. Gen. Elec. Co.*, 818 F. Supp. 1238, 1240 (S.D.Ind. 1993).

As noted in response to requests by Lakeland which requested copies of any and all records and documents related to any proceedings or hearings pertaining or relating to Nyanjong's release, the United States responded that it is not aware of any such documents.

The United States provided plaintiff with a copy of only two documents, which purported to be an order of release of Nyanjong from United States' custody. However, the documents have not been authenticated and are not even complete in form. By the United States' own discovery answers, it does not have any other documents that would authenticate these two documents.

Furthermore, incomplete documents must be stricken from evidence. *Brook v. Carey*, 2007 WL 2069941 *5 (E.D. Cal. 2007) (holding that two documents must be stricken because they were incomplete, unsigned, and not authenticated).

Therefore, Lakeland requests that any evidence regarding the release or discharge of Nyanjong or the dropping of his detainer be excluded from evidence at the trial of this matter.

## VII. Conclusion

Based on the foregoing, Lakeland requests that a partial summary judgment be granted in its favor holding the following: (1) that Jay Seligman had authority to contract

on behalf of defendant with Lakeland for the provision of healthcare services for Duncan Nyanjong; (2) that a contract existed between defendant and Lakeland for the provision of healthcare services for Duncan Nyanjong; (3) that defendant ratified the contract with Lakeland for the provision of healthcare services for Duncan Nyanjong; and (4) that Duncan Nyanjong was never released from ICE custody.

Defendant also requests that this court grant Lakeland's Motion *In Limine* and exclude any evidence pertaining to the release or discharge of Nyanjong or the dropping of his detainer.

Respectfully submitted,

HYMEL DAVIS & PETERSEN, L.L.C.

s/Michael Reese Davis
Michael Reese Davis (Bar Roll No. 17529)
10602 Coursey Boulevard
Baton Rouge, Louisiana 70816
Telephone: (225) 298-8118
Facsimile: (225) 298-8119
mdavis@hymeldavis.com

**Counsel for Plaintiff Lakeland Nursing Home**

**CERTIFICATE OF SERVICE**

I hereby certify that on March 17, 2008, a copy of the foregoing Plaintiff's Memorandum in Support of Motion to Compel and Motion *in Limine* was electronically filed with the Clerk of Court using the CM/ECF system. Notice of this filing will also be sent to Carrie Dunsmore by operation of the court's electronic filing system.

s/Michael Reese Davis
Michael Reese Davis (Bar Roll No. 17529)
Hymel Davis & Petersen, LLC
10602 Coursey Boulevard
Baton Rouge, Louisiana 70816
Telephone: (225) 298-8118
Facsimile: (225) 298-8119
mdavis@hymeldavis.com