officer can be found at Federal Acquisition Regulations ("FAR") 1.601-1.603, and the Immigration Customs Enforcement Contract and Acquisition Procedure ("ICECAP") regulations which are produced at GOV0438-0440, as well as in the position description for the National Mental Health Coordinator, previously provided at GOV0018-20.

INTERROGATORY NO. 3:

Please list any policies and procedures which support your allegation that Jay Seligman did not have authority to bind ICE and/or DIHS in contract with Lakeland?

Response:

Defendant objects to interrogatory no. 3 on the grounds that it is duplicative of interrogatory no. 2. Subject to that objection, see our response to interrogatory no. 2.

INTERROGATORY NO. 4:

Please explain why Duncan Nyanjong was placed in Lakeland Nursing Home?

Response:

Mr. Nyanjong was placed in Lakeland Nursing Home because Lakeland was able to provide the type of medical care Mr. Nyanjong required while in Government custody. Further, the cost of Mr. Nyanjong's care at Lakeland was less expensive than the care previously provided at Columbia Care Center.

INTERROGATORY NO. 5:

Please describe the procedures utilized by ICE and/or DIHS in having an ICE detainee placed in private care facilities such as Lakeland.

Response:

The Department of Homeland Security, Immigration and Customs Enforcement



EXHIBIT B
Blumberg No. 5208

(hereinafter "ICE") has entered into an Interagency Agreement with the Department of Health and Human Services Health Resources and Services Administration, Bureau of Primary Health Care (BPHC) to provide on-site health care and other health-related services to undocumented aliens in ICE custody. The Division of Immigration Health Services (DIHS) is a part of BPHC, and serves as the "medical authority for ICE" to provide all of the services set forth in the Interagency Agreement, as well as the management, direction, coordination and oversight of medical services provided to undocumented aliens in ICE custody. This information was previously provided at GOV 0001-0009.

An undocumented alien in the custody of ICE, as indicated by a valid alien number in the Detained Alien Control System (DACS), is provided medical services as described in the Immigration Health Services Provider Handbook, previously provided at GOV 0027-0087. Medical Facilities that are in the DIHS Managed Care Provider Network must obtain prior authorization for all admissions and procedures as described in a completed DIHS Treatment Authorization Request (TAR) from the DIHS Managed Care Coordinator. Medical coverage of undocumented aliens begins the first day that an individual is placed in custody and under the jurisdiction of the DHS and end the day that DHS releases the detainee from its custody. The previously provided Immigration Health Services Provider Handbook details the procedures for obtaining authorization for medical services, medical referrals, payment of claims, appeal of claims, and specific medically necessary and appropriate health care services and treatment that DIHS will authorize. If the Managed Care Coordinator deems it necessary and a TAR is approved, this medical care may include placement of an individual in a private care facility such as Lakeland.

INTERROGATORY NO. 6:

Please describe the procedures utilized by Jay Seligman in placing Duncan Nyanjong in Lakeland Nursing Home.

Response:

Dr. Seligman followed the procedures as described in Government's response to interrogatory No. 5 and as outlined in the Interagency Agreement between DHS and BPHC/DIHS, the position description for the National Mental Health Care Coordinator and the Immigration Health Services Provider Handbook, previously provided at GOV 0001-0087.

INTERROGATORY NO. 7

Please describe the procedures which ICE is required to follow in releasing ICE detainees, including the procedures used for releasing detainees who are mentally or physically incompetent and/or who are unable to care for themselves.

Response:

In releasing ICE detainees, ICE follows the Immigration and Nationality Act ("INA"), 8 U.S.C. §1221 et seq., which describes the authority to apprehend and detain aliens. For release purposes, ICE follows the same legal standard that Immigration Judges ("IJ") use at the Board of Immigration Appeals ("BIA"), i.e. whether the alien is a flight risk or a danger to the community. If the answer is "no" then the alien may be released. See 8 CFR Sec. 1003.19 (specifically 1003.19(h)(3) for this criteria). While there are certain classifications of aliens that may not seek reclassification, see 8 CFR § 1003.19, if the alien can show by "clear and convincing evidence" that he/she is not a flight risk or danger to the community, he/she will often be released pursuant to the procedures detailed in the statute and regulations.

authorized the release of Mr. Nyanjong: Christopher Jacobs, William Cleary, and Michael Philips (signed on behalf of William Cleary). This information was previously provided at GOV 0216-0217.

INTERROGATORY NO. 11:

Please list all person(s) involved in the dismissal/dropping of Duncan Nyanjong's detainer.

Response:

Defendant objects to interrogatory No. 11 as duplicative of interrogatory No. 10, and refers plaintiff to defendant's response to interrogatory No. 10.

INTERROGATORY NO. 12:

List any policies and/or procedures which describe the procedure which ICE is supposed to utilize in releasing ICE detainees or dropping their detainer.

Response:

Defendant objects to interrogatory 12 as duplicative of interrogatory No. 7, and refers plaintiff to defendant's response to interrogatory No. 7.

INTERROGATORY NO. 13:

Please explain why ICE released Duncan Nyanjong from custody and/or dropped his detainer.

Response:

As discussed in GOV 0220-0222, Mr. Nyanjong's immigration case was administratively closed and it was determined that he posed no likelihood of danger to the community. Because

of this and because of his high medical treatment costs, it was recommended he be released on his own recognizance.

INTERROGATORY NO. 14:

Please list any other ICE detainees, who were mentally or physically incompetent and/or could not take care of themselves, whom ICE has released from custody prior to finding a funding source for the detainees healthcare after release.

Response:

Defendant objects that this interrogatory seeks information not relevant to any claim or defense of any party, and that this interrogatory is unduly broad and burdensome. Furthermore, DHS does not release detainee's names because of the Privacy Act of 1974 ("Privacy Act"), 5 U.S.C. §552a. The Privacy Act provides statutory privacy rights to U.S. citizens and Legal Permanent Residents (LRP). While the Privacy Act does not explicitly cover visitors or aliens, as a matter of DHS policy, any personally identifiable information, including detainee names, that is collected, used, maintained and/or disseminated in connection with a mixed system by DHS shall be treated as a System of Records subject to the Privacy Act, regardless of whether the information pertains to a U.S. citizen, LPR, visitor, or alien. DHS components handle non-U.S. person personally identifiable information held in mixed systems in accordance with the fair information practices, as set forth in the Privacy Act.

INTERROGATORY NO. 15:

Please explain under what circumstances would ICE and/or DIHS consider placement of a detainee with a private healthcare facility to be "permanent."

Response: