A I was -- correct. I was more of a conduit. I -- I don't have authority. I -- I needed Immigration's permission and Immigration Health Services' permission. That was my responsibility.

Q Would the process be you would find a healthcare facility, begin the application process, and get authority from INS? I'm trying to figure out how it worked procedurally.

A Typically, we already had some type of relationship with the healthcare facilities, but sometimes we would not and then I would send the form -- I would either tell them look on the website, where there's forms to do, or -- I guess one of my jobs, I guess, I would sometimes establish new healthcare facilities by calling up and asking them if they're willing to take a detainee.

Q Would you actually do the paperwork for the admission of a detainee?

A The healthcare component I would fill out.



EXHIBIT F

Q And, of course, you would do that with the blessing of ICE?
A Correct.
Q And if I understood your prior testimony, you would certainly try to get that blessing or that authority before you would get the person admitted?
A That's correct.
Q Correct?
A Correct. I'd do the search usually without it, but then I would contact Immigration afterwards.
Q Okay. So as the MHCC, part of your duties or responsibilities was for you to complete requests for medical eligibility; is that correct?
A A medical eligibility, what does that include?
Q I'm actually referring to a form that was filled out with regard to Mr. Nyanjong and it's part of the admission process that was completed to get Mr. Nyanjong into this nursing home.
A Okay. The application to the nursing


©2007

home? Is that what you're referring to?

Q Yes.

A I'm sorry, so what was the question to that?

Q I was going to go from general to specific.

A Oh, okay.

Q Part of your duties and responsibilities was for you to complete the paperwork to get a detainee admitted into a healthcare facility, correct?

A That's the medical forms, correct.

Q Okay. And if one of those forms was entitled "Request for Medical Eligibility," that would have been one of the documents that you would have completed in your capacity as MHCC --

A I'm not --

Q -- correct?

A Yeah, I'm not sure which form that you're referring to.

Q Okay. We'll get to that one.

A Okay.

 ©2007

Q And was part of your job responsibility to assure that the healthcare facilities got paid for their services?

A My job was to authorize -- review the pay statements and authorize whether they did receive the medical care.

Q Before your deposition did you have a chance to sit down and talk about this case with Ms. Dunsmore?

A Yes.

Q And as well as I believe there's another lawyer there, and I apologize for not remembering her name.

MS. LONGMEYER-WOOD: It's Ms. Longmeyer-Wood.

THE WITNESS: Yes, that's correct.

BY MR. DAVIS:

Q And did these attorneys explain to you the nature of this lawsuit and what it's about?

MS. DUNSMORE: Objection. You can answer that we explained it.

MR. DAVIS: What are you objecting to?

 ©2007

handle -- provide the care that was needed.

Q And Duncan was cared for at the Columbia Care Center, correct?

A Correct.

Q Was it your understanding, before Duncan was placed at the nursing home in Louisiana, that he was going to be provided with medical care until he was competent to stand trial or a hearing or until he died?

A No, that -- that -- those are two of the things that could have happened, but not necessarily the only two for instances.

Q What others were out there?

A One thing is we can't -- we cannot pay if Immigration decides to drop the detainer on an individual. So that's another circumstance.

Q All right. Any others?

A There could be, but I can't think of any at this moment.

Q Before you placed Duncan in the Lakeland Nursing Home, was there any indication whatsoever that Immigration was going to drop the detainer?

 ©2007

A Not to my knowledge.
Q Would it be fair to state that as far as you knew, Duncan was going to remain in Lakeland Nursing Home until he either passed away or until he was able to be competent to stand trial or a hearing?
A No. There -- there is an option that I was thinking of. Sometimes we release detainees if we can find other services, and that's the way I was trying to find -- I was trying to find something for him.
Q All right. And we're going to get to that.
A Okay.
Q You were going to try -- the third option being the Medicaid option?
A Medicaid or another social service agency who will just pick up the care for poor people.
Q What was your understanding of Duncan's medical condition when you transferred him from the Columbia Care Center to Lakeland Nursing Home?
A He had HIV, dementia, so him standing

 ©2007

competency in any trial would probably not be, you know, likely. However, his condition can improve or what-have-you.

