IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LAKELAND PARTNERS, L.L.C.<br>d/b/a LAKELAND NURSING HOME,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 06-295C<br>(Judge Margaret M. Sweeney) |

**LIST OF PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h)(1) of the Rules of The Court of Federal Claims, Lakeland hereby asserts that this Court should find the following facts to be uncontroverted for the purposes of Lakeland's Motion for Partial Summary Judgment:

1. Prior to the facts giving rise to this suit, the Department of Homeland Security, Immigration and Customs Enforcement entered into an Interagency Agreement with the Department of Health and Human Services, Bureau of Primary Health Care to provide on-site health care and other health-related services to undocumented aliens in ICE custody. *See* Interagency Agreement, Exhibit A to Memo in Support of MPSJ; Defendant's Answer to Interrogatories, Exhibit B to MPSJ, No. 5.[1]

2. DIHS is responsible for the administration of a comprehensive health care delivery system incorporating medical, mental health, dental, and environmental health services. *See* DIHS Policies and Procedures, Chapter 1 - Organization and Executive Direction, p. 1, Exhibit C.

3. The Department of Immigration Health Services ("DIHS") is a part of BPHC and serves

---

[1] All exhibits reference herein are attached to Lakeland's Memorandum in Support of Motion for Partial Summary Judgment.

as "the medical authority for ICE" to provide all of the services set forth in the Interagency Agreement. DIHS also provides the management, direction, coordination, and oversight of medical services provided to undocumented aliens in ICE custody. *See* Defendant's Answers to Interrogatories, Exhibit B, No. 5; DIHS Policies and Procedures, Exhibit C.

4. In November 2000, ICE detained Duncan Nyanjong. *See* Exhibit 2 to Deposition of Seligman, attached as Exhibit D.

5. In December 2000, Nyanjong appeared before an immigration judge. *Id.* The immigration judge refused to go forward with Nyanjong's case until ICE could provide medical evidence that Nyanjong understood the nature of the proceedings against him. *Id.*

6. ICE was unable to provide evidence that Nyanjong ever became mentally competent.

7. In January 2001, Nyanjong was placed in the Columbia Care Center ("CCC") for psychiatric treatment. *Id.*

8. Nyanjong's immigration case was administratively closed until such time that he became mentally competent. *Id.*

9. The cost of caring for Nyanjong at CCC was $350 a day. *Id.* In fact, as of January 2004, the cost of caring for Nyanjong had reached over $400,000. *See* Exhibit 3 to Deposition of Seligman, Exhibit E.

10 Mr. Nyanjong's care had been assigned to Jay Seligman, a National Mental Health Coordinator with DIHS. *Id.*

11. Mr. Seligman believed that Nyanjong would probably never be competent enough to understand the nature of his proceedings. *See* Exhibit 2 to Deposition of Seligman,

attached as Exhibit D; Deposition of Seligman, Exhibit F, p. 33.

12. Given the costs of care at CCC, ICE and DIHS became increasingly concerned about the cost of Nyanjong's care. *Id.* at p. 27.

13. Mr. Seligman searched for a nursing home in which to place Nyanjong. *See* Exhibit 3 to Seligman Deposition, attached as Exhibit E; *see also* Deposition of Seligman, Exhibit F, p. 28.

14. Cost containment was the sole reason for Mr. Seligman's search. *Id.* at p. 28.

15. In April 2004, Lakeland was contacted by Mr. Seligman.

16. On behalf of ICE and DIHS, Mr. Seligman negotiated the terms of Nyanjong's placement at Lakeland with Hank Cooley, Lakeland's administrator.

17. Because of Nyanjong's condition, which had clearly prevented him from being released from ICE custody, Mr. Seligman never indicated to Mr. Cooley that Nyanjong's placement would be temporary. *See* Deposition of Hank Cooley, attached *in globo* as Exhibit G, p. 75.

18. Mr. Seligman believed that Nyanjong would be at Lakeland until he passed away or was mentally competent to stand trial, or until an alternative payor source was located. *See* Deposition of Seligman, Exhibit F, pp. 25 - 26.

19. Mr. Cooley was never informed that there was a chance Nyanjong would be released from ICE custody or that his funding could be cut off. *See* Deposition of Cooley, Exhibit G, p. 80.

20. Lakeland would not have accepted Nyanjong if it had known that there was a chance Nyanjong's funding could be cut off. *See* Deposition of Cooley, Exhibit G, p. 81.

21. Based upon Mr. Seligman's representations, Mr. Cooley believed Nyanjong's placement

in Lakeland to be permanent, i.e., until an alternative payor source was located or until Nyanjong died. *Id.* at p. 75.

