IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LAKELAND PARTNERS, L.L.C.,<br>d/b/a LAKELAND NURSING HOME,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 06-295C<br>(Judge Sweeney) |

DEFENDANT'S OPPOSITION TO PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

STEVEN J. GILLINGHAM
Assistant Director

CARRIE A. DUNSMORE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………...……………..…………..ii

INDEX TO APPENDIX………………………………………………………….iii

ARGUMENT…………………………...……………………………………………1

I. Mr. Nyanjong Was Properly Released From Government Custody …………..…1

II. There Was No Contract Entered Into Between The Government And Lakeland…4

A. The Request For Medical Eligibility Is Not A Contract…………………..5

B. Procurement Contracts Must Be In Writing………………………………7

C. Even If An Implied Contract Existed, Such A Contract Could Not Have Bound The Government To Pay For Mr. Nyanjong's Health Care Either "Permanently" Or After He Was Released From Government Custody….7

i. A Contract To "Permanently" Pay For Mr. Nyanjong's Health Care Would Be Void Because It Would Violate The Anti-Deficiency Act…………………………………………………….8

ii. A Contract Obliging The Government To Pay For Mr. Nyanjong's Health Care After He Was Released From Government Custody Would Be Void Because DHS/ICE Cannot Pay For Health Care Of Detainees Released From Government Custody………………8

III. Commander Seligman Did Not Have Implied Authority To Bind The Government In Contract……………………………………………………11

IV. Commander Seligman's Actions Were Not Ratified By His Supervisors …...…14

CONCLUSION………………………………………………………………….15

## TABLE OF AUTHORITIES

## CASES

American General Leasing, Inc. v. United States,
587 F.2d 54 (Ct. Cl. 1978)…………………………………………………………...7

Applegate v. United States,
52 Fed. Cl. 751 (2002)…………………………………………………………...12

Branch Banking & Trust Co. v. United States,
98 F. Supp. 757 (1951)……………………………………………………………11, 12

Brunner v. United States,
70 Fed. Cl. 623 (2006)…………………………………………………………..11

California Sand & Gravel, Inc. v. United States,
22 Cl. Ct. 19, 27 (1990)……………………………………………...11, 12, 14, 15

Cessna Aircraft Co. v. Dalton,
126 F.3d 1442 (Fed. Cir. 1997)……………………………………………………8

F. Alderete Gen. Contractors, Inc. v. United States,
715 F.2d 1476 (Fed. Cir. 1983)…………………………………………………..12

Federal Crop Ins. Corp. v. Merrill,
332 U.S. 380 (1947)……………………………………………………………...10

H. Landau & Co. v. United States,
886 F.2d 322 (Fed. Cir. 1989)…………………………………………..11, 12

Harbert/Lummus Agrifuels Projects v. United States,
142 F.3d 1429 (Fed. Cir. 1998)……………………………………………..7, 14

Hercules, Inc. v. United States,
516 U.S. 417 (1996)……………………………………………………………….8

Jarvis v. United States,
45 Fed. Cl. 19 (1999)…………………………………………………………...8

Johnson Management Group CFC, Inc. v. Martinez,
308 F.3d 1245 (Fed. Cir. 2002)……………………………………………………7

Liberty Mut. Ins. Co. v. United States,
70 Fed. Cl. 37 (2006)……………………………………………………………12

Russell Corp. v. United States,
537 F.2d 474 (Ct. Cl. 1976)……………………………………………………….5

Sam Gray Enterprises, Inc. v. United States,
43 Fed. Cl. 596 (1999)……………………………………………………….11, 12

Stout Road Associates, Inc. v. United States,
80 Fed. Cl. 754 (2008)………………………………………………………..12

