IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LAKELAND PARTNERS, L.L.C.,<br>d/b/a LAKELAND NURSING HOME,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 06-295C<br>(Judge Sweeney) |

DEFENDANT'S RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT, AND COUNTER STATEMENT OF FACT

Pursuant to Rule 56(h)(2) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits the following response to plaintiff, Lakeland Partners, L.L.C.'s "Proposed Findings of Uncontroverted Fact" dated March 17, 2008, and submits its counter statement of fact in response to plaintiff's motion for summary judgment.

DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF FACT

1. Prior to the facts giving rise to this suit, the Department of Homeland Security, Immigration and Customs Enforcement entered into an Interagency Agreement with the Department of Health and Human Services, Bureau of Primary Health Care to provide on-site health care and other health-related services to undocumented aliens in ICE custody. *See* Interagency Agreement, Exhibit A to Memo in Support of MPSJ; Defendant's Answer to Interrogatories, Exhibit B to MPSJ, No. 5.

<u>Defendant's Response:</u>

Admits.

2. DIHS is responsible for the administration of a comprehensive health care delivery system incorporating medical, mental health, dental, and environmental health services. *See* DIHS Policies and Procedures, Chapter 1 - Organization and Executive Direction, p. 1, Exhibit C.

<u>Defendant's Response:</u>

Admits.

3. The Department of Immigration Health Services ("DIHS") is a part of BPHC and serves as "the medical authority for ICE" to provide all of the services set forth in the Interagency Agreement. DIHS also provides the management, direction, coordination, and oversight of medical services provided to undocumented aliens in ICE custody. *See* Defendant's Answers to Interrogatories, Exhibit B, No. 5; DIHS Policies and Procedures, Exhibit C.

<u>Defendant's Response:</u>

Admits.

4. In November 2000, ICE detained Duncan Nyanjong. *See* Exhibit 2 to Deposition of Seligman, attached as Exhibit D.

<u>Defendant's Response:</u>

Admits.

5. In December 2000, Nyanjong appeared before an immigration judge. *Id.* The

immigration judge refused to go forward with Nyanjong's case until ICE could provide medical evidence that Nyanjong understood the nature of the proceedings against him. *Id.*

Defendant's Response:

Admits.

6. ICE was unable to provide evidence that Nyanjong ever became mentally competent.

Defendant's Response:

Plaintiff provides no factual evidence to support this contention. However, defendant admits ICE did not ever determine that Mr. Nyanjong to be mentally competent.

7. In January 2001, Nyanjong was placed in the Columbia Care Center ("CCC") for psychiatric treatment. *Id.*

Defendant's Response:

Admits.

8. Nyanjong's immigration case was administratively closed until such time that he became mentally competent. *Id.*

Defendant's Response:

Admits.

9. The cost of caring for Nyanjong at CCC was $350 a day. *Id.* In fact, as of January 2004, the cost of caring for Nyanjong had reached over $400,000. *See* Exhibit 3 to Deposition of Seligman, Exhibit E.

Defendant's Response:

Admits.

10. Mr. Nyanjong's care had been assigned to Jay Seligman, a National Mental Health Coordinator with DIHS. *Id.*

Defendant's Response:

Defendant objects to the phrase "Mr. Nyanjong's care had been assigned" as vague, but admits that Commander Seligman was employed by DIHS as the National Mental Health Coordinator, and that in that position his responsibilities included coordinating mental health and medical care for detainees in the custody of ICE, including Mr. Nyanjong.

11. Mr. Seligman believed that Nyanjong would probably never be competent enough to understand the nature of his proceedings. *See* Exhibit 2 to Deposition of Seligman, attached as Exhibit D; Deposition of Seligman, Exhibit F, p. 33.

Defendant's Response:

Admits.

12. Given the costs of care at CCC, ICE and DIHS became increasingly concerned about the cost of Nyanjong's care. *Id.* at p. 27.

Defendant's Response:

Admits.

13. Mr. Seligman searched for a nursing home in which to place Nyanjong. *See* Exhibit 3 to Seligman Deposition, attached as Exhibit E; *see also* Deposition of Seligman, Exhibit F, p. 28.

Defendant's Response:

Admits.

14. Cost containment was the sole reason for Mr. Seligman's search. *Id.* at p. 28.

Defendant's Response:

Admits.

