gotten in touch with me and had told me that he had a resident that e wanted to try at my facility that was currently in Columbia Care -- I'm not sure if it was South or North Carolina. We felt like we could handle this resident. That he had HIV and dementia and some other things. He knew what kind of resident that we took at our facility.

Q. You had had INS detainees prior to Mr. Nyanjong?

A. The facility had INS detainees before.

Q. But you personally?

A. I personally had not.

Q. Did you have a procedure for admitting INS detainees at that time?

A. I did not.

Q You and Dr. Seligman worked out an arrangement?

A. Correct.

Q. You think that was done by --

A. I think we faxed him over a written price of what we would charge him per month for the resident.

Q. Do you think you would have a copy of that?



EXHIBIT
S

no, ma'am.
Q. Did you ever speak with anyone else about Duncan?
A. The only time that I spoke with anybody else was when I received the order of release.
Q. We'll get to that. At the time when he was placed, you had only dealt with Dr. Seligman?
A. Correct.
Q. You never spoke with anyone from ICE? I'll represent Seligman was at DHIS.
A. I only spoke to Commander Seligman.
Q. Let's just explain the procedure for this. Once you speak to Seligman, you would work out a price. And what happened then?
A. He told me it sounded good. That he would arrange for Mr. Nyanjong to be transferred from Columbia Care Center to my facility. He said he would be flown in. He would contact me and give me the flight number and times. I think he said he would have two agents with him to make sure he got there. He called me and gave me a flight number and time. I had our transportation driver meet him at the



d0362280-1f3d-4aad-a9de-4f7d0777546f

org? You never went the to site?
A. No, ma'am.
Q. You did see this form?
A. Yes, ma'am.
Q. I'm going to show you this which we're going to call Cooley 3 Gov 27 through 87. You can take a second to glance at this document. Look through it.
A. Okay.
Q. Have you ever seen this document before?
A. No, ma'am.
Q. Have you ever seen anything like that before?
A. No, ma'am.
Q But you have a number of immigration detainees in your facility?
A. Correct.
Q. You've never seen anything like this?
A. No, ma'am.
Q. Your understanding of the terms and conditions of their stay is based only on conversations you had with people at DHIS?
A. Most of my understanding is from conversations that I've had with Commander

paid, Huey Long Hospital to be paid --
A. I didn't actually read this document when I received it. I knew it was for the hospital.
Q. You saw that even though you didn't read it carefully?
A. Correct.
Q. Turning back to Cooley 3 which is that one. You testified that you didn't have access to the Internet --
A. No, ma'am.
Q. -- at the time. Dr. Seligman told us that he had told you about this document.
A. Okay.
Q Do you have any memory of that?
BY MR. HARTDEGEN:
Objection. Mr. Seligman said, I believe, he told Lakeland about the website and specifically stated he didn't provide this document to Lakeland.
EXAMINATION BY MS. DUNSMORE:
Q. That's fair. Do you remember Dr. Seligman telling you about the website?
A. I remember him saying some things were available on the web when I told him we did not



d0362280-1f3d-4aad-a9de-4f7d0777546

have Internet.

Q. Your understanding of the terms and conditions of Duncan Nyanjong's stay were based on conversations you had before and whatever documents you and Dr. Seligman had exchanged?

A. Correct.

Q. Was this the same for Martina?

A. Yes.

Q. Would you remind me of her last name?

A. Saduski.

Q. It's the same procedure. It was not based on any written document such as this, not based on a provider handbook, but just based on whatever conversations you had with --

A. Correct. Basically Commander Seligman would ask me for a per diem rate; and once you sent him the rate and told him the person would be a good fit, he would send it to me.

Q. You may or may not have exchanged -- what was the name of the other form again?

A. Which one?

Q. Not the 90-L, but the other form that you have.

A. Admission agreement.

Q. You may or may not have had Dr.

Q. Am I correct that this form 90-L would have been filled out by Mr. Seligman before you would have sent him an application packet which included the admission agreement?

A. Correct.

Q. Would you necessarily have sent Mr. Seligman an application packet with the admission agreement?

A. Not necessarily.

Q. Is it your discretion to admit a patient without having them fill out the admission agreement?

A. Yes.

Q. Could you have done that in this case?

A. I could have. Some residents are not able to understand the admission packet, and some of them, even though they understand, refuse to sign any documents; and in Mr. Nyanjong's case, he understood some English and could follow some simple commands. We really had doubts about what he really could understand and not understand.

Q. Tell us what you consider permanently to mean when someone fills out form 90-Ls and marks permanently?



d0362280-1f3d-4aad-a9de-4f7d0777546