IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LAKELAND PARTNERS, L.L.C.<br>d/b/a LAKELAND NURSING HOME, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-295C<br>(Judge Margaret M. Sweeney) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Pursuant to Rule 56(h)(2) of the Rules of this Court, Lakeland offers the following responses to defendant's proposed uncontroverted facts:

Defendant's Proposed Finding of Uncontroverted Fact No. 1:

The Department of Homeland Security, Immigration and Customs Enforcement (ICE) is responsible for promoting public safety and national security through the enforcement of United States immigration laws that all removable aliens depart the United States. A1.[1] ICE is responsible for transporting aliens, managing them while in custody and waiting for their cases to be processed, and removing unauthorized aliens from the United States when so ordered. Id.

Plaintiff's Response: Lakeland agrees with this proposed finding.

Defendant's Proposed Finding of Uncontroverted Fact No. 2:

ICE has entered into an interagency agreement with the Department of Health and Human Services, Health Resources and Services Administration, Bureau of Primary Health Care. A4-12. The purpose of the agreement is to set forth

[1] "A _" refers to a numbered page in Defendant's Appendix.

the responsibilities of the Department of Health and Human Services (DHHS), Health Resources and Services Administration (HRSA), Bureau of Primary Health Care (BPHC) regarding the provision of on-site health care and other health-related services to undocumented aliens detained at various locations by the ICE. The agreement provides that "the Division of Immigration Health Services (DIHS), which is part of BPHC, will serve as the medical authority for ICE." A4.

Plaintiff's Response: Lakeland agrees with this proposed finding.

Defendant's Proposed Finding of Uncontroverted Fact No. 3:

The Interagency Agreement provides that DIHS will serve as the medical authority for ICE and provide all of the services set out in the Interagency Agreement, as well as management, direction, coordination and oversight of these services. A4-12. ICE's responsibilities are:

> ICE agrees to reimburse BPHC for DIHS's delivery of all on-site health care and other health-related services provided to or arranged for undocumented aliens in the custody of ICE... ICE agrees to furnish and maintain the medical facility space and security necessary for DIHS to provide health care services to detained aliens.

A4. DIHS's responsibilities under the agreement are:

> DIHS agrees to provide on-site health care for detained aliens or will arrange for off-site services, as appropriate ... DIHS will coordinate payment for all off-site services arranged by and authorized by DIHS.

A5. The Interagency agreement also states that DIHS will provide:

> Administration and operation of a managed care network referred to as the Managed Care Branch (MCB) for the authorization and validation of medical care and medical payment oversight for persons in custody under the authority of the Immigration and Nationality Act, as amended, and which may be house in ICE-contracted detention facilities, and Federal, state or local governmental facilities. For medical care provided outside the facility, DIHS may determine that an alternative medical provider or institution is more cost-effective or more aptly meets the needs of ICE and the detainee. The MCB will assist ICE in the placement of detainees with special medical

and health-related conditions but will not act as an agent for ICE in securing and purchasing detention and jail beds.

A6.

Plaintiff's Response: Lakeland agrees with this proposed finding.

Defendant's Proposed Finding of Uncontroverted Fact No. 4:

DIHS promulgated an Immigration Health Services Provider Handbook ("Provider Handbook"), which states that to be eligible for DHIS care, the following must apply:

- The individual must be in DHS/BTSD custody as indicated by a valid alien number in the Detained Alien Control System (DACS) or a valid tracking number assigned by the Border Patrol.
- This assigned tracking number is a unique detainee identifier that can be correlated to a particular detainee and the Sector or Sector/Station that had custody of the detainee.
- All detainees provided to network providers must be referred by DHIS for treatment or consultation.
- The detainee will be in custody and will arrive with a DHS/BTSD officer or Federal Marshall that has been arranged by the local DHS/BTSD facility or correctional institution.
- The detainee will have DHIS Treatment Authorization Request form identifying and requesting the specific treatment and/or consultation."

A14.

Plaintiffs' Response: Lakeland agrees with this statement, but otherwise denies that it is applicable and notes that Lakeland was never provided a copy of this handbook and did not have access to it. *See* Exhibit S, attached to Lakeland's Opposition to Defendant's Motion for Summary Judgment.

Defendant's Proposed Finding of Uncontroverted Fact No. 5:

The Provider Handbook also provides, under the heading "Who Is Covered?" that:

The Immigration and Nationality Act (INA), Section 234, INA and the Public Health Service Act (PHSA), Section 322, PHSA provide for cooperative

> arrangements between ICE and the PHS (Public Health Service) for the medical inspection of aliens within and outside of the United States and for the provision of services by PHS personnel to aliens being detained by ICE.