Q Would it be fair to state that as the MHCC, you handled the transfer from the Columbia Care Center down to Lakeland Nursing Home?

A I was the conduit again, the case manager, so, yes, for that part.

Q Would it be fair to state that ICE was concerned with the rising costs of continuing to care for Duncan at the time he was transferred to Lakeland?

A Just with the e-mail you -- you were saying to me, I don't think -- I don't think Immigration really cared that much about it.

Q Would you agree that the reason you transferred Duncan from Columbia Care to Lakeland Nursing Home was to save money on the continuing cost of caring for him?

A That is correct.

Q And the reason is because the rates for a nursing home in Louisiana were a lot lower than the

 ©2007

rates the Columbia Care Center was charging the Federal Government?

A I think it was $150 less a day or something like that. That's...

Q In fact, in your capacity as MHCC, weren't you shopping around for cheaper medical care centers that could handle inmates or detainees such as Duncan?

A As long as it was an appropriate care facility, yes.

Q I just want to make sure that I'm understanding. The reason that Duncan was sent to the Lakeland Nursing Home was to save money rather than to provide any sort of specialized care that Duncan couldn't have gotten at the Columbia Care Center?

A Cost containment was the reason.

MR. DAVIS: Ms. Dunsmore, if you could place a two-page memorandum in front of Mr. Seligman Bates stamped GOV 263 and 264.

MS. DUNSMORE: Certainly. And we'll mark that as Seligman 2?


©2007

A I -- I don't know about the qualifier "never," but I believe the rest of it is definitely accurate.

Q Well, if the "never" raises a question, what term would you use? Probably?

A Probably.

Q It continues, "Due to the subject's HIV affliction, according to LCDR Seligman, he is eligible for certain State programs that would pay for his housing and treatment. He is hoping to place him into a nursing home. The Columbia Care Center currently costs approximately 350 per day. I advised LCDR Seligman that we needed a full psychological examination in order to make that determination." Are those statements accurate?

A The only -- the only word that I have contention is "eligible." It's potential. But I agree with the rest of it.

Q The next paragraph of the memo essentially discusses the psychiatric examination, indicating that Mr. Nyanjong does not have the capacity to distinguish between right and wrong,


©2007

at the time I was a lieutenant commander.
Q Okay. Earlier in your deposition you said that in your capacity as MHCC you would coordinate things but there had to be approval, correct?
A Correct.
Q And is the CDR the approval that you were referring to?
A I'm not sure. I'm not sure who approved it. It could have been him. It could have been someone else.
Q Okay. But you got approval from a supervisor to make this transfer, correct?
A Correct.
Q And your approval would have come from within DIHR?
A DIHS, yes.
Q DIHS?
A Correct. Well, DIHS and ICE's concurrence.
Q ICE would have concurred?
A Yes.


©2007

bills to you, correct?
A No, they would send it to DIHS headquarters.
Q And those bills would then be sent to whom?
A They would be sent to me for authorization that I concurred that the detainee receive the medical care there.
Q And you would sign off on those bills and then send them on through the channels to be paid?
A That's correct.
Q Would it be fair to state that everything clicked right along there at Lakeland Nursing Home until the discharge issue arose?
A Correct.
Q And I will represent to you that on April 1st, 2005 Mr. Nyanjong was released from ICE custody. So that from May 12th, 2004 through April 1st, 2005 ICE/DIHS paid Lakeland for its costs of caring for Duncan, correct?
A I believe so.
Q You don't have any reason to doubt that,


©2007

Q And after getting that approval, you indicated that you were the authorizing officer, correct?
A Correct.
Q By the way, was Duncan the only INS detainee that you transferred out to a nursing home?
A No.
Q Okay. Could you estimate how many you coordinated?
A Into a nursing home? One other.
Q Okay. And with the one other did you follow the same procedure that you did with Duncan?
A I believe so.
Q I would like to now ask you some questions on the Request for Medical Eligibility Determination, which I'd like to mark as Seligman 8.
MS. DUNSMORE: The first page says Request for Medical Eligibility and the second starts with Medical Information, correct?
MR. DAVIS: Absolutely.


©2007