22. According to defendant, the procedure DIHS used for placing individuals in private care facilities, such as Lakeland, was as follows:

> An undocumented alien in the custody of ICE, as indicated by a valid alien number in the Detained Alien Control System (DACS), is provided medical services as described in the Immigration Health Services Provider Handbook, previously provided at GOV 0027-0087. Medical facilities that are in the DIHS Managed Care Provider Network must obtain prior authorization for all admissions and procedures as described in a completed DIHS Treatment Authorization Request (TAR) from the DIHS Managed Care Coordinator. Medical coverage of undocumented aliens begins the first day that an individual is placed in custody and under the jurisdiction of the DIHS and ends the day that DHS releases the detainee from custody. The previously provided Immigration Health Services Provider Handbook details the procedures for obtaining authorization for medical services, medical referrals, payment of claims, appeal of claims, and specific medically necessary and appropriate health care services and treatment that DIHS will authorize. If the Managed Care Coordinator deems it necessary and a TAR is approved, this medical care may include placement of an individual in a private care facility such as Lakeland.

*See* Defendant's Answers to Interrogatories, Exhibit B, No. 5.

23. Defendant admitted that Mr. Seligman followed this procedure in having Nyanjong admitted to Lakeland. *See* Defendant's Answer to Interrogatories, Exhibit B, No. 6.

24. On April 19, 2004, Mr. Seligman completed the Request For Medical Eligibility Determination, which had been provided by Lakeland. *See* Request for Medical Eligibility Determination, Exhibit H.

25. Mr. Seligman confirmed his previous conversations with Hank Cooley by marking "permanent" on the Request for Medical Eligibility. *Id.*; Deposition of Cooley, Exhibit G, p. 75.

26. The Request for Medical Eligibility Determination stated that DIHS would be the responsible party for payment. *See* Request for Medical Eligibility Determination,

Exhibit H.

27. On May 11, 2004, Mr. Seligman completed the Treatment Authorization Request. *See* TAR, attached as Exhibit I.

28. INS was notified of the Treatment Authorization Request. *Id.*

29. The TAR was submitted to the appropriate DIHS/ICE officials for approval. *See* TAR; Deposition of Seligman, Exhibit F, p. 56; Defendant's Answers to Interrogatories, Exhibit B, No. 6; Defendant's Answers to Requests for Admissions, Exhibit J, Nos. 3 and 10.

30. Mr. Seligman followed proper and usual procedures in placing Nyanjong in Lakeland and Nyanjong's placement in Lakeland was approved by the appropriate ICE and DIHS officials. *Id.*; Defendant's Answers to Requests for Admissions, Exhibit J, No. 15.

31. Lakeland and Mr. Seligman agreed that the monthly rate paid to Lakeland would be $2,964 plus pharmacy costs.

32. On May 12, 2004, Lakeland received Nyanjong as a patient.

33. Lakeland initially had no problems receiving payment from ICE/DIHS. *See* Deposition of Cooley, Exhibit G, p. 85; Deposition of Seligman, Exhibit F, p. 62.

34. The manner in which ICE and DIHS paid Lakeland for its services was in accordance with ICE and DIHS procedures. *See* Defendant's Answers to Requests for Admissions, Exhibit J, No. 9.

35. Payment to Lakeland was approved by the appropriate ICE and DIHS officials. *See* Defendant's Answers to Requests for Admissions, Exhibit J, No. 11.

36. Lakeland treated Nyanjong without incident until January 15, 2005, when a nurse found him on the floor and unresponsive.

37. Nyanjong was transferred to Huey P. Long Hospital, which diagnosed him with

respiratory failure and placed him in the ICU on a ventilator.

38. On February 4, 2005, Nyanjong was returned to Lakeland, too weak to ambulate or take care of himself. Nyanjong could not feed, clean, or otherwise care for himself. Mentally he was unable to understand anything beyond simple commands.

39. As a result of Nyanjong's admission to Huey P. Long Hospital, ICE began to reconsider Nyanjong's status.

40. Towards the end of February 2005, William Cleary, the ICE Field Office Director, noted that Nyanjong's case had been administratively closed pending medical treatment. *See* Exhibit 9 to Deposition of Seligman, attached as Exhibit K.

41. Mr. Cleary recommended releasing Nyanjong "O.R. after providing sufficient notice to the nursing home of our intention and to provide them sufficient time to find another location for him to obtain other funding source to pay for his care." *Id.*

42. As of March 2005, defendant quit providing payment for Nyanjong's care.

43. Christopher Jacobs faxed to Lakeland an Order to Release Nyanjong on April 1, 2005. *See* Order to Release Alien, attached as Exhibit M.

44. After Nyanjong's release from custody, Lakeland requested that the government honor its contract with Lakeland by continuing to pay for Nyanjong's care.