United States v. Beebe,
180 U.S. 343 (1901)…………………………………………………………..14

## STATUTES AND REGULATIONS

FAR 1.602-3……………………………………………………………………..13

FAR 2.101………………………………………………………………………...7

8 C.F.R. § 1003.19……………………………………………………………...3

8 C.F.R. § 1236.1(c)(6)(i)……………………………………………………….3,4

31 U.S.C. § 1341………………………………………………………………….8

## MISCELLANEOUS

J. Cibinic & R. Nash, Formation of Government Contracts 43 (1982)………………….11

**ADDENDUM TO INDEX TO DEFENDANT'S APPENDIX**

**Document** **Page Number**

May 4, 2008 Affidavit of Christopher M. Jacobs……………………………………………..70

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LAKELAND PARTNERS, L.L.C.,<br>d/b/a LAKELAND NURSING HOME,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 06-295C<br>(Judge Sweeney) |

DEFENDANT'S OPPOSITION TO PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56(b) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States respectfully requests that the Court deny plaintiff's partial motion for summary judgment in the above-referenced case, filed March 17, 2008, because plaintiff, Lakeland Partners L.L.C.("Lakeland"), has not demonstrated that it is entitled to judgment in this matter. In support of this request, we rely upon plaintiff's motion and complaint, our separately filed opposition to plaintiff's statement of uncontroverted fact, defendant's previously filed motion for summary judgment and proposed findings of uncontroverted facts, and the following memorandum and its attachment.

ARGUMENT

I. Mr. Nyanjong Was Properly Released From Government Custody

In our motion for summary judgment we demonstrated that the Government could not be obliged to pay for Duncan Nyanjong's health care costs after he was released from

Government custody. Def. Br. at 5-7.[1] In its partial motion for summary judgment, Lakeland argues that Mr. Nyanjong was not properly released. Pl. Br. at 16-19.[2] It argues that the documents produced to support Mr. Nyanjong's release are legally ineffective, and that the agency did not properly follow its own regulations in releasing Mr. Nyanjong. Id. Neither argument is supportable. In fact, the evidence is clear that Mr. Nyanjong was properly released from Government custody on April 1, 2005.

The Government has produced two documents demonstrating that Mr. Nyanjong was released from Government custody: 1) the Order To Detain Or Release Alien signed by Chris Jacobs of ICE on April 1, 2005, and faxed to Lakeland on that same date, A43-45, [3] and 2) the Order to Release on Recognizance, signed by Michael Philips of ICE for William Cleary, Field Office Director, dated February 23, 2005, A46. Lakeland argues that neither document is legally effective because it alleges that portions of the documents have been left blank, and because Mr. Nyanjong was not able to comply with the terms of the document. Pl. Br. at 17-18.

Chris Jacobs of ICE has submitted an affidavit explaining that he has personal knowledge that Mr. Nyanjong was released from Government custody on April 1, 2005, and that both documents are legally effective. See May 4, 2008 Affidavit of Chris Jacobs

---

[1] "Def. Br." refers to a numbered page of Defendant's Motion For Summary Judgment, filed March 18, 2007.

[2] "Pl. Br." refers to a numbered page of Plaintiff's Partial Motion For Summary Judgment

[3] "A_" refers to a numbered page to the previously filed Appendix to Defendant's Motion For Summary Judgment.

at A70-71.[4] In his affidavit, Mr. Jacobs explains that the Order to Detain or Release Alien form was complete with only his signature, and that it is not necessary for two officers to sign the form. A71 at ¶ 5. He also explains that the Order to Release on Recognizance is accurate and complete as filed. A72 at ¶ 7. Mr. Jacobs explains that the fact that Mr. Nyanjong did not demonstrate that he was likely to appear for any scheduled proceeding or interview did not void his release. A71 at ¶ 4. Finally, Mr. Jacobs states that he has personal knowledge that removal proceedings occurred in Mr. Nyanjong's case. A71 at ¶ 6.