15. In April 2004, Lakeland was contacted by Mr. Seligman.

Defendant's Response:

Plaintiff provides no factual evidence to support this contention, and defendant has no additional knowledge to support this fact. However, defendant admits that Mr. Nyanjong was admitted to Lakeland Nursing Home in May, 2004.

16. On behalf of ICE and DIHS, Mr. Seligman negotiated the terms of Nyanjong's placement at Lakeland with Hank Cooley, Lakeland's administrator.

Defendant's Response:

Plaintiff provides no factual evidence to support this contention, and defendant has no additional knowledge as to the facts regarding the negotiations between Lakeland and the United States regarding the terms of Mr. Nyanjong's placement. Defendant admits that Commander Seligman placed Mr. Nyanjong at Lakeland.

17. Because of Nyanjong's condition, which had clearly prevented him from being released from ICE custody, Mr. Seligman never indicated to Mr. Cooley that Nyanjong's placement would be temporary. *See* Deposition of Hank Cooley, attached *in globo* as Exhibit G, p. 75.

Defendant's Response:

Defendant objects to the phrase "Because of Nyanjong's condition, which had clearly prevented him from being released from ICE custody" because it is plaintiffs' legal conclusion, not a factual contention, that Mr. Nyanjong could not be released from ICE

custody. Denies that Commander Seligman never indicated that Mr. Nyanjon's placement could be temporary as unsupported by contemporaneous evidence.

18. Mr. Seligman believed that Nyanjong would be at Lakeland until he passed away or was mentally competent to stand trial, or until an alternative payor source was located. *See* Deposition of Seligman, Exhibit F, pp. 25 - 26.

Defendant's Response:

Denies. Commander Seligman stated that he also believed there was a possibility that Mr. Nyanjong would be released from custody if other health care options were found for him, such as Medicaid or another social service provider.

19. Mr. Cooley was never informed that there was a chance Nyanjong would be released from ICE custody or that his funding could be cut off. *See* Deposition of Cooley, Exhibit G, p. 80.

Defendant's Response:

Admits that Mr. Cooley stated that he was not informed that Mr. Nyanjong could have been released from ICE custody, but denies that he was never informed of the possibility as unsupported by contemporaneous evidence. Moreover, Lakeland had access to the Immigration Health Services Provider Handbook, available on DIHS's website which made clear that DIHS could only pay for the health care of detainees in Government custody.

20. Lakeland would not have accepted Nyanjong if it had known that there was a chance Nyanjong's funding could be cut off. *See* Deposition of Cooley, Exhibit G, p. 81.

Defendant's Response:

Admits that Mr. Cooley stated in his deposition that Lakeland would not have accepted Nyanjong if it had known that there was a chance Nyanjong's funding could be cut off, but denies the fact as unsupported by contemporaneous evidence, and entirely speculative.

21. Based upon Mr. Seligman's representations, Mr. Cooley believed Nyanjong's placement in Lakeland to be permanent, i.e., until an alternative payor source was located or until Nyanjong died. *Id.* at p. 75

Defendant's Response:

Denies that Mr. Seligman made such representation to Mr. Cooley. Admits that Mr. Cooley stated in his deposition that he believed Nyanjong's placement in Lakeland to be permanent.

22. According to defendant, the procedure DIHS used for placing individuals in private care facilities, such as Lakeland, was as follows:

> An undocumented alien in the custody of ICE, as indicated by a valid alien number in the Detained Alien Control System (DACS), is provided medical services as described in the Immigration Health Services Provider Handbook, previously provided at GOV 0027-0087. Medical facilities that are in the DIHS Managed Care Provider Network must obtain prior authorization for all admissions and procedures as described in a completed DIHS Treatment Authorization Request (TAR) from the DIHS Managed Care Coordinator. Medical coverage of undocumented aliens begins the first day that an individual is placed in custody and under the jurisdiction of the DIHS and ends the day that DHS releases the detainee from custody. The previously provided Immigration Health Services Provider Handbook details the procedures for obtaining authorization for medical services, medical referrals, payment of claims, appeal of claims, and specific medically necessary and appropriate health care services and treatment that DIHS will authorize. If the Managed Care Coordinator deems it necessary and a TAR is approved, this medical care may include placement of an individual in a private care facility such as Lakeland. *See* Defendant's Answers to Interrogatories, Exhibit B, No. 5.