A14-15. It provides that "Coverage is effective on the first day that an individual is places in the custody and under the jurisdiction of DHS/BTSD," and "Coverage ends on the day that DHS/BTSD releases the detainee from its custody as indicated in DACS." A15.

Plaintiff's Response: Lakeland agrees with this statement, but otherwise denies that it is applicable and notes that Lakeland was never provided a copy of this handbook and did not have access to it. *Id.*

Defendant's Proposed Finding of Uncontroverted Fact No. 6:

The Provider Handbook provides that DHIS "will verify DHS/BTSD custody status through the DACS before making any benefit payments on a claim. If an individual is not eligible, according to DACS, DHIS will deny the claim." A14.

Plaintiff's Response: Lakeland agrees with this statement, but otherwise denies that it is applicable and notes that Lakeland was never provided a copy of this handbook and did not have access to it.

Defendant's Proposed Finding of Uncontroverted Fact No. 7:

The Provider Handbook defines a "detainee" as "An individual who is in the custody and under the jurisdiction of the Department of HomelandSecurity/Border and Transportation of Security Directorate." A17.

Plaintiff's Response: Lakeland agrees with this statement, but otherwise denies that it is applicable and notes that Lakeland was never provided a copy of this handbook and did not have access to it.

Defendant's Proposed Finding of Uncontroverted Fact No, 8:

The Position Description for the National Mental Health Care Coordinator provides that:

> The United States Public Health Service is tasked by the Immigration and Customs Enforcement (ICE) to provide direct mental health and short stay unit care to detainees. It is the responsibility of the NMHC to adhere to National Polices and Procedures as stated in the ICE Health Service Division Polices And Procedures Manual regarding the following areas:
>
> - Receive written treatment authorization requests for off-site and/or non-routine mental health care services from DIHS Managed Care Coordinators.
> - Function as a reviewer to determine the mental health necessity and appropriateness of requested services by consulting clinical guidelines established by the Chief Medical Director of DIHS.
> - Provides support and assistance to ICE in placing detainees with special mental health needs in appropriate facilities.

A18.

Plaintiff's Response: Lakeland agrees with this statement.

Defendant's Proposed Finding of Uncontroverted Fact No. 9:

On November 30, 2000, Duncan Nyanjong was arrested in Utica, New York. A21. After stating that he was a citizen of Kenya, who entered the United States in 1992 via a tourist visa, his case was referred to ICE, (then known as the Immigration and Naturalization Service or "INS"), and he was transported to INS custody. Id. The INS began a removal proceeding against Mr. Nyanjong on that same day. A22.

Plaintiff's Response: Lakeland agrees with this statement.

Defendant's Proposed Finding of Uncontroverted Fact No. 10:

On December 19, 2000, a hearing was held on Mr. Nyanjong's deportation. A23. The court held that it would require medical evidence that Mr. Nyanjong was competent and able to understand the proceedings against him, and stated it would

not proceed with the case until they had documentation of Mr. Nyanjong's competency. Id. On January 9, 2001, Mr. Nyanjong's removal proceedings were administratively closed by Immigration Judge John B. Reid because Mr. Nyanjong was en route to a facility in South Carolina for psychiatric treatment. Id.

Plaintiff's Response: Lakeland agrees with this statement.

Defendant's Proposed Finding of Uncontroverted Fact No. 11:

In December 2000, INS officials in Buffalo contacted the Columbia Care Center and requested that Mr. Nyanjong be transported to that facility. A24. Columbia Care agreed to accept Mr. Nyangjong on December 28, 2000. A27. Mr. Nyanjong was transferred to Columbia Care on January 9, 2001. A26.

Plaintiff's Response: Lakeland agrees with this statement.

Defendant's Proposed Finding of Uncontroverted Fact No. 12:

The United States Public Health Service is tasked by the Immigration and Customs Enforcement (ICE) to provide direct mental health and short stay unit care to detainees. A18.

Plaintiff's Response: Lakeland agrees that the position description for NMHC's states that the United States Public Health Service is tasked by the Immigration and Customs Enforcement (ICE) to provide direct medical, mental health and short stay unit care to detainees.

Defendant's Proposed Finding of Uncontroverted Fact No. 13:

From July 2002 to May 2006, Commander Jay Seligman of the United States Public Health Service was employed by DIHS as the National Mental Health Coordinator. A51. In that position his responsibilities included coordinating mental health and medical care for detainees in the custody of ICE. A48. These duties

included performing case management of detainees that are being released into the community and conduction utilization review of hospitalizations of mentally and medically ill clients/detainees. Id.