45. Nyanjong eventually died in Lakeland nursing home.

46. Lakeland paid for all expenses and costs associated with his care until that time.

47. Jay Seligman's position description stated that it was his responsibility to receive written treatment authorization requests for off-site and/or non-routine mental health care services from DIHS Managed Care Coordinators. *See* NMHC Position Description, Exhibit N.

48. Mr. Seligman also functioned as a reviewer to determine mental health necessity and appropriateness of requested services. *Id.*

49. It was Mr. Seligman's responsibility to provide support and assistance to ICE in placing detainees with special mental health needs in appropriate facilities. *Id.*

50 Mr. Seligman's position description stated:

> **4. Authority and Responsibility**
>
> • The incumbent works as an independent provider of mental health services. The incumbent is expected to oversee the mental health care of those detained in long term mental health treatment facilities. The incumbent shall also have responsibility for the development and implementation of national mental health operating procedures.

51. One purpose of Mr. Seligman's job was "prevention of the introduction of potentially dangerous individuals into the community." *Id.*

52. Mr. Seligman was the official responsible for negotiating contracts for the placement of detainees such as Nyanjong in off-site facilities on behalf of the government. *See* Deposition of Seligman, Exhibit F, p. 12.

53. It was Mr. Seligman's responsibility for getting detainees such as Nyanjong admitted into off-site healthcare facilities such as Lakeland. *Id.* at pp. 12 and 14.

54. Mr. Seligman admitted Nyanjong into Lakeland with the "blessing of ICE" and was granted authority by them in completing Nyanjong admission into Lakeland. *Id.* at 13.

55. Mr. Seligman was the "case manager" for Nyanjong. *Id.* at 27.

56. Mr. Seligman was responsible for coordinating the transfer of Nyanjong into Lakeland and he got approval from DIHS and ICE for doing so. *Id.* at 56.

57. Mr. Seligman was the officer responsible for authorizing Nyanjong's admission into Lakeland. *Id.* at 57.

58. It was Mr. Seligman's responsibility to review payment statements submitted by healthcare facilities and to authorize payment. *Id.* at 15.

59. It was part of Mr. Seligman's job to place detainees in healthcare facilities such as Lakeland. *See* Defendant's Answers to Request for Admissions, Exhibit J, No. 16.

60. Given Mr. Seligman's duties as NMHC, it was appropriate for Mr. Seligman to place Nyanjong in Lakeland. *Id.* at No. 17.

61. Mr. Seligman's superiors whom defendant contends had contracting authority were aware of Nyanjong's placement in Lakeland and were aware that Lakeland was providing healthcare services to Nyanjong on behalf of DIHS/ICE. *See* Defendant's Answers to Request for Admissions, Exhibit J, No. 20

62. The official whom defendant contends had contracting authority was aware that Lakeland was being compensated for the healthcare services it was providing to Nyanjong. *Id.* at No. 21.

63. Nyanjong's placement in Lakeland was approved by the appropriate ICE and/or DIHS officials. *Id.* at No. 10.

64. Payment to Lakeland was approved by the appropriate ICE and/or DIHS officials. *Id.* at No. 11.

65. Defendant received a benefit and consideration for the payments it provided to Lakeland. *Id.* at No. 19.

66. The government has no evidence that Nyanjong was ever officially released or discharged from custody or that his detainer was dropped.

67. The government has no evidence that Nyanjong was properly released from custody or discharged or that his detainer was properly dropped. *See* Defendant's Responses to

Request for Production, Exhibit O, Nos. 3 & 4; *see* 4/10/07 Correspondence, Exhibit P; 9/17/07 Correspondence, Exhibit Q.

Respectfully submitted,

HYMEL DAVIS & PETERSEN, L.L.C.

s/Michael Reese Davis
Michael Reese Davis (Bar Roll No. 17529)
10602 Coursey Boulevard
Baton Rouge, Louisiana 70816
Telephone: (225) 298-8118
Facsimile: (225) 298-8119
mdavis@hymeldavis.com

**Counsel for Plaintiff Lakeland Nursing Home**

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2008, a copy of the foregoing Plaintiff's Proposed Findings of Uncontroverted Facts was electronically filed with the Clerk of Court using the CM/ECF system. Notice of this filing will also be sent to Carrie Dunsmore by operation of the court's electronic filing system.

s/Michael Reese Davis
Michael Reese Davis (Bar Roll No. 17529)
Hymel Davis & Petersen, LLC
10602 Coursey Boulevard
Baton Rouge, Louisiana 70816
Telephone: (225) 298-8118
Facsimile: (225) 298-8119
mdavis@hymeldavis.com