Moreover, Lakeland's argument that Mr. Nyanjong was not properly released pursuant to 8 C.F.R. § 1003.19 is mistaken. Plaintiff argues that Mr. Nyanjong was not properly released from Government custody because he did not show by clear and convincing evidence that he was likely to appear for any scheduled proceeding or interview that he was required to attend. Pl. Br. at 19. Section 1003.19(h)(3) of title 8 of the Code of Federal Regulations provides:

> Except as otherwise provided in paragraph (h)(1) of this section, an alien subject to section 303(b)(3)(A) of Div. C of Pub.L. 104-208 may apply to the Immigration Court, in a manner consistent with paragraphs (c)(1) through (c)(3) of this section, for a redetermination of custody conditions set by the Service. Such an alien must first demonstrate, by clear and convincing evidence, that release would not pose a danger to other persons or to property. If an alien meets this burden, the alien must further demonstrate, by clear and convincing evidence, that the alien is likely to appear for any scheduled proceeding or interview.

However, Lakeland ignores the fact that the regulations also provide for other procedures for the release of "unremovable aliens and certain long-term detainees." Specifically, section § 1236.1(c)(6)(i) also provides that:

---

[4] This document was previously provided to the Court as an attachment to Defendant's May 4, 2008 Opposition to Plaintiff's Motion In Limine, and is again provided in Defendant's Supplemental Appendix, attached to this brief.

> [i]f the district director determines that an alien subject to section 303(b)(3)(A)(ii) or (iii) of Div. C of Pub.L. 104-208 cannot be removed from the United States because the designated country of removal or deportation will not accept the alien's return, the district director may, in the exercise of discretion, consider release of the alien from custody upon such terms and conditions as the district director may prescribe, without regard to paragraphs (c)(2), (c)(4), and (c)(5) of this section.

8 C.F.R. § 1236.1(c)(6)(i). In sum, although section 1003.19 provides an avenue for an alien to convince an Immigration Judge that he should be released from custody, and as such, places certain burdens on that alien, such as requiring him to demonstrate his ability to appear at certain proceedings, section 1236.1 provides an avenue for ICE, at the discretion of its director, to release any alien from custody under any terms that the director may prescribe.

Mr. Nyanjong was properly released from Government custody, and, accordingly, Lakeland's motion for summary judgment based upon the contention that he was not properly released from custody must fail and should be denied.

II. <u>There Was No Contract Entered Into Between The Government And Lakeland</u>

Lakeland argues that it is entitled to summary judgment that a contract existed between it and the United States. Pl. Br. at 13-14. It argues that there was an offer made to Lakeland to accept Mr. Nyanjong as a patient, that the offer was accepted by Lakeland, that both parties intended to enter into a contract, and that the United States received consideration for this contract (namely, the provision of Mr. Nyanjong's health care). <u>Id.</u> However, in its brief, Lakeland points to no document that would constitute an express contract between the parties. In its complaint, Lakeland refers to the "Request For Medical Eligibility" as the contract, but, as we demonstrated in our motion for summary judgment, see Def. Br. at 8-10, this document alone is not a contract. To the extent that

plaintiff is now referring to some unwritten implied-at-law contract, the Federal Acquisition Regulations ("FAR") require procurement contracts, such a contract to provide health care to a Government detainee, to be in writing. Moreover, even if such an implied contract could exist, plaintiff has not, and cannot, allege that there was a contract to provide for Mr. Nyanjong's health care "permanently" or once he was released from Government custody. Accordingly, plaintiff's motion for summary judgment as to the existence of a contract between it and the Government should be denied.

A. The Request For Medical Eligibility Is Not A Contract

Plaintiff's complaint states that the April 19, 2004 "Request For Medical Eligibility Determination" ("the Form") is a contract between Lakeland and ICE/DHIS. Pl. Compl. at ¶ 26. As we demonstrated in our motion for summary judgment, however, there can be no material dispute that this document does not constitute a binding contract with the United States Government. Def. Br. at 8-10. The document is titled "Request For Medical Eligibility," not a "contract" or "agreement." A29. Neither party signed the document.[5] Id. The document contains no specific terms, nor does it discuss consideration in any way. In Russell Corp. v. United States, 537 F.2d 474, 481 (Ct. Cl. 1976), the Court of Claims set out the elements of an express contract: "For there to be an express contract, the parties must have intended to be bound and must have expressed their intention in a manner capable of understanding. A definite offer and an unconditional acceptance must be established." (Emphasis added). In this case, where

[5] No one from Lakeland signed the document. Commander Seligman filled out this document on behalf of the Government, but clearly crossed out the designation "Responsible Party Signature" on line I of the document.

the two-page Form does not indicate the parties' intentions in any way, and does not contain any of the basic elements of a contract, Lakeland cannot establish the existence of an express contract between it and the United States.