Defendant's Response:

Admits.

23. Defendant admitted that Mr. Seligman followed this procedure in having Nyanjong admitted to Lakeland. *See* Defendant's Answer to Interrogatories, Exhibit B, No. 6.

Defendant's Response:

Admits.

24. On April 19, 2004, Mr. Seligman completed the Request For Medical Eligibility Determination, which had been provided by Lakeland. *See* Request for Medical Eligibility Determination, Exhibit H.

Defendant's Response:

Admits.

25. Mr. Seligman confirmed his previous conversations with Hank Cooley by marking "permanent" on the Request for Medical Eligibility. *Id.*; Deposition of Cooley, Exhibit G, p. 75.

Defendant's Response:

Admits that Commander Seligman marked the "permanent" rather than the "temporary" line on the Request For Medical Eligibility. Denies that such marking confirmed any previous conversation with Mr. Cooley.

26. The Request for Medical Eligibility Determination stated that DIHS would be the responsible party for payment. *See* Request for Medical Eligibility Determination, Exhibit H.

Defendant's Response:

Admits.

27. On May 11, 2004, Mr. Seligman completed the Treatment Authorization Request. *See* TAR, attached as Exhibit I.

Defendant's Response:

Admits.

28. INS was notified of the Treatment Authorization Request. *Id.*

Defendant's Response:

Admits.

29. The TAR was submitted to the appropriate DIHS/ICE officials for approval. *See* TAR; Deposition of Seligman, Exhibit F, p. 56; Defendant's Answers to Interrogatories, Exhibit B, No. 6; Defendant's Answers to Requests for Admissions, Exhibit J, Nos. 3 and 10.

Defendant's Response:

Admits.

30. Mr. Seligman followed proper and usual procedures in placing Nyanjong in Lakeland and Nyanjong's placement in Lakeland was approved by the appropriate ICE and DIHS officials. *Id.*; Defendant's Answers to Requests for Admissions, Exhibit J, No. 15.

Defendant's Response:

Admits that the procedures utilized by Commander Seligman in placing Mr. Nyanjong were the usual procedures utilized by the Mental Health Care Coordinator in placing such detainees and were approved by the appropriate ICE and DIHS officials.

31. Lakeland and Mr. Seligman agreed that the monthly rate paid to Lakeland would be $2,964 plus pharmacy costs.

Defendant's Response:

Plaintiff provides no factual evidence to support this contention. Defendant admits that the Treatment Authorization Request stated that "at Lakeland the charge will be $175 a day due to the HIV medicine," and that a chart of Mr. Nyanjong's bills (previously provided at A34-35) showed a range of expenses from $1,100.52 to $6,840.72 for monthly expenses.

32. On May 12, 2004, Lakeland received Nyanjong as a patient.

Defendant's Response:

Plaintiff provides no factual evidence to support this contention, but defendant admits this fact.

33. Lakeland initially had no problems receiving payment from ICE/DIHS. *See* Deposition of Cooley, Exhibit G, p. 85; Deposition of Seligman, Exhibit F, p. 62.

Defendant's Response:

Admits.

34. The manner in which ICE and DIHS paid Lakeland for its services was in accordance with ICE and DIHS procedures. *See* Defendant's Answers to Requests for Admissions, Exhibit J, No. 9.

Defendant's Response:

Admits.

35. Payment to Lakeland was approved by the appropriate ICE and DIHS officials. *See* Defendant's Answers to Requests for Admissions, Exhibit J, No. 11.

Defendant's Response:

Admits.

36. Lakeland treated Nyanjong without incident until January 15, 2005, when a nurse found him on the floor and unresponsive.

Defendant's Response:

Plaintiff provides no factual evidence to support this contention, and defendant has no additional knowledge to support this fact.

37. Nyanjong was transferred to Huey P. Long Hospital, which diagnosed him with respiratory failure and placed him in the ICU on a ventilator.

Defendant's Response:

Plaintiff provides no factual evidence to support this contention, and defendant has no additional knowledge to support this fact. Admits that Mr. Nyanjong was admitted to Huey P. Long Hospital in January 2005.

38. On February 4, 2005, Nyanjong was returned to Lakeland, too weak to ambulate or take care of himself. Nyanjong could not feed, clean, or otherwise care for himself. Mentally he was unable to understand anything beyond simple commands.