Plaintiff's Response: Lakeland agrees with this statement.

Defendant's Proposed Finding of Uncontroverted Fact No. 14:

Commander Seligman is not a contracting officer. A49.

Plaintiff's Response: Lakeland disagrees with this statement. *See* Lakeland's Memorandum in Support of Motion for Summary Judgment and Opposition to Defendant's Motion for Summary Judgment. Furthermore, Lakeland notes that Mr. Seligman's self-serving assertion in his affidavit that he is not a contracting officer is a conclusion of law insufficient to negate a genuine issue of material fact.

Defendant's Proposed Finding of Uncontroverted Fact No. 15:

In 2004, Commander Seligman began to become concerned about the cost of treating Mr. Nyanjong at the Columbia Care Center. A28, A52-53. On January 22, 2004, Commander Seligman sent an email to William Cleary stating:

> I have had Duncan Nyanjong A# 76-480-523 in Columbia Care Center as of 1/01/03. It has cost the service over $400,000 so far in care. With his medical condition, I may be able to have located in a nursing home. Can you please tell me who I can contact in order to explore community placement[?]

A28.

Plaintiff's Response: Lakeland agrees with this statement.

Defendant's Proposed Finding of Uncontroverted Fact No. 16:

Commander Seligman arranged for Mr. Nyanjong to be transferred from Columbia Care Center to Lakeland Nursing Home. A29, A31. On April 19, 2004, Jay Seligman submitted a Request for Medical Eligibility Determination for

Duncan Nyanjong to Lakeland Nursing Home. A29. Commander Seligman listed himself as the "Applicant" on the form, but crossed out the line entitled "Responsible Party. Signature." Id.

Plaintiff's Response: Lakeland agrees with the first sentence. Lakeland disagrees with the remainder as written. Mr. Seligman testified that he crossed out the "responsible party" language to indicate that he was not *personally* responsible for payment of services. *See* Seligman Deposition, p. 59, attached as Exhibit T to Lakeland's Opposition to Defendant's Motion for Summary Judgment. The Request for Medical Eligibility also shows that DIHS is listed as the responsible party.

Defendant's Proposed Finding of Uncontroverted Fact No. 17:

Duncan Nyanjong was released from Columbia Care facility on May 12, 2004. A32. From May, 2004 through March, 2005, Mr. Nyanjong was treated at Lakeland Nursing Home and the United States Government, through NHS, paid for his health care. A33-38.

Plaintiff's Response: Lakeland agrees with this statement but notes that payment was made via ICE/DIHS. *See* Deposition of Cooley, Exhibit G, p. 85[2]; Deposition of Seligman, Exhibit F, p. 62; Defendant's A36. The manner in which ICE and DIHS paid Lakeland for its services was in accordance with ICE and DIHS procedures. *See* Defendant's Answers to Requests for Admissions, Exhibit J, No. 9. Payment to Lakeland was approved by the appropriate ICE and DIHS officials. *See* Defendant's Answers to Requests for Admissions, Exhibit J, No. 11.

---

[2] Unless otherwise noted, all exhibits referenced herein are those submitted in connection with Lakeland's motion for summary judgment and motion *in limine*.

Defendant's Proposed Finding of Uncontroverted Fact No. 18:

On April 1, 2005, ICE, having determined that Mr. Nyanjong was no longer a danger to the community, A42, released Mr. Nyanjong from government custody. A43-46. Christopher Jacobs of DHS faxed Lakeland the order to release Mr. Nyanjong from government custody. Id.

Plaintiff's Response: Lakeland disagrees with and disputes this statement. ICE did not want to incur any further expense in caring for Mr. Nyanjong, so it was looking for any excuse to cease payment. There is no documentation showing that the proper officials made a determination that Mr. Nyanjong was suitable for release or that Mr. Nyanjong was properly released from custody.[3] Furthermore, the alleged order of release which was faxed to Lakeland on April 1, 2005, was incomplete. Nyanjong was never released from custody. *See* Lakeland's Memo in Support of Motion for Summary Judgment and Motion *In Limine*. The reason Mr. Nyanjong was allegedly released from custody was to save costs. *See* Lakeland's Memorandum in Support of Motion for Summary Judgment; Deposition of Mr. Seligman, Exhibit F, pp. 27 - 28.