Moreover, during his deposition, the administrator of Lakeland Nursing Home, Henry Allen Cooley, explained that in the general practice of Lakeland, a Request For Medical Eligibility is not considered to be a contract. Mr. Cooley stated that at the time Mr. Nyanjong was admitted to Lakeland Nursing Home, a potential applicant to a nursing home would fill out the Request For Medical Eligibility form and transmit it to Lakeland. A58-59.[6] Lakeland would review the Form and determine whether Lakeland had the capability to care for the patient, and whether there was an available bed for the patient. A59. Mr. Cooley testified that at times Lakeland would not accept a patient after receiving their Request For Medical Eligibility Form, A64-65, and that the Request For Medical Eligibility Form "doesn't guarantee a spot in the nursing home." A67-69. If Lakeland wishes to offer admission to a patient, the patient would be provided an admission packet containing the terms and conditions of admission, as well as a separate agreement which the resident or representative must sign to indicate their agreement to the terms and conditions. A62-63. Although Mr. Cooley asserted that "in this particular case" (i.e., Mr. Nyanjong's case) the Request For Medical Eligibility form was a contract, A65, it is clear that his belief was not in keeping with the practice of Lakeland, nor is it consistent with the fundamentals of contract formation, which as we have explained, requires an offer of certain terms, an acceptance of these terms, and an intent to contract.

[6] Mr. Cooley referred to the Request For Medical Eligibility Determination Request as a form 90-L, A63. The Request is clearly labeled as "Form 90-L" in the top left corner. A29.

B. Procurement Contracts Must Be In Writing

To the extent that Lakeland is alleging that an unwritten contract was entered into between itself and the Government, that argument must also fail. FAR 2.101 requires procurement contracts such as the one at issue in this case to be "in writing" unless "otherwise authorized." In that regard, the Court of Claims has explained:

> The Federal Procurement Regulations have the force of law. Moreover, parties contracting with the Government are charged with having knowledge of the law governing the formation of such contracts. Therefore, it is clear, in addition to other manifestations of the parties' intent, that applicable procurement regulations in the present case, require Government contracts to be in writing in order to be binding upon the parties.

American General Leasing, Inc. v. United States, 587 F.2d 54, 58 (Ct. Cl. 1978) (internal citations omitted); see also Johnson Management Group CFC, Inc. v. Martinez, 308 F.3d 1245, 1258 n.5 (Fed. Cir. 2002) (citing FAR 2.101 and emphasizing that contracts are to be in writing); Harbert/Lummus Agrifuels Projects v. United States, 142 F.3d 1429, 1433 (Fed. Cir. 1998) (holding that "agency procedures must be followed before a binding contract can be formed" and that contracting officer "lacked the authority to enter into the oral contract and it is therefore not binding upon the government"). Accordingly, any unwritten contract that Lakeland may now be relying upon would not be binding on the Government.

C. Even If An Implied Contract Existed, Such A Contract Could Not Have Bound The Government To Pay For Mr. Nyanjong's Health Care Either "Permanently" Or After He Was Released From Government Custody

Finally, even if Lakeland could demonstrate an implied contract existed between itself and the United States, it cannot show that a contract existed to bind the Government to pay for Mr. Nyanjong's care either "permanently" or after he was released from Government custody. Accordingly, even if Lakeland could demonstrate that the

Government entered into some contract, it cannot establish that it entered into a contract obliging the Government to pay for Mr. Nyanjong's health care after he was released from Government custody on April 1, 2005.

i. A Contract To "Permanently" Pay For Mr. Nyanjong's Health Care Would Be Void Because It Would Violate The Anti-Deficiency Act