Defendant's Response:

Plaintiff provides no factual evidence to support this contention, and defendant has no additional knowledge to support this fact.

39. As a result of Nyanjong's admission to Huey P. Long Hospital, ICE began to reconsider Nyanjong's status.

Defendant's Response:

Plaintiff provides no factual evidence to support this contention. Defendant denies that ICE reconsidered Mr. Nyanjong's status as a result of his admission to Huey P. Long Hospital.

40. Towards the end of February 2005, William Cleary, the ICE Field Office Director, noted that Nyanjong's case had been administratively closed pending medical treatment. *See* Exhibit 9 to Deposition of Seligman, attached as Exhibit K.

Defendant's Response:

Admits.

41. Mr. Cleary recommended releasing Nyanjong "O.R. after providing sufficient notice to the nursing home of our intention and to provide them sufficient time to find another location for him to obtain other funding source to pay for his care." *Id.*

Defendant's Response:

Admits.

42. As of March 2005, defendant quit providing payment for Nyanjong's care.

Defendant's Response:

Plaintiff provides no factual evidence to support this contention. Defendant admits that it refused to pay for Mr. Nyanjong's health care after he was released from ICE custody on April 1, 2005.

43. Christopher Jacobs faxed to Lakeland an Order to Release Nyanjong on April 1, 2005. *See* Order to Release Alien, attached as Exhibit M.

Defendant's Response:

Admits.

44. After Nyanjong's release from custody, Lakeland requested that the government honor its contract with Lakeland by continuing to pay for Nyanjong's care.

Defendant's Response:

Plaintiff provides no factual evidence to support this contention. Defendant denies that they were under any contractual obligation to pay for Mr. Nyanjong's care after he was released from ICE custody, but admits that Lakeland requested that the Government continue to pay for Mr. Nyanjong's care.

45. Nyanjong eventually died in Lakeland nursing home.

Defendant's Response:

Plaintiff provides no factual evidence to support this contention. Defendant admits that Mr. Nyanjong is deceased.

46. Lakeland paid for all expenses and costs associated with his care until that time.

Defendant's Response:

Plaintiff provides no factual evidence to support this contention, and defendant has no additional knowledge to support this fact.

47. Jay Seligman's position description stated that it was his responsibility to receive written treatment authorization requests for off-site and/or non-routine mental health care services from DIHS Managed Care Coordinators. *See* NMHC Position Description, Exhibit N.

Defendant's Response:

Admits.

48. Mr. Seligman also functioned as a reviewer to determine mental health necessity and appropriateness of requested services. *Id.*

Defendant's Response:

Admits that the position description stated for the National Mental Health Care Coordinator states that the NMCC will "function as a reviewer to determine mental health necessity and appropriateness of requested services."

49. It was Mr. Seligman's responsibility to provide support and assistance to ICE in placing detainees with special mental health needs in appropriate facilities. *Id.*

Defendant's Response:

Admits that the position description stated for the National Mental Health Care Coordinator states that the NMCC will "provide support and assistance to ICE in placing detainees with special mental health needs in appropriate facilities."

50. Mr. Seligman's position description stated:

> **4. Authority and Responsibility**
> • The incumbent works as an independent provider of mental health services. The incumbent is expected to oversee the mental health care of those detained in long term mental health treatment facilities. The incumbent shall also have responsibility for the development and implementation of national mental health operating procedures.

Defendant's Response:

Admits.

51. One purpose of Mr. Seligman's job was "prevention of the introduction of potentially dangerous individuals into the community." *Id.*

Defendant's Response:

Admits that the position description stated for the National Mental Health Care Coordinator states that the scope and effort of the NMCC include "prevention of the introduction of potentially dangerous individuals into the community."

52. Mr. Seligman was the official responsible for negotiating contracts for the placement of detainees such as Nyanjong in off-site facilities on behalf of the government. *See* Deposition of Seligman, Exhibit F, p. 12.

Defendant's Response:

Admits that Commander Seligman was responsible for placing detainees in off-site facilities, denies that he was responsible for negotiating contracts.

53. It was Mr. Seligman's responsibility for getting detainees such as Nyanjong admitted into off-site healthcare facilities such as Lakeland. *Id.* at pp. 12 and 14.