Defendant's Proposed Finding of Uncontroverted Fact No. 19:

On April 4, 2005, Jay Seligman, then serving as National Mental Health Care Coordinator, send an email with the following text: "Duncan Nyanjong A #76 480 523 was release from ICE custody on April 1, 2005. DIHS has been paying for his care at Lakeland Nursing Home phone number 318-448-0141 . Please do not pay for any care after 1 APR 05."

A47.

[3] Mr. Phillips email of April 4, 2005, is pure hearsay.

Plaintiff's Response: Lakeland disagrees with this statement. Release is a legal determination.

Defendant's Pro posed Finding of Uncontroverted Fact No. 20:

Henry Allan Cooley is employed at Lakeland Nursing Home A55, as the nursing home's administrator, and as such, oversees all operations of the home on a day-to-day basis. A56. Mr. Cooley was the administrator at Lakeland when Mr. Nyanjong was admitted there, from May 2004 to April 2005. A56-57.

Plaintiff's Response: Lakeland agrees with this statement.

Defendant's Proposed Finding of Uncontroverted Fact No. 21:

At the time Mr. Nyanjong was admitted to Lakeland, A58, the procedure for admitting patients to the Nursing Home was as follows: The form for admission was called a 90-L, id., or "Request For Medical Eligibility Determination." A63. A potential applicant to the nursing home would fill out that form with their medical information and have it signed by a physician. A58-59. Once Lakeland received the form, they would review it to determine whether they could meet the patient's medical needs, whether they have a payor source for their care, and whether they had a bed for the patient. A59. If these criteria were met, they would admit the patient. Id.

Plaintiff's Response: Lakeland agrees with this statement.

Defendant's Proposed Finding of Uncontroverted Fact No. 22:

Sometimes Lakeland would receive a Form 90L and then refuse to admit the patient, because they didn't have space, or didn't have the capacity to care for the patient, or because they didn't have a payor source or wouldn't fit in the facility due to their medical or mental conditions. A64-65. The Request For Medical Eligibility

Form "doesn't guarantee a spot in the nursing home." A 67, A68-69.

Plaintiff's Response: Lakeland agrees with this statement.

Defendant's Proposed Finding of Uncontroverted Fact No. 23:

After Lakeland reviewed the 90-L form and determined whether they had space for a patient, patients would come to the facility and sign a contract or admission statement upon admission. A62, A65. The admission packet is how patients learned the terms and conditions of their stay at Lakeland such as which services were included in the monthly fee, and which were extra. A60, A62-63. The admissions packet contains "an agreement in which the resident will - or the responsible person will sign and say this is the terms and conditions that we agree with." A60. The agreement explains to patients what services are included with their care. A61. Mr. Cooley stated that patients did not sign the 90-L form, but signed the admission form. A65-66. The 90-L does not provide terms and conditions to patients. A66. It does not provide any price information. Id.

Plaintiff's Response: Lakeland disagrees with this statement as written. Mr. Cooley stated that the admissions packet is not always filled out and that a patient may be admitted without an admissions packet as in this case. *See* Deposition of Hank Cooley, p. 76, attached as Exhibit S to Lakeland's Opposition to Defendant's Motion for Summary Judgment. Mr. Cooley also stated that the price for Nyanjong's care was discussed prior to the Request for Medical Eligibility Determination being filled out because Mr. Seligman wanted to know Lakeland's price before he even wanted to fill out any documents. *See* Defendant's A66. Mr. Cooley would not have admitted Mr. Nyanjong unless and until ICE/DIHS guaranteed payment as the responsible party. *See* Exhibit S, attached to Lakeland's Opposition to Defendant's Motion for Summary

Judgment.

Respectfully submitted,

HYMEL DAVIS & PETERSEN, L.L.C.

s/Michael Reese Davis

Michael Reese Davis (Bar Roll No. 17529)
10602 Coursey Boulevard
Baton Rouge, Louisiana 70816
Telephone: (225) 298-8118
Facsimile: (225) 298-8119
mdavis@hymeldavis.com

**Counsel for Plaintiff Lakeland Nursing Home**

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2008, a copy of the foregoing Response to Defendant's Proposed Findings of Uncontroverted Facts was electronically filed with the Clerk of Court using the CM/ECF system. Notice of this filing will also be sent to Carrie Dunsmore by operation of the court's electronic filing system.

s/Michael Reese Davis

Michael Reese Davis (Bar Roll No. 17529)
Hymel Davis & Petersen, LLC
10602 Coursey Boulevard
Baton Rouge, Louisiana 70816
Telephone: (225) 298-8118
Facsimile: (225) 298-8119
mdavis@hymeldavis.com