Plaintiff alleges in its complaint that the Government breached its contract to "permanently" pay for Mr. Nyanjong's health care. Pl. Compl. at ¶ 26. As demonstrated in our motion for summary judgment, however, the Anti-Deficiency Act, 31 U.S.C. § 1341, bars the Government from entering into a contract for future payment of money in advance of, or in excess of, an existing appropriation, and therefore restricts the ability of the Government to enter into multi-year contracts because funds generally cannot be obligated beyond the current fiscal year. Cessna Aircraft Co. v. Dalton, 126 F.3d 1442, 1449 (Fed. Cir. 1997). Consequently, no contract can have existed obliging the Government "permanently pay" for Mr. Nyanjong's health care in the absence of specific authorization for such a "permanent" undertaking. Hercules, Inc. v. United States, 516 U.S. 417, 427 (1996); Jarvis v. United States, 45 Fed. Cl. 19, 20 (1999) (holding that "[o]pen-ended liabilities would violate the Anti-Deficiency Act . . . and [are ] unauthorized as a matter of law."). Because plaintiff shows no authorization for such permanent contract, the "contract" cannot be enforced.

ii. A Contract Obliging The Government To Pay For Mr. Nyanjong's Health Care After He Was Released From Government Custody Would Be Void Because DHS/ICE Cannot Pay For Health Care Of Detainees Released From Government Custody

Lakeland is seeking damages for breach of contract because the Government refused to pay for Mr. Nyanjong's health care after he was released from Government

custody on April 1, 2005. The Government could not, however, have entered into a contract that would oblige it to pay for Mr. Nyanjong's care after he was released from custody. As discussed at length in our motion for summary judgment, the Government cannot to pay for the health care of detainees once they are released from custody. See Def. Br. at 5-7.

In 2004, when Mr. Nyanjong was placed at Lakeland, ICE and the Department of Health and Human Services, Department of Immigration Health Services ("DHIS") and Health Resources and Services Administration, Bureau of Primary Health Care ("BPHC") entered into an Interagency Agreement setting forth the responsibilities of ICE and DIHS "regarding the provision of on-site health care and other health-related services to undocumented aliens detained at various locations by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE)." (emphasis added). A4-12. The agreement provides that DIHS, "will serve as the medical authority for ICE and provide all of the services set out in the agreement, as well as management, direction, coordination, and oversight of these services." A4. DIHS's responsibilities are "to provide on-site health care for detained aliens or will arrange for off-site services, as appropriate … DIHS will coordinate payment for all off-site services arranged by and authorized by DIHS." A5. ICE's responsibilities are: "to reimburse BPHC for DIHS's delivery of all on-site health care and other health-related services provided to or arranged for undocumented aliens in the custody of ICE… ICE agrees to furnish and maintain the medical facility space and security necessary for DIHS to provide health care services to detained aliens." A4 (emphasis added).

It is clear that in order to be entitled to health care from DIHS, an individual "must be in DHS/BTSD custody as indicated by a valid alien number in the Detained Alien Control System ("DACS") or a valid tracking number assigned by the Border Patrol." A14. DIHS policy manuals clearly state the limits of DIHS's authority to pay only for detainee's health care. See, e.g., The Immigration Health Services Provider Handbook. A14. The handbook answers the question "Who is Covered?" as follows: "The Immigration and Nationality Act (INA), Section 234, INA and the Public Health Service Act (PHSA), Section 322, PHSA provide for cooperative arrangements between ICE and the PHS (Public Health Service) for the medical inspection of aliens within and outside of the United States and for the provision of services by PHS personnel to aliens being detained by ICE." A14-15 (emphasis added). "Coverage is effective on the first day that an individual is placed in the custody and under the jurisdiction of DHS/BTSD," and "[c]overage ends on the day that DHS/BTSD releases the detainee from its custody as indicated in DACS." A15. (emphasis added).

DIHS may not provide health care to individuals that are not in Government custody, and therefore any alleged contract with Lakeland that promised to pay for such services would be void as to that provision. See, e.g., Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947)). Accordingly, even if the Government had entered into a contract with Lakeland, it could not oblige the Government to pay for Mr. Nyanjong's health care once he was released from custody, and plaintiff's partial motion for summary judgment should therefore be denied.