Defendant's Response:

Admits.

54. Mr. Seligman admitted Nyanjong into Lakeland with the "blessing of ICE" and was granted authority by them in completing Nyanjong admission into Lakeland. *Id.* at 13.

Defendant's Response:

Admits that Mr. Seligman admitted Nyanjong into Lakeland with ICE's knowledge, denies that he was "granted authority" by ICE for any of his action.

55. Mr. Seligman was the "case manager" for Nyanjong. *Id.* at 27.

Defendant's Response:

Admits that Commander Seligman was the National Mental Health Care Coordinator and in that position his responsibilities included coordinating mental health and medical care for detainees in the custody of ICE, including Mr. Nyanjong. These duties included performing case management of detainees that are being released into the community and conduction utilization review of hospitalizations of mentally and medically ill clients/detainees.

56. Mr. Seligman was responsible for coordinating the transfer of Nyanjong into Lakeland and he got approval from DIHS and ICE for doing so. *Id.* at 56.

Defendant's Response:

Admits.

57. Mr. Seligman was the officer responsible for authorizing Nyanjong's admission into Lakeland. *Id.* at 57.

Defendant's Response:

Defendant denies that Commander Seligman was responsible for authorizing Mr. Nyanjong's admission into Lakeland. Commander Seligman is not a contracting officer and has no authority to enter into contract. Defendant admits that as the official responsible for Mr. Nyanjong's health care Commander Seligman approved the treatment authorization request placing him at Lakeland.

58. It was Mr. Seligman's responsibility to review payment statements submitted by healthcare facilities and to authorize payment. *Id.* at 15.

Defendant's Response:

Defendant admits that Commander Seligman was responsible for reviewing the payment statements, to ensure that that such healthcare was actually received, at which point he forwarded on to the responsible parties to authorize the actual payment.

59. It was part of Mr. Seligman's job to place detainees in healthcare facilities such as Lakeland. *See* Defendant's Answers to Request for Admissions, Exhibit J, No. 16.

Defendant's Response:

Defendant admits that Commander Seligman was responsible for placing detainees in health care facilities.

60. Given Mr. Seligman's duties as NMHC, it was appropriate for Mr. Seligman to place Nyanjong in Lakeland. *Id.* at No. 17.

Defendant's Response:

Defendant objects to the term "appropriate" as vague and without meaning, but admits that it was within Commander Seligman's duties as National Mental Health Care Coordinator to place Nyanjong at Lakeland.

61. Mr. Seligman's superiors whom defendant contends had contracting authority were aware of Nyanjong's placement in Lakeland and were aware that Lakeland was providing healthcare services to Nyanjong on behalf of DIHS/ICE. *See* Defendant's Answers to Request for Admissions, Exhibit J, No. 20

Defendant's Response:

Admits.

62. The official whom defendant contends had contracting authority was aware that Lakeland was being compensated for the healthcare services it was providing to Nyanjong. *Id.* at No. 21.

Defendant's Response:

Admits.

63. Nyanjong's placement in Lakeland was approved by the appropriate ICE and/or DIHS officials. *Id.* at No. 10.

Defendant's Response:

Admits.

64. Payment to Lakeland was approved by the appropriate ICE and/or DIHS officials. *Id.* at No. 11.

Defendant's Response:

Admits.

65. Defendant received a benefit and consideration for the payments it provided to Lakeland. *Id.* at No. 19.

Defendant's Response:

Defendant objects to this contention because it because it is plaintiffs' legal conclusion, not a factual contention.

66. The government has no evidence that Nyanjong was ever officially released or discharged from custody or that his detainer was dropped.

Defendant's Response:

Denies. The Government has provided the Order To Detain Or Release Alien signed by Chris Jacobs of ICE on April 1, 2005, and faxed to Lakeland on that same date, and the

Order to Release on Recognizance, signed by Michael Philips of ICE for William Cleary, Field Office Director, dated February 23, 2005, as well as the affidavit of Chris Jacobs of ICE, all showing that Mr. Nyanjong was released from ICE custody.

67. The government has no evidence that Nyanjong was properly released from custody or discharged or that his detainer was properly dropped. *See* Defendant's Responses to Request for Production, Exhibit O, Nos. 3 & 4; *see* 4/10/07 Correspondence, Exhibit P; 9/17/07 Correspondence, Exhibit Q.