## III. Commander Seligman Did Not Have Implied Authority To Bind The Government In Contract

Lakeland asserts that Commander Seligman had "implied authority" to bind the Government in contract. Pl. Br. at 9-13. Because Commander Seligman did not have such implied authority, the Court should deny plaintiff's motion for summary judgment. "[A]uthority to bind the Government is sometimes implied when such authority is considered to be an integral part of the duties assigned to a Government employee." Sam Gray Enterprises, Inc. v. United States, 43 Fed. Cl. 596, 603 n.10 (1999). However, that "doctrine applies only when some contracting authority was actually delegated." Id. (quoting California Sand & Gravel, Inc. v. United States, 22 Cl. Ct. 19, 27 (1990), aff'd, 937 F.2d 624 (Fed. Cir. 1991), for the proposition that "a person with no actual authority may not gain actual authority through the court-made rule of implied actual authority").

Although Lakeland relies on Brunner v. United States, 70 Fed. Cl. 623 (2006), which in turn cites H. Landau & Co. v. United States, 886 F.2d 322 (Fed. Cir. 1989), to postulate that Commander Seligmant had "implied actual authority," Lakeland stretches the holding of those cases beyond their breaking points. In H. Landau, the Federal Circuit held that "implied actual authority . . . will suffice" to "hold the government bound by the acts of its agents." 886 F.2d at 324. In so holding, the Federal Circuit relied on a single Court of Claims case and an excerpt from a government contracts textbook. Id. (quoting Branch Banking & Trust Co. v. United States, 98 F. Supp. 757, 766, 120 Ct. Cl. 72 (1951), and J. Cibinic & R. Nash, Formation of Government Contracts 43 (1982).

Since the issuance of H. Landau, the aforementioned textbook excerpt has taken on a life of its own, but the holdings of both H. Landau and Branch Banking – necessarily

extracted from the facts of the cases – are exceedingly limited.[6] In the former, the court held that actual authority to draw checks on a joint bank account "might carry with it the implied authority to guarantee payment from that account." California Sand & Gravel, Inc. 22 Cl. Ct. at 27 (discussing H. Landau). In Branch Banking, the court merely held that "an officer authorized to make a contract for the United States has the implied authority thereafter to modify the provisions of that contract particularly where it is clearly in the interest of the United States to do so." 98 F. Supp. at 766 (quoted in H. Landau, 886 F.2d at 324).

Thus, in both H. Landau and Branch Banking, the Government official possessed actual authority to contract, but "a person with no actual authority may not gain actual authority through the court-made rule of implied actual authority." California Sand & Gravel, 22 Cl. Ct. at 27 ("The court believes that Landau and the theory of implied actual authority is of limited application, and was not intended to repeal the long established rule that, when dealing with the government, only government agents with actual authority can make a contract, express or implied."); see also Sam Gray Enterprises, Inc., 43 Fed. Cl. at 603 n.10 (implied actual authority "doctrine applies only when some contracting authority was actually delegated"); Stout Road Associates, Inc. v. United States, 80 Fed. Cl. 754, 758 (2008) (same). Here, as we demonstrated in our motion for

[6] Applegate v. United States, 52 Fed. Cl. 751, 758 (2002) (explaining that a case's holding properly is limited to its actual facts considered by the court); Liberty Mut. Ins. Co. v. United States, 70 Fed. Cl. 37, 51 (2006) ("Although Supreme Court dicta are binding on subordinate lower federal courts, the Federal Circuit has cautioned that dicta in its own decisions 'should be read in the light of the court's central holding and the controlling fact in that case.'" (quoting F. Alderete Gen. Contractors, Inc. v. United States, 715 F.2d 1476, 1479 (Fed. Cir. 1983)).

summary judgment, Commander Seligman had no actual authority to contract on behalf of the United States. See Def. Br. at 12. As such, it would stretch the holdings of the cases relied upon by plaintiff beyond recognition, to find that Commander Seligman, who has no actual contracting authority at all, somehow had implied actual authority to enter into an agreement with Lakeland.