Defendant's Response:

Denies. The Government has provided the Order To Detain Or Release Alien signed by Chris Jacobs of ICE on April 1, 2005, and faxed to Lakeland on that same date, and the Order to Release on Recognizance, signed by Michael Philips of ICE for William Cleary, Field Office Director, dated February 23, 2005, as well as the affidavit of Chris Jacobs of ICE, all showing that Mr. Nyanjong was released from ICE custody.

DEFENDANT'S COUNTERSTATEMENT OF FACT

1. Christopher Jacobs is currently employed as a Deportation Officer, Buffalo Field Office. A70 at ¶ 1. He has been employed in that capacity for over 12 years. Id.

2. Mr. Jacobs reviewed the documents, labeled GOV 0214-217, which consist of copies of the order to release Mr. Duncan Nyanjong from Government custody. A70 at ¶ 2. He personally faxed these documents to the Lakeland Nursing Home on April 1, 2005 under the direction of James J. Creahan, Deputy Field Office Director. Id. Per a conversation with Deputy Field Office Director Creahan, the

decision to release Mr. Nyanjong was made at Headquarters, Immigration and Customs Enforcement, Detention and Removals. Id.

3. Mr. Jacobs stated that these documents are authentic copies of the release forms in this case. A70 at ¶ 3. They are true and accurate, and are sufficient to release Mr. Nyanjong from Government custody. Id. Accordingly, Mr. Nyanjong was released from Government custody as of April 1, 2005. Id. The form I-220A Order to Release on Recognizance was also sent via facsimile. A70-71 at ¶ 3. This document sets conditions for the alien to abide by upon release from custody. A71 at ¶ 3.

4. Mr. Jacobs explained that Mr. Nyanjong was properly released from Government custody because it was determined that he was no longer a danger to himself or the community. A71 at ¶ 4. Mr. Nyanjong was properly released in accordance with these statutes. Id. The fact that Mr. Nyanjong did not demonstrate that he was likely to appear for any scheduled proceedings or interview did not void his release. Id.

5. The Order to Detain or Release Alien form is complete with only Mr. Jacobs's signature. A71 at ¶ 5. It is not necessary for two officers to sign this form. Id. This form requires a signature for the officer directing the action. Id. The officer can either order that the subject is detained in the care and custody of the accepting facility or released from the custody of the facility. Id. This form is generally used as a means to track an alien movement while under non-service detention. Id.

6. The Order to Detain or Release Alien form indicates that removal proceedings occurred in this matter. A71 at ¶ 6. Mr. Jacobs has personal knowledge that removal proceedings occurred. Id. Mr. Nyanjong was placed into removal proceedings at Albany, New York on December 12, 2000. Id. He was transferred from Albany to the Buffalo Federal Detention Facility in Batavia, New York. Id. He was detained in custody of the Immigration and Naturalization Service and was present for removal hearings. Id. Mr. Nyanjong attended removal proceedings until January 9, 2001 when The Immigration Judge administratively closed his case due to his medical condition. Id.

7. The Order to Release on Recognizance is accurate and complete as filed. A72 at ¶ 7. Mr. Nyanjong was removed from custody on or about April 1, 2005. Id. This document released him from the care and custody of Immigration and Customs Enforcement. Id. The form Order to Release on Recognizance directs an individual to report to Immigration and Customs Enforcement in accordance with the conditions listed on the document. Id.

8. On April 1, 2005, the Government released Duncan Nyanjong from Government custody, the release from custody is evidenced in the form I-203, directing Lakeland Nursing Home to release Mr. Nyanjong from custody. A72 at ¶ 8. His Immigration case was pending before the Executive Office for Immigration Review, but had been removed from the docket. Id.

Respectfully submitted,

GREGORY G. KATSIS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Steven J. Gillingham
STEVEN J. GILLINGHAM
Assistant Director

/s/Carrie A. Dunsmore
CARRIE A. DUNSMORE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tel: (202) 305-7576
Fax: (202) 514-8624

May 19, 2008

Attorneys for Defendant

Certificate of Filing

I hereby certify that on this 19th day of May, 2008, a copy of "Defendant's Opposition to Plaintiff's Partial Motion for Summary Judgment" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/Carrie A. Dunsmore
Carrie A. Dunsmore