Lakeland argues that placing Mr. Nyanjong at Lakeland was an integral part of Commander Seligman's duties as Mental Health Coordinator such that even if he did not have actual authority to contract, he had implied authority to contract. Pl. Br. at 9-13. However, even if plaintiff could demonstrate that Commander Seligman had implied authority to place Mr. Nyanjong at Lakeland, there can be no question that he did not have authority, implied or actual, to bind the Government to pay once Mr. Nyanjong was released from Government custody or to bind the Government to "permanently" pay for Mr. Nyanjong's health care. As we demonstrated in our motion for summary judgment, and discussed above, no one has authority to bind the DHS/ICE to pay for health care costs after a detainee is released from custody, or to bind the Government to "permanently" pay for a detainee's health care. Accordingly, even if Commander Seligman's duties could be construed such that he had implied authority to contract with Lakeland, he cannot have any authority, implied or otherwise to commit DHS/ICE to continue to pay Lakeland once Mr. Nyanjong was released from Government custody, or to "permanently" pay for Mr. Nyanjong's health care, because no one in the Government has such authority.

IV. Commander Seligman's Actions Were Not Ratified By His Supervisors

Lakeland next argues that the agreement was a binding contract because it was ratified by "Mr. Seligman's superiors." Pl. Br. at 15. This argument is equally meritless. Lakeland does not identify a specific individual who allegedly ratified the agreement, and the FAR bars the agreement from being ratified in the manner suggested by plaintiff. Moreover, as with Lakeland's argument relating to the existence of a contract and implied authority to contract, no Government official could have ratified an agreement to provide health care to Mr. Nyanjong once he was released from custody, or to "permanently" provide health care to Mr. Nyanjong because no one in the agency had authority to enter into such a contract.

"Agreements made by government agents without authority to bind the government may be subsequently ratified by those with authority" but only "if the ratifying officials have actual or constructive knowledge of the unauthorized acts." Harbert/Lummus, 142 F.3d at 1433 (quoting United States v. Beebe, 180 U.S. 343, 354 (1901)), for the proposition that "ratification can only be based upon a full knowledge of all the facts upon which the unauthorized action was taken"). "Moreover, ratification must be based on a demonstrated acceptance of the contract. Silence in and of itself is not sufficient to establish a demonstrated acceptance of the contract by the [contracting officer]." Id. at 1434 (citations omitted).

Even if the Government had wished to ratify the contract it could not legally do so, at least with regard to any agreement to pay for Mr. Nyanjong's care after he had been released from custody. "For effective ratification, a superior must have authority to ratify." California Sand & Gravel, Inc. v. United States, 22 Cl. Ct. 19, 27 (1990). The

FAR authorizes ratification of Government contracts "only" if "[t]he resulting contract would otherwise have been proper if made by an appropriate contracting officer." FAR 1.602-3(c)(3) (emphasis added). The FAR provides that "that ratification must be done by "the head of the contracting activity," FAR 1.602-3(b)(2) and that "in no case shall the authority be delegated below the level of chief of the contracting office." Id.

In this case, plaintiff has not alleged, and cannot allege that any of these conditions have been met. Lakeland does not identify any particular person who has ratified the contract, let alone "the head of the contracting activity" or "the chief of the contracting office." FAR 1.602-3(b)(2)-(3). Nor can it show that this contract "would otherwise have been proper" if made by an appropriate contracting officer. As demonstrated above, any contract that obliged the Government to "permanently" pay for Mr. Nyanjong's care or to pay for his care after he was released from custody would be void. The agency cannot ratify an improper contract, and thus, Lakeland cannot demonstrate that this contract was ratified by Commander Seligman's superiors.

## CONCLUSION

For the above reasons, we respectfully request that the Court deny plaintiff's partial motion for summary judgment.

Respectfully submitted,

GREGORY G. KATSIS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Steven J. Gillingham
STEVEN J. GILLINGHAM
Assistant Director

/s/Carrie A. Dunsmore
CARRIE A. DUNSMORE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tel: (202) 305-7576
Fax: (202) 514-8624
Attorneys for Defendant

May 19, 2008

Certificate of Filing

I hereby certify that on this 19th day of May, 2008, a copy of "Defendant's Opposition to Plaintiff's Partial Motion for Summary Judgment" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/Carrie A. Dunsmore
CARRIE A. DUNSMORE

ADDENDUM TO DEFENDANT' APPENDIX

**ADDENDUM TO INDEX TO DEFENDANT'S APPENDIX**

**Document** **Page Number**

May 4, 2008 Affidavit of Christopher M. Jacobs……………………………………………..70

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LAKELAND PARTNERS, LLC,<br>d/b/a LAKELAND NURSING HOME<br><br>Plaintiff<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | Case Number: Fed. Cl. 06-295C |

DECLARATION OF CHRISTOPHER M. JACOBS

I, Christopher M. Jacobs, do hereby declare and state under the penalty of perjury:

1. I am over eighteen years of age. I am currently employed as a Deportation Officer, Buffalo Field Office. I have been employed in that capacity for over 12 years.

2. I have reviewed the documents, labeled GOV 0214-217, which a copy of the order to release Mr. Duncan Nyanjong from Government custody. I faxed these documents to the Lakeland Nursing Home on April 1, 2005 under the direction of James J. Creahan, Deputy Field Office Director. Per conversation with Deputy Field Office Director Creahan, the decision to release Mr. Nyanjong was made at Headquarters, Immigration and Customs Enforcement, Detention and Removals.

3. These documents are authentic copies of the release forms in this case. They are true and accurate, and are sufficient to release Mr. Nyanjong from Government custody. Accordingly, Mr. Nyanjong was released from Government custody as on April 1, 2005. The form I-220A Order to Release on Recognizance was also



May 05 08 10:32a DHS 847-2486 p.2

sent via facsimile. This document sets conditions for the alien to abide by upon release from custody.

4. Mr. Nyanjong was properly released from Government custody because it was determined that he was no longer a danger to himself or the community. Mr. Nyanjong was properly released in accordance with these statutes. The fact that Mr. Nyanjong did not demonstrate that he was likely to appear for any scheduled proceedings or interview did not void his release as upon communication with officials at the Lakeland Nursing Home, I was advised that Mr. Nyanjong was terminally ill and unable to walk, speak or eat.

5. The Order to Detain or Release Alien form is complete with only my signature. It is not necessary for two officers to sign this form. This form requires a signature for the officer directing the action. The officer can either order that the subject is detained in the care and custody of the accepting facility or released from the custody of the facility. This form is generally used as a means to track an alien movement while under non-service detention.

6. The Order to Detain or Release Alien form indicates that removal proceedings occurred in this matter. I have personal knowledge that removal proceedings occurred. Mr. Nyanjong was placed into removal proceedings at Albany, New York on December 12, 2000. He was transferred from Albany to the Buffalo Federal Detention Facility in Batavia, New York. He was detained in custody of the Immigration and Naturalization Service and was present for removal hearings. Mr. Nyanjong attended removal proceedings until January 9, 2001 when The Immigration Judge administratively closed his case due to his medical condition.

7. The Order to Release on Recognizance is accurate and complete as filed. Mr. Nyanjong was removed from custody on or about April 1, 2003. This document released him from the care and custody of Immigration and Customs Enforcement. The form Order to Release on Recognizance directs an individual to report to Immigration and Customs Enforcement in accordance with the conditions listed on the document.

8. On April 1, 2005, the Government released Duncan Nyanjong from Government custody, the release from custody is evidenced in the form I-203, directing Lakeland Nursing Home to release Mr. Nyanjong from custody. His Immigration case was pending before the Executive Office for Immigration Review, but had been removed from the docket.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Date 5/4/08

Christopher M. Jacobs
Deportation Officer
Buffalo Field Office



May 05 08 10:33a DHS 847-2486 p.4